REDACTED VERSION

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| KLINGE CORPORATION<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>Defendant,<br><br>and<br><br>SEA BOX, INC.<br><br>Defendant-Intervenor. | ) | No. 08-134C<br><br>Judge Eric C. Bruggink |

**STATEMENT OF FACTS**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT**
**ON THE ADMINISTRATIVE RECORD**

Respectfully Submitted,

Dated: April 30, 2008

By: [signature]
Richard P. Rector
DLA Piper US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: (202) 799-4000
Facsimile: (202) 799-5000

Counsel for Plaintiff

Of Counsel:

Seamus Curley
Samuel B. Knowles
DLA Piper US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: (202) 799-4000
Facsimile: (202) 799-5000

[redacted]

*A. The Parties*

1. The plaintiff, Klinge Corporation ("Klinge"), is located in York, Pennsylvania and is a domestic manufacturer of refrigeration units and supplier of refrigerated containers and related items and services.

2. The defendant, United States Marine Corps Systems Command ("the agency"), is located in Quantico, Virginia and is the Marine Corps' principal agent for acquisition of systems and equipment used by the operating forces to accomplish their war-fighting mission. The Contracting Officer for this procurement was Terence J. McGinn ("CO McGinn"), and primary counsel was David P. Ingold, Esq.

3. The Intervener and awardee of the disputed Contract, Sea Box, Inc. ("Sea Box"), is a New Jersey-based company and a regular competitor of Klinge in Department of Defense procurements. Sea Box's Director of Contracts, Robert Farber, J.D., has served as its chief point of contact during the two preceding protests before the Government Accountability Office ("GAO") involving the award of this Contract and in the proceedings before this Court.[1]

*B. Description Of The Acquisition*

4. Through this procurement, the agency sought to purchase an indefinite quantity of Large Field Refrigeration Systems ("LFRS"), which consist of two principal components: (a) a 20-foot, International Standards Organization ("ISO")-compliant, insulated Container

---

[1] Mr. Farber was not admitted under the Protective Order issued by the GAO. Additionally, the parties agreed that Mr. Farber would not have access to protected materials in the proceedings before this Court. Instead, Mr. Farber and Sea Box have only had access to redacted materials.

[redacted]

("Container"); and (b) an electrically powered Refrigeration Unit ("RU"). Klinge's Appendix, Tab 1, *Statement of Objectives*, at P-000001[2].

5. A Refrigerated Container (or LFRS) is a different article of commerce from -- with a name, character, and use distinct from -- a Container. A Refrigerated Container (or LFRS) is also a different article of commerce from -- with a name, character, and use distinct from -- an RU. *Id.* A Refrigerated Container is also known in the industry as a "Reefer Container." *See generally* C. Maheshwar, *Container Refrigeration*, *AIR CONDITIONING AND REFRIGERATION JOURNAL*, Oct.–Dec. 2004, *available at* http://www.hvacindia.com/journals-20042005/2004oct/article04.html ("A refrigerated container (reefer container) is a container in which temperature can be maintained within certain limits that correspond to the storage conditions required for certain types of cargoes.").

6. Between September 2006 and March 2007, the agency conducted market research for the LFRS. The agency's market research indicated, *inter alia*, that non-U.S. components would likely be required:

[redacted]

AR, Tab 2, *Market Research for LFRS*, at 18.

---

2 On March 11, 2008, the agency filed the Administrative Record in this matter. All citations to the Administrative Record identify "AR", the tab number, the title of the document, and, if appropriate, the relevant page number(s). The cited Statement Of Objectives was not included in the Administrative Record. However, Klinge had earlier supplied that document to the Court as part of the Appendix with its initial March 6, 2008 filing. Accordingly, the foregoing citation is to that Appendix ("Klinge Appendix").

[redacted]

### *C. The Request For Proposals*

7. On April 10, 2007, the agency issued Request for Proposal ("RFP") No. M67854-07-R-5060 for an LFRS and related supplies and services. *See* AR, Tab 4, *Request For Proposals No. M67854-07-R-5060 (April 18, 2007).*[3]

8. The RFP contemplated a "commercial item" Indefinite-Delivery Indefinite-Quantity Contract. *Id.* at 39. The LFRS was to be comprised of a "picture-frame" type RU[4] integrated within an ISO-compliant, insulated Container. *Id.* at 39-44.

9. The RFP set forth eight Contract Line Item Numbers ("CLINs"). *Id.* at 40. CLIN 0001 required delivery of the LFRS. The RFP contemplated a minimum quantity of 10 units and a maximum quantity of 300 units, with a unit -- or LFRS -- consisting of an integrated Container and RU. *Id.*

10. CLIN 0003 (2-Year Parts Support Package) required the provision of spare parts for the LFRS. *Id.* The RFP did not identify the specific components to be included in the Parts Support Package; rather, each offeror was permitted to identify and propose the components appropriate for its proposed solution. *Id.*

11. Because the acquisition had an estimated value that exceeded $193,000, it was subject to the Trade Agreements Act ("TAA"). *See* Federal Acquisition Regulation ("FAR")

---

[3] To prevent confusion, note that the Index To Administrative Record lists the RFP under Tab 3. However, the RFP actually appears in the Administrative Record at Tab 4, at page 39, after the first amendment to the RFP. Under Tab 3 of the Administrative Record, the agency furnished a document entitled, "Large Field Refrigeration System ("LFRS") Statement of Objectives", which appears to be a draft of the latter portion of the RFP. *Compare* AR29-36, 39-45 *and* Klinge's Appendix.

[4] A "picture-frame" type RU is one that essentially is integrated into and serves as one of four walls of a Refrigerated Container. *Cf.* http://www.klingecorp.com/PFR-561.htm (last visited April 30, 2008). *See generally* C. Maheshwar, *Container Refrigeration, Air Conditioning and Refrigeration Journal*, Oct. –Dec. 2004, *available at* http://www.hvacindia.com/journals-20042005/2004oct/article04.html (describing "picture-frame" Refrigerated Container at page 8).

