REDACTED VERSION

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| **KLINGE CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 08-134C** |
| **v.** | ) | |
| | ) | **Judge Eric C. Bruggink** |
| **THE UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SEA BOX, INC.** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT**
**ON THE ADMINISTRATIVE RECORD**

Respectfully Submitted,

Dated: April 30, 2008

By: [signature]

Richard P. Rector
DLA Piper US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: (202) 799-4000
Facsimile: (202) 799-5000

Counsel for Plaintiff

Of Counsel:

Seamus Curley
Samuel B. Knowles
DLA Piper US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: (202) 799-4000
Facsimile: (202) 799-5000

[redacted]

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054 (Fed. Cir. 2000) ........ 10

*Annheuser-Busch Brewing Ass'n v. United States*, 207 U.S. 556 (1908) ........ 14

*Banknote Corp. of Amer. v. United States*, 365 F.3d 1345 (Fed. Cir. 2004) ........ 8

*Bannum, Inc. v. United States*, 404 F.3d 1346 (Fed. Cir. 2005) ........ 9

*Blackhawk Industries Products Group Unlimited, LLC v. GSA*, 384 F. Supp. 2d 662 (E.D. Va 2004) ........ 10

*Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487 (2006) ........ 24, 32

*Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988) ........ 19, 20

*CCL Service Corp. v. United States*, 48 Fed. Cl. 113 (2000) ........ 24

*Citizens of Overton Park v. Volpe*, 401 U.S. 402 (1971) ........ 30

*Dynacs Engineering Company, Inc. v. United States*, 48 Fed. Cl. 614 (2001) ........ 36

*Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071 (Fed. Cir. 2001) ........ 10

*Galen Med. Assocs. v. United States*, 369 F.3d 1324 (Fed. Cir. 2004) ........ 9, 10

*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324 (Fed. Cir. 2001) ........ 10

*Industrial Union Department, AFL/CIO v. American Petroleum Institute*, 448 U.S. 607 (1980) ........ 19

*Mantech Telecommunications and Information Systems Corp. v. U.S.*, 49 Fed. Cl. 57 (2001) ........ 28

*Microdyne Outsourcing, Inc. v. U.S.*, 72 Fed. Cl. 230 (2006) ........ 24

*Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443 (2001) ........ 24

*NVT Techs., Inc. v. United States*, 370 F.3d 1153 (Fed. Cir. 2004) ........ 10

*PGBA, LLC v. United States*, 60 Fed. Cl. 196, 204 (2004) *aff'd*, 389 F.3d (Fed. Cir. 2004)........19

*Planning Research Corp. v. United States*, 971 F.2d 736, 741, (Fed. Cir. 1992) ........................24

*Ran-Paige Company, Inc. v. United States*, 35 Fed. Cl. 117 (1996) ............................................11

*Red River Service Corp. v. United States*, 60 Fed. Cl. 532 (2004)................................................19

*Rex Service Corp. v. United States*, 448 F.3d 1305 (Fed. 2006) ....................................................8

*Rig Master, Inv. v. United States*, 70 Fed. Cl. 413 (2006)..............................................................31

*Scanwell Labs., Inc. v. Schaffer*, 424 F.2d 859 (D.C. Cir. 1970) ....................................................10

*Synetics, Inc. v. United States*, 45 Fed. Cl. 1 (1999) .........................................................................30

*Texas Instruments v. United States*, 681 F.2d 778 (C.C.P.A. 1982) ..............................................14

*Torrington Co. v. United States*, 764 F.2d 1563 (Fed. Cir. 1985)....................................................14

**GAO Cases**

*Barents Group, L.L.C.*, B-276082, B-276082.2, 97-1 CPD ¶ 164 (Comp. Gen. 1977) ................28

*Becton Dickinson AcuteCare*, B-238942, 90-2 CPD ¶ 55 (Comp. Gen. 1990).............................11

*CSK International, Inc.*, B-278111, B-278111.2, 97-2 CPD ¶ 178 (Comp. Gen. 1997)..............11

*Martin Marietta Corp.*, B-233742.4, 90-1 CPD ¶ 132 (Comp. Gen. 1990)..................................28

*Pacific Lock Company*, B-209982 (Comp. Gen 2007)...................................................................11

*Spectrofuge Corp. of North Carolina, Inc.*, B-281030.3, 99-1 CPD ¶ 65, at 2 (Comp. Gen. 1999).......................................................................................................................................28

**Customs and Border Protection Rulings**

*U.S. Customs Rul. Letter HQ Rule No. H018467* (1/4/08)...........................................................15

*U.S. Customs Rul. Letter HQ Ruling No. 735191* (6/15/94) ..........................................................15

*U.S. Customs Rul. Letter HQ Rule No. 968000* (2/14/06)..............................................................15

*U.S. Customs Rul. Letter NY Ruling No. 867396* (10/25/91) ........................................................22

*U.S. Customs Rul. Letter HQ* 563587 (2/8/07) ........ 14

**Statutes**

APA, 5 U.S.C. § 706 ........ 9

APA, 5 U.S.C. § 706(2)(A) ........ 10

19 U.S.C. § § 2518(4)(B) ........ 3, 13

Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 103-320, § 12(a), (b), 110 Stat. 3870 (1996) ........ 8

Buy American Act ("BAA") 19 U.S.C. §§ 2501-2582 ........ 12

28 U.S.C. § 1491(b)(1) ........ 8

28 U.S.C. § 1491(b)(4) ........ 9

29 U.S.C. § 1491(b) ........ 8

**Regulations**

19 C.F.R. § 177.21 ........ 15

48 C.F.R. § 1.102(a), FAR 1.102(a) ........ 35

48 C.F.R. § 1.102(b)(3), FAR 1.102(b)(3) ........ 28, 35

48 C.F.R. § 1.102(d), FAR 1.102(d) ........ 35

48 C.F.R. § 15.306(d)(1), FAR 15.306(d)(1) ........ 29

48 C.F.R. § 15.306(d)(3), FAR 15.306(d)(3) ........ 29

48 C.F.R. § 15.306(e)(1), FAR 15.306(e)(1) ........ 29, 30

48 C.F.R. § 15.307(b), FAR 15.307(b) ........ 36

48 C.F.R. § 25.402(a)(1), FAR 25.402(a)(1) ........ 12

48 C.F.R. § 25.402(b), FAR 25.402(b) ........ 13

48 C.F.R. § 25.403(c)(i), FAR 25.403(c)(i) ..... 13

48 C.F.R. § 52.225-18, FAR 52.225-18 ..... 26

48 C.F.R. § 52.225-18(a), FAR 52.225-18(a) ..... 26

48 C.F.R. § 252.225-7020, DFARS 252.225-7020 ..... 3

48 C.F.R. § 252.225-7021, DFARS 252.225-7021 ..... 4

48 C.F.R. § 252.225-7021, DFARS 252.225-7021(a)(1), (6), (7), and (13) ..... 13

48 C.F.R. § 252.225-7021, DFARS 252.225-7021(a)(4) ..... 13

48 C.F.R. § 252.225-7021, DFARS 252.225-7021(3)(i)-(ii) ..... 13

**Treaties**

World Trade Organization Government Procurement Agreement ("WTO GPA"). ..... 12

## I. QUESTIONS PRESENTED IN THIS BID PROTEST

1. Did the United States Marine Corps Systems Command ("the agency") act arbitrarily or capriciously or contrary to law by determining that the Large Field Refrigeration System ("LFRS") offered by Sea Box, Inc. ("Sea Box") under Contract Line Item Number 1 ("CLIN 0001") complies with the Trade Agreements Act ("TAA") and constitutes an end product of [redacted] when the two primary components of the LFRS are not [redacted] and are integrated in [redacted] to form a functioning end product?

2. Did the agency act arbitrarily or capriciously or contrary to law by basing its determination that Sea Box's LFRS is TAA compliant upon: (a) an oral withdrawal of written representations that the LFRS is [redacted] (b) oral assurances that no [redacted] despite contraindications in Sea Box's proposal materials and in undisclosed representations made to the agency by Sea Box after the award of the Contract but before Klinge Corporation ("Klinge") filed a bid protest at the Government Accountability Office ("GAO"); and (c) representations by Sea Box that it will [redacted]

3. Is Sea Box ineligible for award based on its admission during the Court-ordered remand that its offer failed to comply with the TAA under CLIN 0003 at the time of award?