[redacted]

25.402(b).[5] As such, the RFP required that each offeror comply with Department of Defense FAR Supplement ("DFARS") 252.225-7021, "Trade Agreements." However, the agency inadvertently failed to include the required TAA Certificate in the RFP. *See* DFARS 252.225-7020 ("Trade Agreements Certificate"). *Id.* at 43.

12. The RFP set forth the following four evaluation factors for this "best value" procurement: (a) Operational Effectiveness (most important); (b) Past Performance (less important); (c) supportability (least important); and (d) Price (evaluated, but not rated). *Id.* at 42.

***D. The Initial Proposals***

13. Klinge's initial proposal offered to supply a U.S.-made LFRS containing the [redacted] RU, which is [redacted] AR, Tab 9, *Initial Proposal of Klinge Corporation with attachments (May 30, 2007)*, at 492.

14. The Container component of Klinge's LFRS was to be manufactured [redacted] and shipped to the U.S., where it would be integrated with the RU in [redacted] Klinge's overall price (base year and four option years included) was [redacted] AR, Tab 10, *see Source Selection Evaluation Team Initial Findings and Results (12 June 2007)*, at 9.

15. In its initial proposal, Sea Box offered [redacted] AR, Tab 8, *Initial Proposal of Sea Box, Inc. with attachments (May 30, 2007)*, at 103.

16. The LFRS offered by Sea Box [redacted]

---

5 Since the inception of this protest, the TAA threshold has increased to $194,000.

6 It was discovered during Klinge's first debriefing that the agency had miscalculated its proposal by more than [redacted] *GAO, Protest filed by Klinge Corporation B-309930* (July 30, 2007), at 827.

[redacted]

[redacted] *Id.* at 102, 105, 106, and 132. [redacted]

17. Sea Box's initial proposal indicated that [redacted] *Id.* at 102-104, 106; *see also* Klinge's Appendix, Tab 4, *Excerpts from Initial Proposal of Sea Box, Inc. (May 30, 2007)*, at P-000057 (§ 4.1 [redacted]

18. Specifically, in its initial proposal, [redacted] *Id.* at AR, Tab 8, *Initial Proposal of Sea Box, Inc. with attachments (May 30, 2007)*, at 105 (Rows 14-20). [redacted] Notably, according to the [redacted] *Id.*

19. Sea Box's proposal further represented that, [redacted]

[7] It appears that the document entitled, "Container Maintenance," which was part of Sea Box's initial proposal, was inadvertently omitted from the Administrative Record.

[redacted]

[redacted]

20. Sea Box included within its initial proposal the following certificates related to the "country of origin" for its proposed products:

[redacted]

*Id.* at 156-160.

21. Each of these certificates unequivocally and conspicuously [redacted]. Specifically, each Certificate contained the following information in the space designated for the identification of any foreign end product offered to the Government:

| **Description:** | **Country of Origin:** |
| --- | --- |
| [redacted] | [redacted] |

Notably, this representation is [redacted]

[redacted]

[redacted] *See Klinge's Appendix, Tab 25, Excerpts of Documents Obtained by Klinge Corp. From GSA Through Freedom of Information Act Request*, at P-000217 (fourth and fifth row).

22. Additionally, Sea Box expressly certified in its initial proposal [redacted] AR, Tab 8, *Initial Proposal of Sea Box, Inc. with attachments (May 30, 2007)*, at 160 (§ (i)(2) [redacted]

23. Consistent with these representations, [redacted] The Certificates identified the place of performance as:

[redacted]

*Id.* (FAR 52.214-14 certification).

24. Sea Box offered no explanation [redacted]

[redacted]

[redacted]

25. The discrepancy is significant [redacted] *ee* DFARS 252.225-7021(a)(3). [redacted]

***E. The Agency's Initial Evaluation Of The Proposals***

26. In the initial evaluation, the agency concluded that Klinge's Proposal did not meet a certain mandatory requirement of the RFP. AR, Tab 10, *Source Selection Team Initial Findings and Results Report (June 12, 2007)*, at 663.

27. Unbeknownst to Klinge, [redacted] *See* AR, Tab 34, *Comments on Agency Report Filed by Klinge Corporation (December 20, 2007)*, at 1210-1212 (disparate treatment argument).

28. Nonetheless, the agency found Klinge "unacceptable" and eliminated it from the competition, while awarding the Contract to Sea Box. *Id.*

29. The agency failed to review proposals for TAA compliance prior to the first award to Sea Box. In fact, the only reference in the original evaluation materials to a country-of-origin review is found in the recommendation portion of the Source Selection Evaluation Team's evaluation report, which recommends that [redacted]

[redacted]

[redacted] AR, Tab 10, *Source Selection Evaluation Team Findings and Results Report (June 12, 2007)*, at 651. The Buy American Act ("BAA") did not apply to the procurement.

***F. Award To Sea Box & First GAO Protest***

30. On July 16, 2007, the agency sent a letter to Klinge advising that the Contract had been awarded to Sea Box at an evaluated price of $12,576,970.90 (for the base year plus four option years). AR, Tab 34, *Comments on Agency Report filed by Klinge Corporation (December 20, 2007)*, at 1187.

31. The letter further stated that, of the five proposals received in response to the RFP, Sea Box's proposal represented "best value." On July 17, 2007, Klinge requested a debriefing, which the agency provided via telephone conference on July 26, 2007. During the debriefing, Klinge learned that its proposal had been deemed "technically unacceptable" because the agency determined that it failed to demonstrate an ability to satisfy a mandatory requirement of the RFP. *Id.*

32. On July 30, 2007, Klinge filed a protest at the Government Accountability Office ("GAO") asserting, *inter alia*, that: (a) the agency wrongfully eliminated Klinge from the competition for failing to meet the mandatory requirement; and (b) Sea Box could not satisfy the TAA and, as such, the award was based upon a misrepresentation or mistake. That protest bore GAO Case No. B-309930. *Id.* at 1186; *see also* AR, Tab 18, *GAO Protest filed by Klinge Corporation B-309930 (July 30, 2007)*, at 817.