4. Did Sea Box make a material misrepresentation that the country of origin of its LFRS (CLIN 0001) or the parts to be supplied under CLIN 0003 (2-Year Parts Support Package) is [redacted] and did the agency rely upon either misrepresentation when awarding the Contract?

5. Did the agency act arbitrarily or capriciously or contrary to law by (a) engaging in post-FPR discussions only with Sea Box and permitting it to disavow portions of its written discussion responses regarding CLIN 0001 and to make representations inconsistent with its

proposal materials; or (b) permitting another change in its proposal to cure an admission of noncompliance with the TAA under CLIN 0003 during the Court-ordered remand?

## II. STATEMENT OF THE CASE

This case warrants judicial relief. The Defendant, United States Marine Corps Systems Command ("the agency"), has violated the law by awarding a contract for a [redacted] end product in violation of the Trade Agreements Act ("TAA"). Regrettably, the Government Accountability Office ("GAO") has permitted this violation, allowing the agency to rely on secret, oral discussions with the awardee, Sea Box, Inc. ("Sea Box") that were undocumented, contrary to Sea Box's written proposal, and actively concealed by the agency until very late in the GAO protest process. At issue for the Plaintiff, Klinge Corporation ("Klinge"), is not just a significant procurement, but its viability as a U.S. manufacturer. If federal agencies are permitted to ignore the trade laws passed by Congress, then Klinge cannot compete domestically and will have to either close its business or move its manufacturing operations overseas.[1]

The procurement at issue was subject to the TAA, which requires that proposed end products originate from or be "substantially transformed" in the U.S. or certain other countries with which the U.S. has trade agreements ("designated countries"). As defined by the TAA, a product is substantially transformed when it becomes "a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was transformed." 19 U.S.C. § § 2518(4)(B); *see also* Defense FAR Supplement ("DFARS") Part 225 and DFARS 252.225-7020 and 252.225-7021.

---

1 The facts underlying this protest are set forth in greater detail with citations to the Administrative Record in Klinge's Statement Of Facts In Support Of Motion For Judgment On The Administrative Record (cited herein as "Fact" followed by the appropriate ¶ number). In limited circumstances, it was necessary to cite to the Appendix filed by Klinge with its initial Complaint and accompanying motions on March 6, 2008. Those citations are listed as "Klinge Appendix" followed by the appropriate Tab number.

Here, the principal product at issue under CLIN 0001 is a Large Field Refrigeration System ("LFRS"), which is the agency's term for a product known in the industry as a Refrigerated Container or Reefer Container. *See* Fact ¶ 5. A Refrigerated Container, which is used to transport and store materials in a refrigerated environment, has two chief components: (1) a Refrigeration Unit ("RU"), which supplies refrigerated air; and (2) a Container, which is the ruggedized enclosure for the refrigerated air. *See* Fact ¶ 4. To state an obvious (but critically important) fact, a Refrigerated Container is a different article of commerce than either an RU or a Container alone. *See* Fact ¶ 5. Thus, a critical issue in this case is: At what point in the manufacturing process does a "Refrigerated Container" exist that is distinct from its component parts?

In Klinge's case, this transformation occurs in its plant in [redacted] where Klinge integrates its [redacted] RU with a [redacted] Container. In Sea Box's case, the [redacted] Sea Box has [redacted] It is this point at which the LFRS becomes a "Refrigerated Container" that is distinct from its component parts. Because, for Sea Box, this occurs i[redacted]

It was arbitrary and capricious for the agency to determine that Sea Box's end product was [redacted] based upon the existing record. Sea Box's written discussion responses and Final Proposal Revision ("FPR") make clear, *inter alia*, that "[redacted]

[redacted]

Also, in its original proposal, [redacted]epeatedly certifying that the LFRS was an end[redacted]In its FPR (following Klinge's initial GAO protest), Sea Box disavowed these certifications without any explanation or change in the manufacturing process to justify the new certifications. The agency ignored this unexplained change and blindly accepted Sea Box's new claim to be supplying a [redacted]end product.

More specifically, when Klinge first protested at the GAO and challenged, *inter alia*, Sea Box's compliance with the TAA, the agency took "corrective action" and asked all offerors to explain their compliance with the TAA. At that point, Sea Box suggested for the first time that its LFRS was, by virtue of [redacted] an end product of [redacted] for TAA purposes. It did so, however, by citing not to the "substantial transformation" test required by the TAA, but to a different, [redacted] Thus, Sea Box "certified" to compliance with the TAA on a wholly irrelevant -- and, for purposes of enforcement, illusory -- basis. Sea Box suggested obliquely that its LFRS was now a [redacted]

At this point, the basis for the agency's actions become murky because the agency failed to document its TAA analysis or evaluation in any way. Despite asking offerors to specifically address how their proposals complied with the TAA, and despite Klinge's earlier protest of the issue, there is not a single scrap of paper in the pre-award written record that addresses the agency's TAA evaluation.

Belatedly during the GAO protest, however, the agency conceded that it harbored significant doubts about Sea Box's TAA compliance. Specifically, approximately six weeks after filing the Agency Report, having filed multiple submissions to the GAO vehemently opposing Klinge's arguments that Sea Box's written proposal materials indicated non-compliance and giving the impression that the agency had actually relied on these materials in determining compliance, the agency finally revealed that, after submission of FPRs, it held oral discussions with Sea Box to determine if the company was eligible for award. In those discussions, which are evidenced only by a post-hoc Declaration from agency counsel and statement from the Contracting Officer, the agency reportedly advised Sea Box of its concern that the company was ineligible for award because [redacted] Predictably, Sea Box disavowed that statement, claimed that the [redacted]nd represented that no other work is performed in [redacted]

Despite the numerous, contrary representations in Sea Box's proposal, the agency accepted this explanation and advanced the [redacted]rgument throughout the GAO proceedings and has continued to do so in the proceedings before this Court. Plaintiff submits that the agency's actions in this regard were arbitrary, capricious, an abuse of discretion, and contrary to law. A principled review of the record demonstrates that Sea Box's LFRS is [redacted] and that the agency erred significantly by concluding otherwise.

Additionally, after initiation of the present action, the Court ordered a remand for the "limited purpose" of completing the written record concerning Sea Box's TAA compliance in light of the contraindications discussed above. However, rather than operate within the clearly

defined scope of the remand, the agency -- [redacted] therefore, ineligible for award -- permitted Sea Box to again revise its offer to "cure" the deficiency by [redacted] Notably, prior to doing so (when it first learned of Sea Box's ineligibility), the agency -- now duty-bound to terminate the Contract with Sea Box -- declared that Klinge failed to demonstrate eligibility and that the agency intended to cancel the solicitation, conduct new market research, and reconsider its requirements. However, shortly afterward, upon learning that [redacted] the agency retracted its finding that Klinge was ineligible and reaffirmed its intention to move forward with its award to Sea Box. Tellingly, rather than revisit its determination that a cancellation of the solicitation was appropriate, the agency simply acted as if that finding was never made.

As to CLIN 0001, the agency now states that it deemed Sea Box compliant based upon its earlier, unsupported reasoning that the LFRS [redacted] Sea Box failed to address, and the agency failed to resolve, the contraindications in the record prompting the remand, which include still-undisclosed representations made by Sea Box after the first award, [redacted] the change in country-of-origin certifications without any change in the manufacturing process, and the representations made during the post-FPR oral discussions with Sea Box, which conflict with its written proposal materials. Additionally, the agency stated that it was further persuaded by Sea Box's having expressed a willingness to [redacted] Inexplicably, the agency failed to take a position on whether such a dramatic change in Sea Box's manufacturing process would be

necessary, who would make that determination, and how or when it would be made.