33. Contract performance was suspended pending the outcome of the protest. During the weeks that followed, the agency indicated through counsel that it would be taking some form of corrective action in response to the protest.

[redacted]

34. As such, counsel for Klinge recommended discussion questions that the agency might use after re-forming the competitive range to address the issues raised in Klinge's protest. Among other things, the recommended discussion questions touched upon both Klinge's and Sea Box's compliance with the TAA and suggested that the agency request the country of origin for the component parts to be supplied under the Contract. *See* AR, Tab 36, *Supplemental Agency Report filed in response to request of GAO attorney, Mr. David Ashen, with enclosures (January 14, 20087)*, at 1312 (August 24, 2007 letter from Mr. Curley to Mr. Ingold). The agency declined to request such information. As set forth below, had it done so, it would have determined that Sea Box was not eligible for award.

35. On September 6, 2007, prior to producing documents or a written response to the protest, the agency advised that it would be taking corrective action. Specifically, the agency admitted Klinge (and one other offeror) back into the competitive range and reopened discussions with offerors. Accordingly, the GAO dismissed Klinge's first protest as academic. *See* AR, Tab 19, *Notice of Corrective Action from USMC (August 27, 2007)*, at 838-840.

***G. "Corrective Action" Discussions And Final Proposal Revisions***

36. On September 6, 2007, the agency issued written discussion questions to Klinge and Sea Box. *See* AR, Tab 20, *USMC Questions Submitted to Klinge Corporation and Response Thereto (September 6 & 13, 2007)*; AR, Tab 21, *USMC Questions Submitted to Sea Box, Inc. and Response Thereto (September 6 & 12, 2007).*

37. Among other items, the questions asked each offeror to provide a completed TAA Certificate (DFARS 252.225-7020) and to explain how the offeror's proposed manufacturing process satisfied the TAA. *Id.* at 842 and 885.

[redacted]

38. On September 12, 2007, both offerors submitted responses to the written discussion questions. In response to its TAA discussion question, Klinge provided a completed DFARS 252.225-7020 TAA Certificate and a detailed narrative as to how its LFRS satisfied the TAA. *See* AR, Tab 20, at 854-860. Klinge explained that, because it integrates the [redacted] manufactured container with its U.S.-manufactured RU in its [redacted] and performs [redacted] in the same facility, the LFRS is "substantially transformed" within the U.S. *Id.*

39. In response to its TAA discussion question, Sea Box also provided a completed DFARS 252.225-7020 TAA Certificate, along with a narrative on its LFRS manufacturing process. *See* AR, Tab 21, at 888-890. [redacted]

40. Sea Box began its accompanying explanation by [redacted]

41. Sea Box next represented that, [redacted]

42. Sea Box explained that, [redacted] *Id.* No additional information was provided on the tasks performed by Sea Box within [redacted]

43. Sea Box also proffered the following unsubstantiated cost breakdown, by location, to support its claim of TAA compliance:

[redacted]

*Id.* (emphasis added).

44. The cost-based test advanced by Sea Box to certify TAA compliance is a self-created variation of the BAA country-of-origin test; the BAA focuses upon the cost and origin of components from the United States (rather than the location in which the end product is "substantially transformed," which is the applicable test under the TAA). *See* FAR 25.001(c) (1), (2) (distinguishing BAA and TAA application); FAR 25.003 (setting forth BAA test in

[redacted]

definition of "domestic end product"). Thus, Sea Box "certified" its compliance with the TAA based on an non-existent, inapplicable legal standard.

45. In addition to asking Sea Box about the TAA compliance of its LFRS (CLIN 0001), the agency also asked Sea Box about TAA compliance of each CLIN, including the Spare Parts Support Package (CLIN 0003). *See* AR, Tab 21, at 885 (Question 2).

46. Sea Box provided the following response:

[redacted]

*See* AR, Tab 21, at 889 (emphasis added).

47. Thereafter, on September 20, 2007, both offerors submitted Final Proposal Revisions ("FPRs") at the request of the agency. *See* AR, Tab 22 *Klinge Final Proposal Revision (September 20, 2007)*: AR, Tab 23, *Sea Box Final Proposal Revision (September 20, 2007)*.

48. In its FPR, Sea Box provided an updated, more detailed project schedule for LFRS production. AR, Tab 23, *Sea Box Final Proposal Revision (September 20, 2007)*, at 991-993.

49. The updated schedule showed, [redacted]

[redacted]

> § 3.2.1 The container shall be a 20x8x8 Size 1 C ISO **1496-2 type 41 container.** Note the only approved variations from ISO are called out in this specification.
>
> * * *
>
> § 3.3.1 ISO: The [RU] **system** shall meet the requirements for 20 foot ISO in accordance **with 1496-2 Type 41** (low voltage or dual voltage) container in conformance with ISO 668 (1C) for dimensions. Note: The Marine Corps requires primary of 208 volts 3 phase which is count to ISO 1496.

*See* AR, Tab 5, *Performance Specification for LFRS (undated)*, at 50 and 53 (emphasis added). Thus, the LFRS Performance Specification makes clear that both the Container <u>and</u> the RU were required to satisfy ISO standards.

51. Additionally, ISO Standard 1496-2, which is incorporated by reference into the LFRS Performance Specification, is replete with testing references that require integration of the RU with the Container <u>prior</u> to testing. Specifically:

- § 7.4 (page 5) contains a "NOTE" indicating that rigidity of the Container's end structure is not necessarily equal to the sum of the rigidities of a Container and RU, but rather it is also dependent upon the manner in which the unit is fitted. This test clearly contemplates integration of the RU and Container for an accurate result.