Respectfully, enough is enough. Sea Box was and is ineligible for award under CLINs 0001 and 0003. The agency has twice improperly permitted Sea Box to change its proposal to rescue it from a finding of non-compliance. Finally, the record supports a finding that Sea Box misrepresented the country of origin of its end products under both CLINs prior to award. Klinge respectfully submits that, individually or collectively, each of the foregoing grounds warrants a Declaratory Judgment that: (a) the award to Sea Box was illegal; (b) the Contract with Sea Box must be terminated; (c) Sea Box should be excluded from the competition; and (d) the agency should award the Contract to the next eligible offeror that represents "best value" to the agency. Klinge also seeks injunctive relief consistent with the above decrees.

## III. STATEMENT OF JURISDICTION & STANDING

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 103-320, § 12(a), (b), 110 Stat. 3870 (1996), authorizes the Court to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Banknote Corp. of Amer. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("The Court of Federal Claims has jurisdiction to review both pre-award and post-award bid protests pursuant to 29 U.S.C. § 1491(b), enacted as part of the [ADRA.]").

A protester must establish its status as an "interested party." 28 U.S.C. § 1491(b). To do so, the Federal Circuit has held that the protester "is required to establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite economic interest." *Rex Service Corp. v.*

*United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006)(citations omitted). In addition to the foregoing, the Federal Circuit has held that a protester must demonstrate that alleged errors result in "prejudice." *See Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004). To do so, the protester must establish that there was a "substantial chance" that, but for the alleged errors, it would have received the award. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005).

Here, Klinge was one of three offerors, including Sea Box, within the competitive range and has a direct financial interest in the award of the Contract. Additionally, Klinge has been prejudiced by the agency's unlawful award to Sea Box because there was a "substantial chance" that Klinge would have been awarded the Contract had Sea Box been excluded. Specifically, the agency described all three offerors within the competitive range as [redacted] *See* Fact ¶¶ 66-67. Additionally, Klinge's overall price was well below the agency's independent cost estimate and more than [redacted] less than the next offeror's overall price. *Id.* Additionally, the agency has conceded that Klinge is next in line for award. *See Transcript from Conference Call With Court (March 7, 2008)*, at page 45, line 23 – page 46, line 4 (Government counsel: "If the agency finds that . . . [Sea Box's] systems are noncompliant, then the intent is to terminate for convenience and award to the next offeror, who in this case is Plaintiff, which should make I guess the entire proceeding moot."). Thus, Klinge clearly has standing to pursue this protest.

## IV. STANDARD OF REVIEW

The Court reviews a bid protest action under the standards set forth in the APA. *See* 5 U.S.C. § 706; 28 U.S. § 1491(b)(4); *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir 2004). The APA provides that an agency's decision is to be set aside if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Galen Med. Assocs., Inc.*, 369 F3d at 1329; *Impressa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000). In *Scanwell Labs., Inc. v. Schaffer*, 424 F.2d 859 (D.C. Cir. 1970), the District of Columbia Circuit Court upheld the District Court's review of a government procurement decision under the APA. *Id.* at 874-75 (D.C. Cir. 1970). The Federal Circuit has observed that the Court "implements this APA standard by applying the standard as previously interpreted by the district court[ ] in . . . [the *Scanwell* decision]." *Banknote Corp. of America v. United* States, 365 F.3d 1345, 1351 (Fed. Cir. 2004).

Further, under the APA standard applied in *Scanwell*, and now under the ADRA, "'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Id.* (*quoting Impresa*, 238 F.3d at 1332). When challenging a procurement on the ground of a regulatory violation, the protestor "'must show a clear and prejudicial violation of [the] applicable statutes or regulations.'" *Id.* (*quoting Impresa*, 238 F.3d at 1333). The protester must also "show that there a 'substantial chance' [that] it would have received the contract award absent the alleged error.'" *Id.* (*quoting Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001)).

As a threshold matter, when faced with a challenge to an agency's application of the TAA under the framework of the APA, the Court must determine whether the agency properly applied the TAA. *See, e.g., Blackhawk Industries Products Group Unlimited, LLC v.. GSA*, 384 F. Supp. 2d 662 (E.D. Va 2004). In *Blackhawk*, a contractor that had moved its production

facilities to Vietnam (a non-designated country) obtained a preliminary injunction restraining the GSA from removing its products from a Federal Supply Group based upon the contracting officer's determination that they did not fit under the FAR-based "war materials" exception to the TAA. *See generally id.* If the products were deemed outside the exception, the move to Vietnam, which rendered the products Vietnamese, would result TAA noncompliance.

On a motion to dismiss, the GSA argued the TAA does not create a private right of action. In rejecting the argument, the District Court for the Eastern District of Virginia held that:

> Blackhawk is not bringing a claim under the TAA; it is suing under the APA. <u>Blackhawk is claiming that the agency acted in contravention to the TAA or "not in accordance with the law"</u> when the GSA determined that Blackhawk's products did not fit under the "war materials" exemption in FAR § 25.401(a)(2).

*Blackhawk*, 348 F. Supp. 2d at 668 (emphasis added).

Although not a bid protest case, the *Blackhawk* decision is consistent with other instances where the Court of Federal Claims and the GAO have addressed the propriety of an agency's "substantial transformation" determination under the TAA in both contract administration and formation contexts. *See, e.g.*, *Ran-Paige Company, Inc. v. United States*, 35 Fed. Cl. 117 (1996) (holding that, although handles were attached to pans and covers in the United States, Chinese cookware was not substantially transformed in the U.S. by this minor assembly process and could not be characterized as a "U.S. made end product" under the TAA; as such, a termination for default was proper); *see also Pacific Lock Company*, B-209982 (Comp. Gen 2007) (agency reasonably concluded that a lock consisting of components made in China but assembled in the United States did not meet the requirements of the Trade Agreements Act).[2]

---

2 *See also CSK International, Inc.*, B-278111, B0278111.2, 97-2 CPD ¶ 178 (Comp. Gen. 1997) (agency properly rejected bid offering a tool consisting of tool head produced in a non-designated country and tool handle produced in the U.S. because assembly of the tool head and handle did not represent "substantial transformation"); *Becton Dickinson AcuteCare*, B-238942,

## V. ARGUMENT

### A. *The Agency Misapplied The TAA To Sea Box's LFRS (CLIN 0001) By Determining It To Be An End Product Of* [redacted]

#### 1. *The TAA And The Substantial Transformation Test*

The TAA implements the World Trade Organization Government Procurement Agreement ("WTO GPA") and provides the President authority to waive the domestic preference restrictions of the Buy American Act ("BAA"). 19 U.S.C. §§ 2501-2582. In acquisitions covered by the WTO GPA, the United States Trade Representative, who has been delegated such authority, has waived the BAA and other discriminatory provisions for certain supplies and services provided by vendors of signatory nations. In such acquisitions, eligible products must receive the same treatment as domestic end products. *See* FAR 25.402(a)(1). The test for determining the applicability of the TAA is whether the estimated value of the acquisition meets or exceeds the TAA threshold, which -- at the time of solicitation and award -- was $193,000. *See* FAR 25.402(b). In such acquisitions, the TAA -- as implemented by the FAR and DFARS -- not only waives the BAA, but it also prohibits the purchase of end products from non-designated countries (*i.e.*, those without an Free Trade Agreement ("FTA") with the U.S. or that are not signatories to the WTO GPA). *See* FAR 25.403(c)(i).

The TAA sets forth the following rule of origin:

> An article is a product of a country or instrumentality only if
>
> (i) it is wholly the growth, product, or manufacture of that country or instrumentality, or
>
> (ii) in the case of an article which consists in whole or in

---

90-2 CPD ¶ 55 (Comp. Gen. 1990) (protest sustained where agency based rejection of low bid for tracheal suction sets packaged in Mexico on regulatory definition of "foreign end product", which conflicts with statutory "rule of origin" contained in TAA, under which products were of U.S. origin and, therefore, eligible for award).

> part of materials from another country or instrumentality, it has been substantially transformed into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed.