[redacted]

- § 8.1.1 (page 7) indicates that, unless specified for a particular test, the RU need not be in place. However, if it is not, "substitute framework and/or paneling may be employed during such testing, provided that such substitute components are secured in the same manner as the equipment itself and do not provide greater strength than the equipment would have provided." In other words, if a test does not specifically require integration (and some do), either actual or simulated integration are required.

- § 8.5 (page 9) indicates that the RU must be integrated with the Container to test longitudinal restraint capabilities during rail transport.

- § 8.13.3 (page 12) indicates that integration must occur before water leakage testing can be accomplished.

- § 8.14.2 (page 12) indicates that integration is necessary for airtightness testing, except when the RU is removable. In that instance, the testing contemplates a Container that -- by design and in its normal manner -- has closures at its interfaces (*i.e.*, the Container seals itself). The Containers offered as part of the LFRS under this procurement do not contain such a feature. Accordingly, integration is required.

- § 8.16 (page 13-14) is an operational test for the performance of the Container and RU with the RU actually running post-integration.

*See* AR, Tab 38 (Attachment 2), *ISO Standard 1496-2 (1996-10-01),* at 1359, 1361, 1364-66.

52. The CSC certification process entails an engineering review of the integrated, functioning unit to ensure that ISO Standards have been met. Thus, both the ISO Testing process and the CSC Certification process require integration of the RU and Container, as well as a functioning Refrigerated Container.

53. Full ISO Testing and the CSC Certification are performed only on the three "first article" LFRS units. *See* AR, Tab 23 , at 991 [redacted] Thereafter, the full testing is not repeated on each LFRS production unit; rather, the [redacted] manufacturer simply confirms that the units meet the same standards as the fully tested and certified units. *See* AR, Tab 23, at 993 [redacted]. *See* also AR, Tab 39, *Agency Response to Klinge Corporation's Response to* [redacted]

*GAO Questions (January 24, 2008)*, at 1372 ("a manufacturer obtains its ISO certification for a specified item using an established process, so that each and every item subsequently produced at the same facility utilizing the ISO certified process will be considered ISO compliant."). In order for the [redacted] manufacturer to confirm that production units are ISO/CSC compliant, the units must be integrated and functioning [redacted] prior to shipment.

54. Without explanation [redacted] *Id.* at 1011.

55. The FPR also contained the following representation: [redacted] *Id.* The precise meaning of this representation is not clear.[8] Most importantly, nothing in Sea Box's FPR explained how the "place of manufacture" of the LFRS could have changed from [redacted] when the company's planned manufacturing process remained essentially unchanged.[9]

---

[8] This representation, including [redacted] appears to be a fragment of FAR 52.225-18 ("Place of Manufacture"). This FAR clause was not required by the RFP, [redacted] Also, the test for "place of manufacture" in FAR 52.225-18 is neither the TAA standard applicable to the LFRS procurement, nor the [redacted] Rather, "place of manufacture" means "the place where an end product is assembled out of components, or otherwise made or processed from raw materials into the finished product that is to be provided to the Government." *See* FAR 52.225-18(a). In short, the precise meaning of the representation -- and its relevance to a competent TAA determination -- is not clear.

[9] Notably, a post-protest change in Sea Box's position concerning the country of origin of its refrigerated containers is not isolated to this procurement. Under a different protest at the GAO, Klinge challenged the Utah National Guard's award of a refrigerated container contract to Sea Box (B-310701, filed October 19, 2007), alleging a misapplication of the Buy American Act and its exceptions. Ultimately, the agency took corrective action. During the course of the protest, it was revealed that, prior to award, [redacted] Documents obtained by Klinge pursuant to a Freedom of Information Act request, however, revealed that -- less than two weeks after award of the Utah [redacted]

56. There is no contemporaneous, written record of the agency's evaluation of Sea Box's compliance with the TAA prior to award.

57. In fact, despite asking both offerors to address TAA compliance in discussion questions, and despite the unexplained change in Sea Box's position concerning the country of origin for its LFRS, the agency produced no documents demonstrating that the agency ever considered the issue in its final evaluation and award decision.

58. However, in a Declaration filed with the GAO more than six weeks after submission of the Agency Report (discussed in detail below), the agency revealed for the first time that, following submission of Sea Box's written discussion responses and after the cut-off date for FPRs, agency counsel contacted Mr. Farber of Sea Box by telephone and advised him that Sea Box's narrative on TAA compliance under CLIN 0001 was problematic and conflicted with both: (a) [redacted] *See* AR, Tab 40, *Declaration of Mr. David Ingold, Esquire in response to request from GAO attorney, Mr. David Ashen (January 24, 2008)*, at 1376-1379; *see also* Tab 41, *Contracting Office Statement (January 29, 2008)*, at 1380.

59. Mr. Farber reportedly responded that [redacted] (*i.e.*, Mr. Farber now orally

---

[redacted] *Obtained by Klinge Corp. From GSA Through FOIA Request*, Attachment 25, P-000217 (fourth row). This, of course, did nothing to support the agency's award, as the BAA, not the TAA, governed the acquisition. In December, in its Comments on the Agency Report in that matter, [redacted]

represented [redacted] [redacted]e AR, Tab 40, at 1378-79.

60. The agency accepted Mr. Farber's disavowal of Sea Box's written discussion responses and, relying on this disavowal, found that Sea Box's proposal complied with the TAA and was acceptable for award. *Id.; see also* Tab 41.

61. No contemporaneous evidence of this conversation was ever produced in the GAO proceedings. Also, no hearing was conducted by the GAO on this or any other issue in the protest, despite the fact that Klinge consistently requested such a hearing throughout the GAO proceedings. *See* AR, Tab 31, at 1090; AR, Tab 32, at 1106; AR, Tab 34, at 1212; AR, Tab 37, at 1334; AR, Tab 42, at 1384; AR, Tab 58, at 1571; AR Tab 54, at 1518.

***H. Second Notice Of Award To Sea Box And Debriefing Of Klinge***

62. On October 23, 2007, the agency notified Klinge via e-mail that it had again awarded the LFRS Contract to Sea Box for an evaluated price of $12,069,561.31.