19 U.S.C. § 2518(4)(B) (emphasis added).

In line with the foregoing, DFARS 225.403 provides that, "[f]or acquisitions or supplies covered by the World Trade Organization Government Procurement Agreement, [the agency must] acquire only U.S.-made, qualifying country made, or designated country end products . . . [unless an exception applies]" (emphasis added). While "qualifying country end products " and TAA exceptions are not at issue in this protest, a "designated country end product" is defined as "a WTO GPA country end product, a Free Trade Agreement country end product, a least developed country end product, or a Caribbean Basin country end product." DFARS 252.225.7021(a)(4). An "end product" from a WTO GPA, FTA, least developed, or a Caribbean Basin country is one that:

> (i) Is wholly the growth, product, or manufacture of a [WTO GPA, FTA, least developed, or Caribbean Basin] country; or
>
> (ii) In the case of an article that consists in whole or in part of materials from another country, has been substantially transformed in a [WTO GPA, FTA, least developed, or Caribbean Basin] country into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was transformed.
>
> * * *

DFARS 252.225-7021(a)(1), (6), (7) and (13) (emphasis added).

[redacted] is both a WTO GPA country and an FTA country. *See* DFARS 252.225-7021(3)(i)-(ii). As such, [redacted] end products qualify as "designated country end products" under the TAA. Conversely, [redacted] is not a designated country. As such, [redacted] end products do not qualify as "designated country end products" under the TAA and, absent an exception,

their purchase is strictly prohibited by the U.S. Government.

Moreover, when [redacted] materials are incorporated into an article processed in a designated country or the U.S., a "substantial transformation" analysis is required to determine whether the article is substantially transformed (*i.e.*, has become a new and different article of commerce with a name, character, or use distinct from that of the articles from which it was transformed) in that designated country.[3] If substantial transformation occurs within a designated country or the U.S., the article may be classified, respectively, as either a "designated country end product" or a U.S. end product, despite its [redacted] content. Otherwise, the [redacted] content disqualifies the article for TAA purposes.[4]

The Customs and Border Protection ("CBP") office, which has jurisdiction to make country of origin determinations in relation to federal procurements and beyond (*see* 19 C.F.R. § 177.21 *et seq.*), has explained the analysis as follows:

> In order to determine whether a substantial transformation occurs when components of various origins are assembled into completed products, CBP considers the totality of the circumstances and makes such determinations on a case-by-case basis. The country of origin of the item . . . components, extent of the processing that occurs within a country, and whether such processing renders

---

3 *See Anheuser-Busch Brewing Ass'n v. United States*, 207 U.S. 556, 562 (1908) ("substantial transformation" requires that "[t]here must be a transformation; a new and different article must emerge, 'having a distinctive name, character, or use.'" (internal citation omitted)); *see also Torrington Co. v. United States*, 764 F.2d 1563, 1568 (Fed. Cir. 1985) (substantial transformation requires that an article "emerge from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process."); *Texas Instruments, Inc. v. United States*, 681 F.2d 778 (C.C.P.A. 1982) (substantial transformation occurs if a manufacturing process results in an article of commerce which has a distinctive name, character, or use).

4 *See., e.g., U.S. Customs Rul. Letter HQ* 563587 (February 8, 2007) (in government procurement country of origin final determination, U.S. Customs & Border Protection held that Vu Bolt Container Seal and bolt shank assembled in the U.S. from Chinese and Malaysian parts, are not substantially transformed in the U.S. and, therefore, are Chinese for procurement purposes). Rulings from the Customs and Border Protection ("CBP") office can be retrieved and searched by number, words, or phrases through its "CROSS" system at http://rulings.customs.gov/index.asp? (last visited April 30, 2008).

> a product with a new name, character, and use are primary considerations in such cases. Additionally, factors such as the resources expended on product design and development, extent and nature of post-assembly inspection and testing procedures, and worker skill required during the actual manufacturing process may be relevant when determining whether a substantial transformation has occurred. No one factor is determinative.

*HQ Rule No. H018467 (1/4/08).*

As set forth above, a determination must be made on a case-by-case basis in light of the totality of the circumstances. The country of origin of an end product's components often plays a pivotal role in the outcome. For instance, in *Ruling No. 968000 (2/14/06)*, CBP determined that a telecommunications device, styled the SW4100, which was partially manufactured in China but assembled to completion in the United States, was of U.S. origin. A key feature of the finished product was its specially designed fabric operating system ("FOS") and a suite of advanced software options, which gave it full compatibility with similar items and with other software systems. *Id.* CBP ultimately determined that "the assembly processes that occur within the United States, <u>coupled with the configuration operations that require U.S.-origin software</u>, substantially transforms the components of foreign origin into a product with a new name, character, and use." *Id.* (emphasis added). In other words, the fact that the transformative software, a key component of the end product, was of U.S. origin, coupled with the work performed in the U.S., including the incorporation of that software into the end product, supported a finding of substantial transformation inside the U.S.

The same principles apply to relatively simple components as well. For instance, in *HQ Ruling No. 735191 (6/15/94)*, CBP determined that a foreign-produced shotgun shell casing is substantially transformed in the U.S. when stuffed with gun powder, tested, and crimped to form a sealed and complete shotgun shell, because "[t]he other components, such as the amount of lead shot, gunpowder, buffer and wadding [incorporated in the U.S.] are the determinative parts

in creating the different types of finished shotgun shells." *Id.*

2. *The Agency's Application Of The TAA Was Arbitrary, Capricious, And Contrary To Law Because Sea Box's LFRS Constitutes A* [redacted] *End Product And Any Other Conclusion Is Unsupported By The Record*

In its initial proposal, Sea Box submitted [redacted] *See* Fact ¶¶ 20-25. Additionally, Sea Box's initial proposal also contained [redacted] *See* Fact ¶ 17. Further, Sea Box supplied [redacted]

Additionally, [redacted] the requirements of ISO Standard 1496-2, which was incorporated by the agency into the solicitation. *See* Fact ¶¶ 50-53. Importantly, ISO Standard 1496-2 requires testing of a fully functioning and integrated LFRS, not just the individual components. *Id.* Once it is established that the prototype systems satisfy the ISO standards, [redacted]

After Klinge protested the first award of the Contract to Sea Box, including its ability to satisfy the TAA, the agency took corrective action and issued specific, written discussion questions to both offerors regarding TAA compliance. In response, Sea Box: [redacted]

[redacted] *See* Fact ¶¶ 40-42.

Without question, Sea Box's response [redacted] country" or the United States. Rather, the common-sense conclusion was that the LFRS is a [redacted] end product. [redacted] a Refrigerated Container (or LFRS), which is separate and distinct in name, character, and use from either a [redacted]

On September 20, 2007, following its written discussion responses, Sea Box submitted its FPR, the content of which fully supported the above conclusion. *See* Fact ¶ 47. Therein, Sea Box set forth a more detailed project schedule for the manufacture of its LFRS than what had been supplied in its initial proposal. According to the FPR [redacted] *See* Fact ¶ 49. Additionally, and again exclusive of packing and shipping, [redacted]

Furthermore, the nature and complexity of the tasks clearly demonstrated [redacted]

[redacted]

By any of the above three measurements -- duration, quantum, or complexity of tasks -- it [redacted] Therefore, the agency's award to Sea Box was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.[5]

[redacted]

Despite having multiple opportunities to get it right, the agency's justification for its award decision is wholly inadequate. As a threshold matter, it is critical that there is no reasoned, contemporaneous analysis in the record concerning the agency's TAA determination.[6] *See* Fact ¶¶ 29, 56-57. Thus, under APA standards, the award decision is not rationally supported. *See generally Industrial Union Department, AFL/CIO v. American Petroleum Institute*, 448 U.S. 607 (1980) (agency action unenforceable because not supported by appropriate findings). Further, even if the court were to consider the eleventh-hour Declaration of agency counsel and Statement from CO McGinn regarding the agency's extra discussions solely with Sea Box, the case for judicial deference is less compelling because the agency's position is inconsistent with previously held views. *See Bowen v. Georgetown University Hospital*, 488 U.S. 204, 212 (1988). To illustrate, during the GAO protest, the agency failed to disclose the occurrence of these extra communications and, instead, steadfastly asserted that the pre-award record supported a finding of TAA compliance. See Fact ¶¶ 69-70, 83-86. This position, however, was subsequently abandoned when non-disclosure of those communications was no longer feasible. Along these lines, "courts are extraordinarily skeptical about post-decision agency rationalizations." *Red River Service Corp. v. United States*, 60 Fed. Cl. 532, 541 (2004) (*citing Citizens of Overton Park*, 401 U.S. 402, 419 (1971)). As such, "[i]n examining . . . [an] expanded record, th[e] Court . . . [must be] mindful that it must critically examine any post hoc rationalization." *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 204 (2004), *aff'd*, 389 F.3d

---

6 The only pre-award documentation arguably relating to TAA compliance is devoid of analysis and includes: (i) the agency's SSET Final Findings and Results (October 9, 2007), which states that: [redacted] AR, Tab 29, at 1013; and (ii) the *Contracting Officer's Business Clearance Memorandum (October 15, 2007)*, which contains a check mark in the box labeled [redacted] next to the statement: [redacted] AR, Tab 25, at 1026.