63. In its FPR, Klinge's overall price had been reduced t[redacted] *See* AR, Tab 31, *GAO Protest filed by Klinge Corporation, B-309930.2 (November 6, 2007)*, at 1078.

64. On October 26, 2007, Klinge requested an in-person debriefing, asked for an explanation concerning the agency's "best value" analysis and, pursuant to FAR 15.506(d)(6), requested specific information concerning verification of Sea Box's compliance with the TAA.

65. On November 2, 2007, the agency transmitted a power-point debriefing to Klinge via e-mail. *See* AR, Tab 30, *Debrief to Klinge Corporation (November 2, 2007)*. In violation of FAR 15.506(d), the agency failed to answer any of the questions submitted by Klinge or otherwise address the TAA compliance issue.

[redacted]

66. Had the agency excluded Sea Box, Klinge would have been awarded the Contract.[10] Klinge offered a fully compliant proposal that was next in line, by a substantial margin, in terms of price. *See* AR, Tab 24, *Source Selection Evaluation Team Final Findings and Results Large Fixed Refrigeration Systems (October 9, 2007)*, at 1021.

67. Specifically, the Source Selection Evaluation Team found that [redacted] *Id.* Moreover, both Klinge and the third party offeror were deemed [redacted] in the area of "Operational Effectiveness and Supportability". *Id.* While the agency assigned Klinge a [redacted] rating in the area of past performance and the third party offeror a [redacted] rating, Klinge's overall price [redacted] was more than [redacted] less than the third party's overall price [redacted] *Id.* Moreover, Klinge's offer was more than [redacted] the government's independent cost estimate. *Id.*

### *I. Second GAO Protest of Klinge*

68. On November 6, 2007, Klinge filed its second protest with the GAO under the Solicitation. It bore GAO Case No. B-309930.2. Therein, Klinge raised several protest grounds, including, *inter alia*, that: (a) Sea Box's end products fail to satisfy the TAA; and (b) the award was based upon a misrepresentation or a mistake regarding Sea Box's TAA compliance. Again,

---

10 During the March 7, 2008 initial status conference with the Court, Government counsel conceded this fact when confirming that the agency would temporarily stay performance of the Contract, but would still perform tests on the three refrigerated containers already delivered by Sea Box. Specifically, he stated as follows:

> Yes. The agency would test the three systems, and I should say this to all parties. If the agency finds that the systems are noncompliant, then the intent is to terminate for convenience and award to the next offeror, who in this case is Plaintiff, which should make I guess the entire proceeding moot.

*Transcript of Conference Call With Court (March 7, 2008)*, at page 45, line 23 – page 46, line 4 (emphasis added).

[redacted]

contract performance was suspended in its entirety pending the outcome of the protest. *See* AR, Tab 31, *GAO Protest Filed By Klinge Corporation, B-309930.2 (November 6, 2007).*

69. On November 13, 2007, the agency filed a motion to dismiss Klinge's TAA-related grounds protest. It argued that it had addressed the issue of TAA compliance with both Klinge and Sea Box through written discussions and that both offerors addressed the issue satisfactorily. Specifically, the agency stated that:

> [t]he only difference in protest B-309930.2 [as it relates to the TAA-related protest grounds in Klinge's first protest] is that Klinge has omitted the words "upon information and belief." They now have relied upon nothing more than unsupported allegations and assertions. As provided in Attachments 2 and 3, MCSC specifically addressed this issue with both offerors during discussions. Sea Box as well as Klinge each sufficiently addressed their compliance with the TAA. The Government has reasonably and rationally determined that both offerors are in compliance with the TAA. Klinge offered no specific information during the initial protest, during discussions, nor during the subject protest to support their allegation that Sea Box was noncompliant with the TAA.
>
> As with the Buy America Act, when a bidder or offeror represents that it will furnish end products of designated or qualifying countries (including domestic end products) in accordance with the Trade Agreements Act, it is obligated under the contract to comply with that representation. If prior to award an agency has reason to believe that a firm will not provide compliant products, the agency should go beyond a firm's representation of compliance with the Trade Agreements Act; however, where the contracting officer has no information prior to award which would lead to such a conclusion, the contracting officer may properly rely upon an offeror's representation without further investigation. *Matter of Leisure-Lift, Inc.*, B-291878.3, B-292448.2, September 25, 2003, Comptroller General of the United States, 2003 U.S. Comp. Gen. LEXIS 178.
>
> In the case of Klinge, they failed to provide anything more than a mere allegation of noncompliance by Sea Box. The Government took the additional step to hold discussions and seek information from both offerors to ensure compliance with the TAA. The information provided from Sea Box was reasonably relied upon by the Government to find that it had complied with the TAA.

AR, Tab 52, *Agency's Motion to Dismiss (November 13, 2007)*, at 1485-86 (emphasis added).[11]

---

[11] During the course of these proceedings, it became apparent that certain filings with the GAO had been inadvertently omitted from the Administrative Record. Accordingly, with the [redacted]

70. Attachment 3 cited by the agency was Sea Box's written discussion response on the TAA. *See* AR, Tab 21. Clearly, the agency's argument gave the impression that it had relied upon Sea Box's written response to determine TAA compliance.

71. On November 16, 2007, the agency produced certain "core" documents at the direction of the GAO. The "core" documents included Sea Box's response to the agency's written discussion questions (discussed above) and its FPR. *See* AR, Tabs 21 and 23 respectively.

72. The "core" document production supported Klinge's opposition to the agency's motion to dismiss (dated November 20, 2007), which the GAO denied.

73. Additionally, because these documents revealed that the [redacted] Klinge timely filed a First Supplemental Protest, advancing more specific TAA-related protest grounds. *See* AR, Tab 32, *GAO First Supplemental Protest Filed By Klinge Corporation (November 26, 2007).*

74. At its core, Klinge's supplemental protest ground with respect to CLIN 0001 was (and is) that the core components of Sea Box's LFRS are "substantially transformed" [redacted] and that [redacted] *Id.* at 1097-1101.