(Fed. Cir. 2004). Here, the agency claims the post-protest Declaration of agency counsel and statement of CO McGinn memorializes its pre-award decision-making process. However, the agency reluctantly and belatedly revealed the occurrence, substance, and impact of its post-FPR discussions with Sea Box to the GAO. As such, the agency's position should invoke the skepticism that attaches to post-decision rationalizations.

Equally important, the agency's characterization of Sea Box's written proposal materials is wholly inaccurate. The Declaration of agency counsel (Mr. Ingold) states that Sea Box's [redacted] *See* Fact ¶¶ 89. Thus, the agency portrayed Sea Box' written discussion response as the rogue indication that [redacted] However, as discussed above, both in Sea Box's initial proposal and its FPR clearly demonstrate that the bulk of [redacted] Accordingly, the written proposal materials are actually <u>consistent</u> with the discussion response that was subsequently and conveniently disavowed by Sea Box.

Now, through the remand, Sea Box has again disavowed its proposal, written discussion

---

[redacted]

responses, and FPR in response to the agency's request for a more detailed statement regarding substantial transformation. *See* Fact ¶¶ 124-126. Therein, Sea Box repeats the purported percentages of costs of manufacture set forth in its written discussion response and again improperly lumps [redacted] AR, Tab 46, at 1420. This representation cannot be reconciled with the project schedule set forth in Sea Box's FPR, which reveals that [redacted] See Fact ¶¶ 48-49. As noted above, the fact that [redacted] *See* Fact ¶¶ 50-53.

Additionally, in its FPR, Sea Box listed the [redacted] *Id.* at 986. Additionally, the FPR stated that [redacted] *Id.* In its "Technical Approach Section", Sea Box stated that:

[redacted]

[redacted]

*Id.* at 958. Clearly, the extent of [redacted] before and after [redacted] Additionally, Sea Box supplied an undated document entitled "Large Field Refrigeration System (LFRS) Manufacturing, Assembly, Testing & Inspection Operations." *See* AR, Tab 46, at 1425. This document supports Klinge's argument that the work performed [redacted] *See e.g., NY Ruling No. 867396* (10/25/91) (a new and different article, having a different distinctive name, character or use, is not formed by the painting of the end product).

Moreover, Sea Box's submission failed to provide a detailed statement of its manufacturing processes in <u>all</u> locations, contrary to the Court's remand order. Rather, it focused solely [redacted] Clearly, the intent was to emphasize [redacted] However, the submission does change the fact that th[redacted] Importantly, ISO testing measures the functionality and characteristics of a functioning LFRS.

Unfortunately, in his April 2, 2008 Memorandum, CO McGinn stated nothing beyond that "Sea Box has sufficiently described its manufacturing processes as to CLINs 0001 and 0002 . . .." See Fact ¶¶ 114-117. CO McGinn then continued by expressing his intention to terminate Sea Box as a result of the information supplied under CLIN 0003. *Id.* As discussed, the agency soon again reversed course. And, in his April 14, 2008 Memorandum, CO McGinn expressed his intention to continue to move forward with Sea Box. See Fact ¶¶ 127-133. With respect to

CLIN 0001, he stated the following:

> Likewise, I note that Sea Box has affirmed its previous statements to the Government Accountability Office (GAO) [redacted]
>
> Moreover, it remains my opinion that Sea Box is compliant with the TAA regarding the Large Field Refrigeration System (LFRS) CLIN 0001 by virtue of the substantial transformation that takes place at [redacted] The mere [redacted] into the [redacted] does not in my opinion make Sea Box noncompliant with the TAA.

*See* Fact ¶ 130.

Accordingly, CO McGinn based his finding of compliance upon Sea Box's assurance that it would integrate the two primary components in the United States if required to do so under the TAA. However, he failed to state whether he believed such integration is necessary for compliance or how, if at all, this determination would be made. Additionally, his response (*i.e.*, "it remains my opinion the Sea Box is compliant . . . by virtue of the substantial transformation that takes place at [redacted] . . ) (emphasis added) suggests that CO McGinn stands by the agency's pre-remand reasoning. In other words, CO McGinn's memorandum does not address the new information supplied by Sea Box. Rather, it advances an earlier-stated position and then again advances the concept that the items are merely [redacted] For the reasons stated, these determinations are not supported by the record.

In sum, the only reasonable and rational conclusion to be reached on the existing record is that [redacted] As such, the award to Sea Box violated the TAA, and the agency's conclusion that Sea Box offers a [redacted] LFRS was arbitrary and capricious.

***B. Sea Box Misrepresented The Country Of Origin Of Its LFRS***

The Court has held that, "[t]o establish a material misrepresentation, [the] plaintiff must demonstrate that (1) [the awardee] . . . made a false statement; and (2) the [agency] . . . relied on that false statement in selecting [the awardee's] . . . proposal for the contract award." *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 495 (2006) (*citing CCL Service Corp. v. United States*, 48 Fed. Cl. 113 (2000)). Additionally, "[t]o preserve the integrity of the solicitation process when such a material misrepresentation influences the award of the proposal, the proposal . . . [must be] disqualified from consideration." *Id.* (*citing Planning Research Corp. v. United States*, 971 F.2d 736, 746 (Fed. Cir. 1992)). The Court's rationale has been that:

> [a] bidder to a government contract who makes material misstatements in its proposal taints the award to such a bidder. Misrepresentations in bid proposals prevent government officials from determining the best value to the government and retard the competitive bidding process. When a bidder is found to have misrepresented its ability to perform a contract, that bidder will lose its right to execute the solicited work or bid on the reprocurement of the contract.

*Microdyne Outsourcing, Inc. v. United States*, 72 Fed. Cl. 230, 233 (2006) (*quoting Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 468 (2001) (*citing Planning Research Corp.*, 971 F.2d at 741)).

Here, Sea Box misrepresented the country of origin of its LFRS as [redacted] This statement was clearly material because TAA compliance was a requirement of the solicitation. Moreover, the agency has conceded that it relied upon the [redacted] representation when awarding the Contract to Sea Box.[8] The inaccuracy of Sea Box's

---

[8] Similar to the pre-award record, the Agency Report filed with the GAO on December 20, 2007 failed to clearly reflect the agency's position on country of origin. Rather, the agency broadly argued that Sea Box's written discussion responses and FPR supported a finding of compliance. Additionally, the agency indicated that it relied upon the Singapore FTA to

representation is established by the following facts: Sea Box's initial proposal contained [redacted] all of which identified the country of origin for Sea Box's LFRS to be [redacted] and/or the place of manufacture to be a combination of [redacted] *See* Fact ¶¶ 20-23. While the claim to a [redacted] was factually impossible in light of the fact that [redacted] it is clear that Sea Box was cognizant of the fact that its end product [redacted] Along these lines, Sea Box also identified the [redacted] *See* Fact ¶ 22.