75. As such, Klinge asserted that, for procurement purposes, [redacted] *d.*

---

consent of Government counsel, Klinge has filed a Motion To Supplement The Record. The added documents constitute Tabs 52-59 and continue on with the Bate Stamp numbers affixed on the documents produced by the agency.

[redacted]

76. With respect to CLIN 0003 (2-Year Parts Support Package), in light of Sea Box's written discussion responses, Klinge alleged that "Sea Box failed to satisfy its burden of demonstrating its ability to produce component parts solely from designated countries under the TAA." *Id* at 1101.

77. On December 10, 2007, the agency filed the Agency Report (AR, Tab 33), in which it again failed to disclose: (a) that it believed Sea Box's written discussion response indicated non-compliance with the TAA; and (b) that it engaged in post-FPR discussions only with Sea Box, whereby Sea Box was permitted to disavow a portion of its written submissions.

78. On December 18, 2007 and December 19, 2007, at the direction of the GAO and immediately preceding the December 20th due date for Klinge's Comments on the Agency Report, the agency finally produced Sea Box's initial proposal with all attachments (*i.e.*, the proposal upon which the agency based its first award of the Contract to Sea Box and to which the FPR applied). *See* AR, Tab 8, *Initial Proposal of Sea Box, Inc. with attachments (May 30, 2007).*

79. The agency also produced the Source Selection Evaluation Team's evaluation of the proposals prior to the first award of the Contract. *See* AR, Tab 10, *Source Selection Evaluation Team Initial Findings and Results Report (June 12, 2007).*

80. Prior to the production of these documents, the agency had insisted that they bore no relevance to the protest. As discussed above, however, these documents revealed that Sea Box had repeatedly certified that it [redacted] *See* Fact ¶¶ 20-25, *supra*.

81. On December 28, 2008, Klinge filed a Second Supplemental Protest, which advanced a more specific misrepresentation protest ground based upon: (a) Sea Box's original

[redacted]

representations that the country of origin [redacted] nd (b) its description of its manufacturing process, [redacted] *See* AR, Tab 54, *Klinge's Second Supplemental Protest (December 28, 2007)*.

82. Collectively, Klinge's Comments on the Agency Report (dated December 20, 2007) and Second Supplemental Protest (December 28, 2007) identified the flaws in the agency's analysis, based upon the then-existing record, advanced additional protest grounds, and identified questions of fact that the agency had failed to address, which were and are critical to a probing analysis of who, when, how, and upon what information the agency determined that Sea Box's offer is compliant with the TAA. *See* Id.; AR, Tab 34, *Comments on the Agency Report Filed by Klinge Corporation (December 20, 2007)*.

83. On January 9, 2008, the GAO ordered the agency to answer specific questions, with support from the record, on several of these issues. AR, Tab 55, *GAO's Email to Agency (January 9, 2008)*, at 1522-23. One such question directed the agency to:

[redacted]

(emphasis added). *Id.*

84. In response, the agency filed a supplemental report dated January 14, 2008 that responded to the GAO's specific inquiry by repeatedly citing and relying upon Sea Box's written discussion response and its FPR. *See* AR, Tab 36, *Supplemental Agency Report Filed In Response to Request of GAO Attorney Mr. David Ashen with enclosures (January 14, 2008)*.

[redacted]

85. Inexplicably, the agency again did not identify any "specific discussions" with Sea Box that led the agency to conclude that Sea Box's LFRS is TAA compliant, including the post-FPR communications. *Id.*

86. Instead, the agency continued to create the impression that it based its TAA compliance determination solely upon Sea Box's written submissions. *Id.* at 1295-1296.

87. Klinge responded on January 17, 2008. *See* AR, Tab 37, *Comments on Supplemental Agency Report filed by Klinge Corporation (January 17, 2008)*.

88. Thereafter, in a subsequent filing submitted by the agency on January 24, 2008 (in response to additional questions raised by Klinge and the GAO), the agency for the first time admitted to its telephone communications with Mr. Farber of Sea Box after the submission of its FPR. *See* AR, Tab 40, *Declaration of Mr. David Ingold, Esq. In Response to Request from GAO Attorney Mr. David Ashen (January 24, 2008)*.

89. Specifically, the agency submitted a Declaration from its counsel (David P. Ingold), which stated as follows:

> A question was raised by Sea Box's discussion response regarding CLIN 0001. [redacted] I contacted the Sea Box Director of Contracts to clarify this issue to determine whether Sea Box was compliant with the TAA in order to be eligible for award. Specifically, I asked him to explain what work was being performe[redacted] Mr. Farber indicated that he had prepared the discussion responses and that he was not an engineer and that his discussion statement was incorrect to the extent that it [redacted] I believe that he consulted with Mr. Brennan, the President of Sea Box[redacted] correct in saying that [redacted] I advised the SYSCOM Contracting Officer, Terry McGinn, of my legal opinion that given all the representations of Sea Box that
>
> [redacted]

> they understoo[redacted] shipment of [redacted]

*Id.* (emphasis added); *see also* AR, Tab 39, *Agency's Accompanying Legal Argument (January 24, 2008)*; and AR Tab 41, *Contracting Officer Statement (January 29, 2008).*[12]

90. To date, the agency has failed to identify the "previous information" that Sea Box supplied to the agency after the first award of the Contract and which the agency believed was inconsistent with Sea Box's FPR.

91. Also, the agency has to date not revealed the specific oral assurances given by Sea Box regarding its TAA compliance under CLIN 0001.