After Klinge's initial protest and the agency's corrective action, which included discussion questions requiring that Sea Box squarely address its TAA compliance (*see* Fact ¶ 37), Sea Box submitted a written discussion response applying a [redacted] TAA-compliant. *See* Fact ¶¶ 43-44. In that response, however, [redacted] Rather, it argued its TAA compliance was based upon an assertion that the [redacted]

Thereafter, in its FPR, [redacted] without any explanation as to why it had represented a country of origin [redacted] initially, or how and why Sea Box had abandoned that position without proposing any material

---

determine compliance, thereby suggesting that the LFRS was an end product [redacted] It was only when pressed by the GAO that the agency adopted its current position, which is that Sea Box's FPR unequivocally identified the country of origin to be [redacted] AR, Tab 36, *Supplemental Agency Report filed in response to request of GAO Attorney Mr. David Ashen with enclosures (January 14, 2008)*, at 1288.

change in its manufacturing process. *See* Fact ¶ 54. Additionally, Sea Box included in its FPR a fragmented statement from the FAR 52.225-18 "Place of Manufacture" clause, in which it identified the place of manufacture [redacted] *See* Fact ¶ 55. Notably, the test for "[p]lace of manufacture" under that clause is not interchangeable with the substantial transformation analysis governing this procurement and is therefore irrelevant. *Id.* Additionally, Sea Box unquestionably fails the "[p]lace of manufacture" test as well.[9] Moreover, Sea Box's claim to "manufacture" its LFRS in [redacted] was wholly irreconcilable with both its initial proposal and FPR, which clearly demonstrate that [redacted] *See* part VB *supra.* It is also inconsistent with [redacted] *See* Fact ¶ 55., note 9.

Finally, Sea Box's post-FPR abandonment of a portion of its written discussion responses and its unspecified, oral assurances regarding [redacted] activities are additional instances of misrepresentations. While the record does not establish the precise nature of the post-FPR communications between agency counsel and Sea Box, to the extent they suggest that activities performed in [redacted] dominate the manufacturing process or otherwise effect a substantial transformation, it is clear that such assurances directly conflict with Sea Box's written proposal materials. Moreover, the agency's acceptance of Sea Box's oral assurances and fragmented certification -- which was irrational -- does not negate the

9 Under FAR 52.225-18, "[p]lace of manufacture" means "the place where an end product is assembled out of components, or otherwise made or processed from raw materials into the finished product that is to be provided to the Government." FAR 52.225-18(a). By Sea Box's own admission, it does not [redacted]

fact that the assurances were demonstrably inaccurate. *See Planning Research Corp. v. United States*, 971 F.2d 736, 743 (Fed. Cir. 1992) (agency's post-award facilitation of -- and acquiescence to -- awardee's misrepresentation concerning substitution of personnel held inconsistent with its criteria for evaluating bid proposals).[10]

This procurement has been tainted by Sea Box's material misrepresentations, and the integrity of the competition requires that the award be set aside. Sea Box's claim that its LFRS constitutes an end product of [redacted] is patently inaccurate. And the agency's admitted reliance upon that claim when evaluating TAA compliance and, ultimately, awarding the Contract was unreasonable and unlawful. In short, the agency's reliance was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.[11]

### C. *The Agency Acted Arbitrarily, Capriciously, And Contrary To Law By Failing To Determine That Sea Box Was Ineligible For Award During The Court-Ordered Remand*

This Court has long recognized the fundamental tenet of procurement law that an

[10] In *Planning Research Corporation*, the awardee had offered service providers it never intended to provide. *See generally id.* After award, the agency acquiesced and assisted the contractor in substituting personnel. In the case at bar, the agency's acceptance of Sea Box's unsubstantiated, conclusory assertions that its end product has a country of origin of [redacted] is equally -- if not more -- objectionable, because it occurred prior to award when the agency had not yet assumed the administrative burdens of awarding the contract and when, by the specific design of its TAA discussion questions, the agency was supposed to be engaged in a thorough, transparent, objective evaluation of the issue.

[11] Klinge submits that, at the very least, the facts and circumstances of this case support a finding that Sea Box has represented the country or origin of its LFRS with reckless disregard for the truth. While counsel for Klinge is aware of authority from this Court providing that "intent" is an element of a misrepresentation claim (*see e.g.*, *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 468 (2001)), counsel respectfully suggests that such authority is inapplicable here and that, on these facts, the more reasoned view -- consistent with procurement policy -- is that an offeor's reckless misrepresentation regarding the country or origin of an end product warrants the same relief as an intentional misrepresentation (*i.e.*, termination of the contract and exclusion from further proceedings under the solicitation). Moreover, Klinge also respectfully submits that the facts and circumstances in this matter are sufficient to support a finding of an intentional misrepresentation by Sea Box.

offeror's "failure to comply with [the] Solicitation would preclude it from receiving an award as '[i]t is fundamental that a materially noncompliant proposal cannot form the basis of an award.'" *Mantech Telecommunications and Information Systems Corp. v. U.S.*, 49 Fed. Cl. 57, 71 (2001) (*quoting Spectrofuge Corp. of North Carolina, Inc.*, B-281030.3, 99-1 CPD ¶ 65, at 2 (Comp. Gen. 1999) and *citing Barents Group, L.L.C.*, B-276082, B-276082.2, 97-1 CPD ¶ 164, at 10 (Comp. Gen. 1977) and *Martin Marietta Corp.*, B-233742.4, 90-1 CPD ¶ 132, at 7 (Comp. Gen. 1990)).

Here, it is beyond dispute that Sea Box admitted during the Court-ordered remand that its offer was noncompliant with the TAA under CLIN 0003 at the time it was awarded the Contract. Specifically, in its April 1, 2008 submission to the agency, Sea Box admitted [redacted] *See* Fact ¶¶ 109-110. In other words, [redacted] *See* Fact ¶¶ 124-126.

Because the TAA applies to each CLIN in the solicitation, all parts offered under CLIN 0003 had to be the wholly the growth, manufacture, or produce of a designated country or the U.S. or substantially transformed in such a country. Because [redacted] which constitute end products for the purposes of CLIN 0003 -- Sea Box's proposal was unacceptable and ineligible for award. As such, upon learning that Sea Box's proposal offered noncompliant end products under CLIN 0003, the agency was duty-bound to terminate the Contract with Sea Box.

Initially, the Government expressed an intention to do exactly that. Specifically, CO

McGinn stated in his Memorandum For The Record dated April 2, 2008 that:

> Sea Box has included [redacted] which now indicates that [redacted] There is no explanation provided as to the identity of [redacted] so as to meet the requirements of the TAA. Regardless of Sea Box's detailed information regarding CLIN 0001, I do not find sufficient information to determine that Sea Box has fully met the requirements of the TAA as set forth in DFARS clause 252.225-7021 because of its failure to provide sufficient information regarding its spare parts provided by CLIN 0003.
>
> Given my determination regarding Sea Box, it is my intent to immediately terminate contract M67854-07-D-5060 in its entirety.

AR, Tab 48, at 1459. However, the agency reversed its course less than two weeks later, after Sea Box, in the second round of remand submissions, advised that:

[redacted]

AR, Tab 49, at 1465. Sea Box also supplied an attachment to its submission setting forth the country or origin for the parts now to be offered under CLIN 0003, some of which were expressly changed from Sea Box's FPR. *See* Fact ¶ 126. In light of the foregoing, the agency decided not to terminate the Sea Box Contract and, instead, to allow performance to continue.

The agency's decision to do so was wholly improper. To be clear, Sea Box did not simply make a minor, immaterial adjustment to its proposal during the remand (which also would have been improper). Rather, it convinced its parts supplier to locate alternative sources

for certain items offered and to absorb the cost of doing same. Moreover, in addition to changing the source of supply for the previously non-compliant items, it appears that, in three instances, Sea Box now offers components bearing different parts number and, in one case, a different quantity. These changes converted Sea Box's proposal from a non-compliant offer under the TAA to a compliant offer (for CLIN 0003 purposes only). The agency's decision to accept (indeed, solicit) such changes during a remand is contrary to law.

Typically, under an APA review, the Court will order a remand under the following circumstances:

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).