92. In addition, although it intervened and participated in the GAO protests, Sea Box never offered evidence that: (a) described in detail the specific work that it had proposed to perform in the U.S.; or (b[redacted]

93. In response to the agency's admission of its secret discussions with Sea Box, Klinge formally protested the agency's post-FPR discussions with Sea Box. Klinge argued that these discussions were prejudicial because, by the agency's own admission, the discussions were the basis on which Sea Box's otherwise unacceptable proposal was found acceptable by the agency. *See* AR, Tab 58, *Klinge's Response to Agency's Two Reports of January 24, 2008 (January 28, 2008).*[13]

---

[12] The agency also submitted a second filing that day advancing or responding to various legal arguments. *See* AR, Tab 58.

[13] In the meantime, on January 23, 2008, Klinge responded to questions directed to it by the GAO concerning its own TAA compliance under CLIN 0003. *See* AR, Tab 38.

[redacted]

94. The GAO solicited additional filings from the parties, which largely addressed the issue of whether the agency's post-FPR communications with Sea Box constituted "clarifications" or "discussions" under FAR 15.306. *See* AR, Tabs 43 *(Agency Response) (January 31, 2008)* and 44 (*Klinge Response) (February 1, 2008)*.

95. On February 1, 2008, the GAO closed the record. On February 13, 2008, the GAO denied the protest and found, *inter alia*, [redacted] *See* AR, Tab 45, *GAO Decision denying Klinge Corporation's protest on all grounds (February 13, 2008)*, at 409.

96. The GAO also found that [redacted] *Id.* at 1413 (Footnote 4).

97. The GAO [redacted]

98. With respect to CLIN 0003, the GAO found that, [redacted] *Id.* at 1413-14.

**J. The Proceedings Before This Court**

99. Because these issues are critical to Klinge's continued viability as a U.S. manufacturer, on March 6, 2008, Klinge filed a Complaint, along with a Motion To File Complaint Under Seal and a Motion For A Temporary Restraining Order And Preliminary Injunction, in this Court.

100. During the initial telephone status conference with the parties (March 7, 2008), the Court denied without prejudice Klinge's motion for a temporary restraining order and preliminary injunction in light of the agency's agreement not to place any additional orders under

[redacted]

the Contract and not to use any of the LFRS already ordered. Additionally, the parties agreed to a briefing schedule whereby the parties would file cross-motions on the Administrative Record, which would culminate in oral argument on April 10, 2008.

101. The agency filed the Administrative Record on March 11, 2008. On March 18, 2008, the Court initiated a telephone conference with the parties. During that telephone conference, the Court advised the parties that, upon review of the pleadings, a remand to the agency would be appropriate to allow the agency to address the issue of Sea Box's compliance with the TAA and the contraindications in the record on the issue. Government counsel advised that he would seek the agency's consent to such a remand.

102. Later that afternoon, after speaking with the agency, Government counsel advised that the Marine Corps refused to consent to a remand and indicated that it would revisit the TAA issue only if ordered to do so by the Court.

103. Government counsel also advised that the agency believed a question existed with respect to Klinge's compliance with the TAA under CLIN 0003 (2-Year Parts Support Package). Accordingly, if the Court was inclined to order the agency to supplement the record concerning Sea Box's TAA compliance, the agency also wished to address Klinge's TAA compliance under CLIN 0003.

104. On March 19, 2008, the Court entered an Order remanding the matter to the agency "for the limited purpose of developing a more complete written record with respect to compliance with the TAA" (emphasis added).

105. Specifically, the Court ordered the agency to obtain from Sea Box "a written explanation of the entire process of manufacturing, assembly, and testing of its refrigerated containers sufficient for the agency to adequately assess compliance."

[redacted]

106. Additionally, the Court ordered the agency to provide Klinge an opportunity to supplement its TAA certification and explanation, "to avoid any disparate treatment from the re-evaluation of TAA compliance . . .."

107. Per the Court's Order, the agency's supplemental TAA determination was due on April 2, 2008, and plaintiff's written response was due on April 7, 2008. The previous briefing schedule was rescinded.

108. Following the Court's Order, Sea Box provided supplemental information to the agency regarding its purported compliance with the TAA under CLINs 0001 (the LFRS), 0002 (the spare Refrigeration Unit), and 0003 (the 2-Year Parts Support Package). *See* AR, Tab 46, *CO Request to Sea Box and Reply (April 1, 2008).* [redacted]

109. In its submission, Sea Box [redacted] *Id.* at 1422.

110. Sea Box's [redacted]

111. Sea Box's admission also directly contradicted its specific, [redacted] *See* AR, Tab 56, *Sea Box's Comments on* [redacted]

*Supplement to Agency Report (January 18, 2008),* at 1528 ([redacted]

112. Significantly, the agency relied upon these now-admittedly inaccurate statements when awarding and defending the Contract to Sea Box. See AR, Tab 57, *Agency's Response to Klinge's Comments on the Agency's Supplemental Report (January 24, 2008),* at 1537 ("Nowhere does Sea Box provide any indication that it is providing end products from nondesignated countries."). Moreover, the GAO -- in deciding the merits of Klinge's protest on the CLIN 0003 issue -- also relied upon these inaccurate representations in upholding the agency's award decision. Specifically, in its unpublished written decision, the GAO held:

[redacted]

AR, Tab 45, *GAO Decision denying Klinge Corporation's protest on all grounds (February 13, 2008),* at 1414 (footnote omitted) (emphasis added).

113. After the Court's remand, when prompted by the agency, Klinge also reaffirmed its compliance with the TAA under CLIN 0003 and cited to those items in the Administrative Record that confirmed that compliance. *See* Tab 47.

114. On April 2, 2008, the agency filed its supplemental TAA determination, which took the form of a document executed by CO McGinn entitled "MEMORANDUM FOR THE RECORD." *See* AR, Tab 48, *Contracting Officer Statement (April 2, 2008).*

[redacted]

115. CO McGinn's Memorandum cited to information supplied by Sea Box and Klinge regarding their respective compliance with the TAA (*see* Tabs 46 and 47 of the Administrative Record) and stated that the agency had determined that Sea Box failed to demonstrate its compliance with the TAA under CLIN 0003. As such, CO McGinn stated that "it is my intent to immediately terminate." *See* AR, *Contracting Officer Statement (April 2, 2008)*, Tab 48, at 1460.