Initially, this matter arguably fit into categories (1)-(4) and (8). As such, the Court ordered a remand, which was limited in scope. Consistent with U.S. Supreme Court precedent, it was intended to permit the agency an opportunity to <u>complete</u> the written record on Sea Box's compliance with the TAA. In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), the United States Supreme Court explained that judicial review under the APA requires a "substantial inquiry" by the Court. That inquiry must "be based on the full administrative record that was before the [decision-maker] at the time he made his decision." *Id.* at 862. This Court consistently follows those principles in defining the limitations on

supplementing the agency record, which applies in the remand context. Specifically, the Court has held that:

> [t]he decision whether to supplement the administrative record rests within the discretion of the trial court, and generally we will permit supplementation for two principal purposes: to assist the court in understanding an agency decision when the record has not adequately explained it, and to place in the record material that, by its very nature, would not be contained in it, such as evidence of bias or bad faith. *See, e.g., Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343-44 (2004). Otherwise, [the Court's] . . . review is confined to "the administrative record already in existence." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

*Rig Masters, Inv. v. United States*, 70 Fed. Cl. 413, 424 (2006). In other words, the Court in *Riggs* described a remand as an appropriate vehicle to permit the Court a full understanding of how the contested decision was made, when the existing record does not reflect same.

This case represents the rare instance where, during the remand (as opposed to before a remand), new information surfaced which conclusively demonstrated that Sea Box's offer was non-compliant with the TAA under CLIN 0003 at the time of award. Thus, it was conclusively established that the agency's award decision was contrary to law. In light of this, with respect to CLIN 0003, the case took on a dimension consistent with the fifth *Esch* scenario (*i.e.*, where post-award information demonstrates that the award was improper, or, more specific to this procurement, in violation of the TAA). The fact that evidence of Sea Box's non-compliance surfaced after rather than before a remand does not change the effect of the information. The award was rendered illegal and the Contract with Sea Box had to be terminated. There simply is no support for a proposition that an agency, when faced with such a situation can accept or solicit a material change to the awardees proposal to moot the illegality. Under any of *Esch* scenarios, the purpose of the remand is to augment the record, not to permit (i) new proposals, (ii) revisions to an existing proposal, or (iii) an opportunity for the agency to establish a new award rationale based upon post-protest events. (*i.e.*, a new procurement decision).

In short, the initial award to Sea Box was contrary to law. And it was arbitrary, capricious, an abuse of discretion, and contrary to law to permit Sea Box an opportunity to "cure" the fatal flaw in its offer. Rather, the only rational or lawful act for the agency to have taken upon learning of Sea Box's ineligibility was to immediately terminate the Contract.

### D. *Sea Box Misrepresented The Country Of Origin Of The Component Parts Offered Under CLIN 0003*

As set forth above, "[t]o establish a material misrepresentation, [the] plaintiff must demonstrate that (1) [the awardee] . . . made a false statement; and (2) the [agency] . . . relied on that false statement in selecting [the awardee's] . . . proposal for the contract award." *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 495 (2006) (*citing CCL Service Corp. v. United States*, 48 Fed. Cl. 113 (2000)). If a misrepresentation is established, "[t]o preserve the integrity of the solicitation process when such a material misrepresentation influences the award of the proposal, the proposal . . . [must be] disqualified from consideration." *Id.* (*citing Planning Research Corp. v. United States*, 971 F.2d 736, 746 (Fed. Cir. 1992)).

Sea Box has taken the position that it always intended to comply with the TAA under CLIN 0003 and that any *misstatement* on this issue was inadvertent. To illustrate, Jim Brennan, President of Sea Box, stated the following in Sea Box's April 10, 2008 submission to the agency:

[redacted]

AR, Tab 49, *CO Request to Sea Box and reply (April 9, 2008)*, at 1465. Mr. Brennan continues by mentioning, among other items, that [redacted]

[redacted]

Klinge respectfully submits that the record establishes that if Sea Box's misstatements were not intentional, then -- at the very least -- they were made with reckless disregard for their truth. First, to the extent that Mr. Brennan's statement creates an impression that [redacted] was unknown to Sea Box and is the reasons why Sea Box was unaware that [redacted] Likewise, Mr. Brennan's implied assertion that Sea Box only recently came to understand how the TAA applies to CLIN 0003 (*i.e.*, that each component offered must be from the U.S. or a designated country), and , in light of that revelation, [redacted] for information on the origin of the component parts, is equally troubling.

Both of these issues were raised as part of Klinge's first protest before the GAO on July 30, 2007. *See* AR, Tab 18, *GAO Protest filed by Klinge Corporation B-309930 (July 30, 2007)*, at 830 (alleging that "[redacted]." and "for CLIN 003, the 'Parts Support Package,' components are or will be produced almost wholly outside of [redacted].") In other words, the country of origin of the component parts offered by Sea Box under CLIN 0003 has been a contested issue since July 2007.

Moreover, after the agency's initial corrective action mooted the July 2007 protest, Klinge re-raised the issue in its November 6, 2007 protest after the Contract was again awarded to Sea Box, and CLIN 0003 has been addressed in multiple filings before the GAO, including those that followed the production of Sea Box's written discussion response. Therein, Sea Box

[redacted]

Significantly, Sea Box tied its statement of compliance to [redacted]

Sea Box's response was very specific, not just a blanket statement. Because we now know this statement to be inaccurate, Sea Box either knew it was false or made the extremely specific representation regarding CLIN 0003 country of origin costs without knowledge of its veracity.

Moreover, Sea Box touched upon CLIN 0003 in its GAO filings. *See* AR, Tab 56, at 1528 ("We repeat our position that CLIN 0003, as well as every other CLIN in these requirements, is TAA compliant. KC's bald, unsupported assertions that they don't are unfounded."). Significantly, as reflected in one of its GAO filings, the agency clearly relied upon these now-admittedly inaccurate statements when awarding and defending the Contract to Sea Box, which had knowledge that either (a) the statement was inaccurate, or (b) that Sea Box had not actually verified the representations before making them. *See* AR, Tab 57, at 1537 ("Nowhere does Sea Box provide any indication that it is providing end products from nondesignated countries.").

Moreover, the GAO -- in deciding the merits of Klinge's protest on the CLIN 0003 issue -- also relied upon these inaccurate representations in upholding the agency's award decision. Specifically, in its unpublished written decision, the GAO held:

[redacted]

[redacted]

See Fact ¶ 112.

It is beyond dispute that Sea Box made material misrepresentations to the agency prior to award of the Contract with respect to the country of origin of the CLIN 0003 components offered. It is also beyond dispute that the agency relied on these misrepresentations when awarding the Contract. Finally, had Sea Box corrected the agency's false understanding or otherwise clarified the confusion on the issue, then the agency would have had to terminate the Sea Box Contract and award same to the next eligible offeror.

***E. The Agency Acted Arbitrarily, Capriciously, And Contrary To Law By Engaging In Prejudicially Unfair Discussions With Sea Box To Obtain Representations of TAA Compliance***

The guiding principles of the FAR provide that "[t]he vision for the Federal Acquisition System is to deliver on a timely basis the best value product or service to the customer, while maintaining the public's trust and fulfilling public policy objectives." FAR 1.102(a). Moreover, an agency administering a procurement must "[c]onduct business with integrity, fairness, and openness . . .." FAR 1.102(b)(3). In so doing, agency officials must consider and act within the limitations of all applicable statutes and regulations. On this, the guiding principles provide that:

> [t]he role of each member of the Acquisition Team is to exercise personal initiative and sound business judgment in providing the best value product or service to meet the customers' needs. In exercising initiative, Government members of the Acquisition Team may assume if a specific strategy, practice, policy or procedure is in the best interests of the Government and is not addressed in the FAR nor prohibited by law (statue or case law), Executive order or other regulation, that the strategy, practice, policy or procedure is a permissible exercise of authority.

*See* FAR 1.102(d) (emphasis added).