116. Without explanation, CO McGinn's Memorandum further stated that Henrik Klinge's Declaration from the GAO protest regarding Klinge's Compliance under CLIN 0003, which was one of the documents cited by Klinge in its post-remand submission, "does not provide a solid basis for a reasoned TAA compliancy determination." *Id.* at 1459.

117. Finally, in his Memorandum, CO McGinn announced for the first time that the agency intended to conduct new market research, potentially change the performance specifications and Statement of Work for the LFRS acquisition, and re-compete the agency's requirement. *Id.* at 1460.

118. Five days later, on April 7, 2008, the day upon which Klinge's response to the above-described actions was due, the Government advised Klinge counsel that it had reversed course. Specifically, Government counsel stated that the agency: (a) believed Sea Box may have made a pre-award misrepresentation with respect to CLIN 0003; (b) believed that Klinge may be TAA compliant with respect to CLIN 0003; and (c) would need additional information to fully assess the parties' TAA compliance and determine if award to Klinge was appropriate.

119. On April 7, 2008, the agency filed an unopposed motion to stay proceedings. In it, the agency represented that "it now believes it has not had sufficient information from both plaintiff and Seabox [sic] and respectfully requests this Court to stay proceedings . . .."

[redacted]

120. The agency further advised that it would "seek additional information from the parties about their respective compliance with the TAA . . .." Based on Government counsel's representations regarding the apparent misrepresentation by Sea Box and potential award to Klinge, counsel for Klinge consented to the Government's motion.

121. As such, on April 8, 2008, the Court entered an Order granting the agency's motion. The Order also: (a) cancelled the April 10th oral argument; (b) required the agency to obtain additional information and file a supplemental decision on or before April 14, 2008; and (c) deferred Klinge's obligation to file a response to the supplemental decision until further order of the Court.

122. The agency subsequently requested additional information from Sea Box and Klinge regarding their compliance, *vel non*, with the TAA. *See* AR, Tab 49, *CO Request to Sea Box and Reply (April 9, 2008)*; AR, Tab 50, *CO Request to Klinge and Reply (April 9, 2008)*.

123. In response, Klinge re-explained how its pre-award offer was TAA compliant under CLIN 0003 and how Klinge intended to ensure compliance. *See* AR, Tab 50, at 1469-81.

124. By contrast, in its April 9th response to the agency, Sea Box admitted that, with regard to CLIN 0003, [redacted] *See* AR, Tab 49, at 1465.

125. Sea Box continued by stating that, [redacted] *Id.*

[redacted]

126. Additionally, Sea Box -- having admitted that its proposed Parts Support Package was non-compliant with the TAA -- offered the following change to its proposal, along with the following assurance:

[redacted]

*Id.* (emphasis added). This change to Sea Box's proposal was further reflected, in part, by specific revisions to the spare parts proposed by Sea Box under CLIN 0003. *Compare* AR, Tab 23, at 987 (FPR) *with* AR, Tab 49, at 1466 (Remand) [redacted]

127. In light of the foregoing, CO McGinn executed a second "MEMORANDUM FOR THE RECORD," dated April 14, 2008, in which he memorialized his determination that: (a) Klinge is compliant with the TAA under CLIN 0003; and (b) that Sea Box "provided a clear and unambiguous statement regarding its ability to comply with the TAA." *See* AR, Tab 51, *Contracting Officer Statement (April 14, 2008)*, at 1482.

128. CO McGinn added that, "[w]hile it caused some concern that Sea Box previously indicated that it would be noncompliant with the TAA, I find that the statement from the president of Sea Box unequivocally documents both the intention and the ability of Sea Box to comply with the TAA regarding CLIN 0003." *Id.* (emphasis added).

[redacted]

129. In other words, the agency was not satisfied that Sea Box's pre-award offer was TAA compliant; rather, it was satisfied that Sea Box had sufficiently changed its proposal during the remand to "cure" the admitted non-compliance.

130. With respect to CLIN 0001 (the LFRS), the agency noted that Sea Box had restated its willingness –[redacted]*d.* (emphasis added). [redacted]*ee* Fact ¶¶ 17, 18, 40, 41, and 49, *supra*.

131. CO McGinn did not address whether, in his view, integration within the United States (or a designated country) is necessary to be TAA compliant. *Id.* Additionally, he did not address if and how he intended to reach a conclusion on this critical issue. *Id.*

132. CO McGinn expressed his opinion tha[redacted]However, he again failed to provide any analysis of the issue or identify whic[redacted]*d.* He also failed to reconcile his opinion wit[redacted]in Sea Box's proposal (*see* Fact ¶¶ 17-25, 39-44, 48-55, *supra*) or with the[redacted]o Sea Box (*See* Fact ¶ 69, 90, *supra*). Rather, CO McGinn stated that "[redacted]

133. Given his finding that both offerors are TAA compliant, CO McGinn stated that the agency no longer intended to terminate the Contract with Sea Box. Notably, there was no

[redacted]

mention in CO McGinn's revised Memorandum of the need to conduct new market research, change the performance specifications and SOW, and re-compete the agency's requirement; rather, now that award to Sea Box was being affirmed, the agency was again satisfied that the solicitation accurately represented its needs.

134. In light of the foregoing, Klinge requested a telephone conference with the Court and the parties. As a result of that telephone conference, the Court entered an Order requiring Klinge to file its First Amended Complaint on April 21, 2008. Additionally, the Court set forth a schedule for briefing and oral argument in the case.

Respectfully Submitted,

Dated: April 30, 2008

By: ____________________

Richard P. Rector
DLA Piper US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: (202) 799-4000
Facsimile: (202) 799-5000

Counsel for Plaintiff

Of Counsel:

Seamus Curley
Samuel B. Knowles
DLA Piper US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: (202) 799-4000
Facsimile: (202) 799-5000

[redacted]