These guiding principles flow through the FAR and permeate all actions to be taken and decisions to be made by procurement officials, whether discretionary or mandatory, including the conduct of exchanges with offerors after the receipt of proposals. *See generally* FAR 15.306. With respect to such exchanges (and "discussions" in particular), if the agency conducts them with any offeror within the competitive range, it must do so with all such offerors (*see* FAR 15.306(d)(1)), and "[a]t a minimum, the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR 15.306(d)(3). Additionally, "[g]overnment personnel involved in the acquisition shall not engage in conduct that . . . [f]avors one offeror over another . . .." FAR 15.306(e)(1). The principle further manifests itself in the rule concerning FPRs, by requiring a common cutoff date for submission. Specifically, the FAR provides that:

> [t]he contracting officer may request or allow proposal revisions to clarify and document understandings reached during negotiations. At the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision. <u>The contracting officer is required to establish a common cut-off date only for receipt of final proposal revisions.</u> Requests for final proposal revisions shall advise offerors that the final proposal revisions <u>shall be in writing</u> and that the Government intends to make award <u>without obtaining further revisions.</u>

FAR 15.307(b) (emphasis added).

In *Dynacs Engineering Company, Inc. v. United States*, on cross-motions for summary judgment, the Court determined that the contracting agency violated most of the above principles. 48 Fed. Cl. 614 (2001). There, in a "best value" acquisition for a microgravity research, development, and operations contract, the agency conducted discussions with both offerors within the competitive range (*i.e.*, the plaintiff and the subsequent awardee) through written discussion questions identifying weaknesses in the proposals. *Id.* at 127. After both

offerors responded in writing, the agency issued "clarification" questions based upon the responses and a deadline for FPRs, which both offerors observed. *Id.* at 128.

After reviewing the FPRs, the agency determined that the future awardee -- FDC -- had added significant risk to its business approach by under-scoping a development and operations portion of the contract in its FPR. *Id.* Accordingly, the agency reopened discussions through written questions identifying weaknesses present in the offerors' FPRs. *Id.* However, some of the weaknesses identified in FDC's FPR were entwined with weaknesses identified during the discussions preceding the FPR. *Id.* at 134. By contrast, in its post-FPR discussions with the plaintiff, the agency "limited its discussion to . . . two new weaknesses discovered in the FPR# 1 proposal." *Id.* at 135. After the submission of new FPRs, the agency awarded the contract to FDC. *Id.* at 129.

In granting the plaintiff's motion for summary judgment on the bid protest that followed, the Court recognized that, through discussions, "the procuring agency does not have to identify 'each and every item that could be raised as to improve its proposal.'" *Id.* at 131 (citation omitted). However, the Court further explained that:

> [n]onetheless, the procuring agency must avoid conducting prejudicially unequal discussions. *See, e.g.*, *Cubic Defense Systems, Inc. v. U.S.*, 45 Fed.Cl. 450, 471 (1999); *Synetics, Inc. v. United States*, 45 Fed.Cl. 1, 17 (1999); *Information Network Sys., Inc.*, 2000 WL 797436, at *6 (Comp.Gen. Jun.12, 2000); *Techniarts Science & Tech. Corp.*, 1998 WL 729188, at *4 (Comp.Gen. Oct.15, 1998); *Bionetics*, 1998 WL 951702, at *3. The FAR requires "integrity, fairness and openness" in procurements conducted under the Federal Acquisition System. FAR § 1.102(b)(3). Section 15.306(e)(1) of the FAR specifically states that "[g]overnment personnel involved in the acquisition shall not engage in conduct that favors one offeror over another."

*Id.* (emphasis added).

The Court continued by finding that, "[d]espite the apparent parallelism of the agency's discussions with the offerors, the court finds that the discussions were indeed unfair." *Id.* at 134.

In the words of the plaintiff, the agency "kept informing FDC about each of [its] . . .weaknesses until FDC got it right." *Id.* at 130.

In the case at bar, the agency engaged in discussions that were even more prejudicially unfair than those engaged in by the government in *Dynacs Engineering*. Here, there was no such parallelism between the discussions, whether real or apparent. That is, the agency made a conscious decision to engage in post-FPR decisions solely with Sea Box. Moreover, its decision to do so was not motivated by a desire to identify new competitive weaknesses (or even to revisit weaknesses already discussed). *See* P-000161-164. Rather, the agency engaged in such discussions because it believed Sea Box's offer to be unacceptable in light of its written discussion response on TAA-compliance. *See Declaration of Agency Counsel David P. Ingold,* Attachment 20. Further, the agency declined to afford Klinge an opportunity to further address potential weaknesses in its proposal, such as certain negative past performance marks and its overall price.

By engaging in such discussions, the agency effectively allowed Sea Box to submit a new FPR, through oral assurances regarding manufacturing activities that suggested that substantial transformation occurs [redacted] While the precise representations made are known, it is patently clear that they (a) [redacted] Despite this, the agency simply accepted Sea Box's assurances and based its award upon same.

Quite simply, the agency's doing so was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. Its post-FPR discussions with Sea Box were prejudicially unfair. In effect, despite the written proposal materials' indication of non-compliance, the agency led Sea Box to water and accepted its conclusory and unfounded oral representations of TAA-compliance. As such, the award must be set aside.

### *F. The Agency Should Be Directed To Terminate Its Contract With Sea Box And Award The Contract To The Next Eligible Offeror Representing "Best Value"*

The Tucker Act, 28 U.S.C. § 1491(b)(2), as amended by the ADRA, gives the Court of Federal Claims authority to direct the award of a contract by injunctive relief. Specifically, the Tucker Act, as amended by the ADRA, states:

> To afford relief in [a bid protest] action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

28 U.S.C. § 1491(b)(2). This Court and others have directed awards within the context of a negotiated procurement. *See, e.g., Alfa Laval Separation, Inc. v. United States*, 47 Fed. Cl. 305, 315 (2000); *TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl. Ct. 33 (1989); *Air Terminal Servs., inc. v. Dep't ofTransp.*, 400 F. Supp. 1029 (D.D.C. 1973) *aff'd per curiam*, 515 F.2d 1014 (D.C. Cir. 1975); *see also* SMS Data Products Group, Inc. v. Austin, 940 F.2d 1514, 1517 (Fed Cir. 1991) (suggesting that a Board of Contract Appeal may not have authority to direct an award, but recognizing that a District Court under the APA does have such authority when "but for" agency violations, the protestor would have been awarded the contract).

The standard for determining whether a directed award is appropriate, in either a sealed bid or negotiated procurement, is whether "but for the illegal behavior of the agency" the contract would have been awarded to the protester. *See Delta Data sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984); *Choctaw Mfg. Co. v. United States*, 761 F.2d 609, 620 (11th Cir.

1985) ("A district court also has the authority to order a government contracting officer to award a contract to an unsuccessful bidder where it is clear that, but for the unlawful conduct of the contracting officer, the contract would have gone to the unsuccessful bidder.").

Klinge respectfully submits that the appropriate remedy under any of the above-stated protest grounds is a directed award of the Contract to the next in line technically acceptable and eligible offeror who represents "best value" to the agency. But for the agency's failure to exclude Sea Box for its failure to comply with the TAA, the next in line offeror would have been awarded the Contract. Here, the agency has conceded that Klinge is next in line with award. Additionally, Klinge's offeror was well below the agency's independent cost estimate and it is more than [redacted] than the next offeror with in the competitive range.

## VI. CONCLUSION

This procurement has been thoroughly mishandled by the agency, despite the agency's repeated changes to get it right. Klinge respectfully requests that this Court enter a Declaratory Judgment decreeing that: (a) the award of the Contract under Solicitation No. M67854-07-R-5060 to Sea Box by the agency was arbitrary, capricious, an abuse of discretion, and not in accordance with the law; (b) Sea Box is ineligible for award; and (c) the Contract should be awarded to the next eligible offeror representing "best value" to the agency, who the agency has identified as Klinge. Additionally, Klinge seeks injunctive relief consistent with such a judgment, including an order enjoining the agency from (a) accepting performance under the Contract by Sea Box and (b) taking any procurement action inconsistent with the declaratory relief issued by the Court; and directing the agency to (c) terminate the Contract to Sea Box and (d) award the Contract to the next eligible offeror representing "best value".

Respectfully Submitted,

Dated: April 30, 2008

By: ______________________

Richard P. Rector
DLA PIPER US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: 202.799.4000
Facsimile: 202.799.5000

Counsel for Plaintiff

<u>Of Counsel</u>:

Seamus Curley
Samuel K. Knowles
DLA PIPER US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: 202.799.4403
Facsimile: 202.799.5403