**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | |
|---|---|
| **KLINGE CORPORATION,** | |
| **Plaintiff,** | **No. 08-134C** |
| **v.** | **Judge Eric C. Bruggink** |
| **THE UNITED STATES OF AMERICA,** | |
| **Defendant,** | |
| **and** | |
| **SEA BOX, INC.** | |
| **Intervenor.** | |

# MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

1. Sea Box, Inc. ("Sea Box"), by its undersigned counsel, as Intervenor, pursuant to Rule 52.1 of the Rules of this Court ("RCFC") and pursuant to this Court's Scheduling Order dated May 9, 2008, respectfully requests that the Court grant judgment in favor of Defendant United States and against the Plaintiff Klinge Corporation.

2. Sea Box and its undersigned counsel were not admitted under the Protective Order issued by the Court in this litigation or by the General Accountability Office ("GAO") in the several proceedings which this litigation has followed. Consequently, Sea Box and its counsel only have access to redacted materials.

3. The Administrative Record and each Supplement to the Administrative Record have been filed in this proceeding by Plaintiff and Defendant under seal. Redacted copies of the Administrative Record and its Supplements have not been filed. Accordingly, Sea Box has not been able to view these documents and is unaware of precisely what they contain.

4. Sea Box believes that the Administrative Record as heretofore filed by Counsel for Plaintiff, and by the Defendant, accurately reflects the record required for inclusion in this proceeding. Based on what Sea Box believes to be the facts reflected in that record and the government's arguments during the several proceedings at GAO which preceded this litigation, Sea Box anticipates that Defendant will expand on those facts and arguments and file its own Motion for Judgment on the Administrative Record by May 15, 2008.

5. Sea Box requests that the Court also incorporate by reference herein the facts and arguments tendered by Defendant in its own corresponding Motion and requests that any conflict between those facts and arguments and those contained herein be resolved by the Court.

## **STATEMENT OF FACTS**

1. As a consequence of its not having had access to the Administrative Record, Sea Box can affect a limited compliance with that portion of Rule 52.1(b) which mandates that Sea Box include a Statement of Facts that draws upon and cites to the portions of the administrative record that bear on the issues presented to the Court. That

is, Sea Box includes, as its own Statement of Facts, citations in the Argument, *infra*, to certain of the tabbed documents [identified as AR Tabs 1 through 51] included in the Index to the Administrative Record, the Supplemental Index to the Administrative Record and the 2nd Supplemental Index to the Administrative Record, such indexes which were provided to Sea Box on May 6, 2008 by Plaintiff. However, Sea Box is unable to cite to specific page numbers within a limited number of those documents.

2. Sea Box requests that any conflict between the Statement of Facts referenced herein and that included by the Defendant in its own corresponding motion be resolved at the Court's discretion. Sea Box is not able to view, corroborate or refute a significant portion of the factual assertions made by Plaintiff since its Statement of Facts in Support of Plaintiff's Motion for Judgment on the Administrative Record ["Statement of Facts"], as provided to Sea Box, was heavily redacted. For example, see Plaintiff's Statement of Facts, paragraph 24 at page 8.

## **ARGUMENT**

Plaintiff has liberally sprinkled its First Amended Complaint for Declaratory and Injunctive Relief ["Complaint"] with assorted assertions that Sea Box proffered statements and/or representations which were "misrepresentations" or "mistakes." Plaintiff seeks to convince the Court by tedious references to these alleged "misrepresentations" or "mistakes" *ad infinitum* that Defendant accepted them to Plaintiff's detriment. It is that untenable foundation upon which Plaintiff subsequently builds its entire Complaint and its Motion for Judgment on the Administrative Record.

As one example, see the Complaint's paragraph 25 at page 9. Plaintiff refers therein to its allegations made in connection with its first protest at the General Accountability Office ("GAO"), B-309930. See AR Tab 18. Plaintiff's allegations therein were unsupported and represented no more than mere conjecture. Rather than providing factual evidence of a misrepresentation or of a mistake, such evidence which it lacked, Plaintiff merely asserted "Upon information and belief…." *Id*, at page 15. Further, Plaintiff therein based its unfounded allegations on what it characterized as Sea Box's "current manufacturing process" and "source for component parts," neither for which Plaintiff at the time had any concrete knowledge whatsoever.

In fact, Sea Box's representations were consistent throughout the entire path of this acquisition, from initial solicitation and award, through the two General Accountability Office ["GAO"] protests (Plaintiff's protest was ultimately denied), and throughout the present proceeding. Sea Box complies with the Trade Agreements Act in every respect, and for every part of the requirement.

In its final attempt as a very, very disappointed offeror to overturn the procuring agency's valid award to a responsible, domestically-owned small business concern, Plaintiff focuses and concentrates its Complaint by constructively labeling Sea Box's proposal as containing "misrepresentations" in the hopes that if repeated long enough, such undeserved and incorrect label might, through sheer luck, find a place to stick.

## **Intervenor's Response to Plaintiff's Count I**
## **[Misapplication of the Trade Agreements Act to CLIN 0001 (LFRS)]**

All paragraph and page number references herein (other than to obvious AR Tabs) are made to Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief.

A. Although hindered by redactions, Sea Box believes that Plaintiff concluded, in paragraph 70 at page 25, that substantial transformation of Sea Box's LFRS *"occurs in China."* That conclusion is unsupported by any prior holding and is specious. Sea Box's LFRS is not substantially transformed in China - it is substantially transformed in the U.S. at its manufacturing facility in New Jersey. Substantial transformation does not occur at the mere mechanical bolting-on of the refrigeration unit ["RU"] to the ISO container ["container"], no matter where that mere mechanical bolting-on is made, and despite Plaintiff's self-serving statements to the contrary. Substantial transformation occurs only after the multitude of additional manufacturing processes are completed so as transform the assembly into a fully-operational and mission-capable LFRS. See AR, Tab 46 (CO request to Sea Box and reply).

B. Plaintiff then attempts to further support its Count I by building on its prior faulty and untenable premise. Although hindered by redactions, Sea Box believes that Plaintiff concluded, in paragraph 71 at page 25, that because substantial transformation of Sea Box's LFRS occurs *"in China,"* it constitutes a *"Chinese"* end product which the agency is prohibited from purchasing pursuant to the Trade Agreements Act. That conclusion is also both unsupported by any holding and specious. As recited above, Sea Box's LFRS is not substantially transformed in China - it is substantially transformed in the U.S. at its manufacturing facility in New Jersey. Substantial transformation does not occur at the mere mechanical bolting-on of the refrigeration unit ["RU"] to the ISO container ["container"], no matter where that mere mechanical bolting-on is made, and despite Plaintiff's self-serving statements to the

contrary. Substantial transformation occurs only after the multitude of additional manufacturing processes are completed so as transform the assembly into a fully-operational and mission-capable LFRS. See AR, Tab 46 (CO request to Sea Box and reply).

C. Based on the foregoing unsupported and specious arguments, Plaintiff's conclusion that the agency's award to Sea Box as "arbitrary, capricious, an abuse of discretion and not in accordance with the law" is untenable and should be rejected. Plaintiff seizes on Sea Box's prospective bolting-on of the RU to the container in the U.S. as *"moreover"* justifying its untenable argument. Sea Box believes that even in the absence of such bolting-on within the U.S., substantial transformation occurs only after the multitude of additional manufacturing processes are completed so as transform the assembly into a fully-operational and mission-capable LFRS. See AR, Tab 46 (CO request to Sea Box and reply).

D. The Index and Supplemental Indexes to the AR as provided to Sea Box by Plaintiff do not reflect any documents dated after February 13, 2008 and before April 1, 2008, and that may be because the indexes as supplied to Sea Box were incomplete. In fact, the AR should reflect a March 28, 2008 letter from Sea Box to the Contracting Officer, Mr. McGinn. Within that letter, Sea Box stated (in part), and referring to the processes which occur following arrival of the RU at the container factory:

*"Following that, at the facility in China, and while being held in position by a forklift, the sturdy metal panel which surrounds the refrigeration unit is simply bolted to*

*the open container, effectively closing off the open end. This process consists of an operator placing a total of 32 connecting bolts into 32 pre-drilled holes – and then tightening them. Such operation is analogous to, and no more complex than, replacing a wheel/tire assembly onto an automobile axle when changing a flat tire by positioning the wheel in place and then setting and tightening five nuts onto five protruding bolts.*

*Even after the attachment of these two parts [i.e., the refrigeration unit to the unfinished container], each still retains its own country of origin characteristics. If the operator was to immediately unbolt and thus separate the two parts, once again their original and individual characteristics would remain unchanged. Without further and substantial transformation of this preliminary container assembly at our facility in the United States via the processes which will be hereinafter described, such assembly (i) would not comply with the specification requirements, (ii) would not be capable of performing all necessary functions, (iii) would not be capable of achieving the expected life, and (iv) would not be capable of passing government inspection and acceptance protocols.*

*The container bolts and closures of this preliminary container assembly are then sealed for Customs inspection purposes, and such assembly as it exists at that moment is transported by U.S. flag carrier to Sea Box's facility in New Jersey for further processing.*

*There are three very compelling and cogent reasons for this sequential shipping sequence – that is, sending the Singapore refrigeration unit to China for bolting to the preliminary container structure and then shipping the resulting assembly to the United States.*

*First, the rigid, thick metal panel which surrounds the refrigeration unit when manufactured by Carrier in Singapore serves as a load support for the preliminary container structure.*

*If the preliminary, open-ended, five-surfaced container was shipped from China to Sea Box's facility in New Jersey without the refrigeration unit's sturdy metal panel in place, that five-surfaced structure could deform or could be crushed under the weight of other structures stacked on top of it during the sea transportation journey to the United States.*

*Sea Box has several possible options. We can ship the five-surfaced preliminary container structure from China separately from the refrigeration unit and risk deformation or crushing, or we can bolt the refrigeration unit onto the structure in China and avoid the issue. Our good business judgment and sense prescribes that we choose the latter. Alternatively, we could bolt on a temporary metal side panel to the preliminary five-surfaced container structure instead of the refrigeration unit, and until it reached our New Jersey facility, but that would result in needless expense and waste. It would also necessitate special handling and stacking, since such structures would have to be placed and stacked on the ocean vessel in a way that would substitute for their reduced weight bearing characteristics.*

*Second, because the container interior has an aluminum floor, shipping an open-ended structure from China to the United States would subject the floor to corrosion from natural elements - even when transported in the confinement of an ocean vessel. To eliminate that issue, the structure should be closed off. And so, Sea Box elects to bolt on the refrigeration unit in China. Alternatively, we could bolt on a temporary metal side*

*panel to the five-surfaced container structure instead of the refrigeration unit, and until it reached our New Jersey facility, but again, that would result in needless expense and waste.*

*Third, shipping an open-ended container presents safety issues. If open and unsealed, substances which are illegal or hazardous could be placed therein during the sea journey and unbeknownst to Sea Box. To eliminate that possibility, the container structure needs to be closed off so that it can pass through Customs without issues. Alternatively, we could bolt on a temporary metal side panel to the five-surfaced container structure instead of the refrigeration unit, and until it reached our New Jersey facility, but again, the same negative consequences would likely result."*

E. Plaintiff concludes, in paragraph 73 at page 25, that it was prejudiced by the improper award to Sea Box. Plaintiff has failed to prove that the award was *improper*, and its argument and this Count I should thus be denied.

## <u>Intervenor's Response to Plaintiff's Count II</u>
## [Award of the Contract Based on a Material Misrepresentation Concerning CLIN 0001 (LFRS)]

A. Although hindered by redactions, Sea Box believes that Plaintiff concluded, in paragraph 75 at page 26, that Sea Box made a material misrepresentation to the agency by representing its LFRS to be a *U.S. end-product.* Plaintiff proceeds to assert that this representation is false because it based on a non-existent, erroneous legal standard and because it conflicts with the manufacturing processes described in Sea Box's

initial proposal, written discussion responses and FPR [final proposal revisions], which reveal the LFRS to be an end product of *"China."* Plaintiff's conclusions are incorrect.

The most telling document is Sea Box's letter to the Contracting Officer (AR Tab 23) in which Sea Box responded to proposal discussion questions prior to submission of its FPR. Plaintiff myopically focuses on Sea Box's additional characterization, within that response, of the relative cost of the various hardware and labor components of CLIN 0001. Sea Box described the contributions of each country and stated its relative value. Such statement of relative value was unnecessary, since the processes were identified as to where they would be performed. Plaintiff would like to somehow call into play the relative value analysis (for components) applicable to the Buy American Act, which was not applicable in this case, as undermining Sea Box's response. The response was nevertheless clear and consistent with its later representations within AR Tab 46. In stretching for its erroneous conclusion, Plaintiff focuses on the words *"and electrically"* appearing in the third paragraph on page 3 of Sea Box's September 12, 2007 letter to the Contracting Officer (AR Tab 23). This two-word characterization was inappropriately inserted by a non-engineer and was superceded by Sea Box's representation in the seventh paragraph on the same page which stated that *electrical* manufacturing processes would be performed in the U.S., not abroad. This issue was addressed by the GAO in its February 13, 2008 decision denying Plaintiff's protest on all grounds. See AR Tab 45. Therein, the GAO, after considering this specific matter as well as others, concluded from the record that the information available to the Contracting Officer prior to award indicated that the RU's would simply be bolted to the containers in China - i.e., that electrical integration would not be done in China.

Sea Box's FPR, its response to the agency's discussion questions, its Trade Agreements Act certifications and its representations in AR Tab 46 all clearly state the same thing: that CLIN 0001 is a U.S. end-product. There was no misrepresentation, and Plaintiff's arguments to the contrary should be rejected.

B. Based on the foregoing, Plaintiff's further conclusions at paragraph 77, 78 and 79 on page 27, particularly that the agency's award to Sea Box as "arbitrary, capricious, an abuse of discretion and not in accordance with the law," are untenable and should be rejected.

C. For the foregoing reasons, this Count should be denied.

**Intervenor's Response to Plaintiff's Count III**
**[Prejudicially Unfair Discussions]**

A. Although hindered by a redaction, Sea Box believes that Plaintiff concluded, in paragraph 81 at page 28, that Sea Box's LFRS constitutes a *Chinese* end product. That conclusion is unsupported by the record and is specious. Sea Box's LFRS is not substantially transformed in China - it is substantially transformed in the U.S. at its manufacturing facility in New Jersey. Substantial transformation occurs only after a multitude of additional manufacturing processes are completed so as transform the RU and container parts, and other parts, into a fully-operational and mission-capable LFRS. See AR, Tab 46 (CO request to Sea Box and reply).

B. Plaintiff, in paragraphs 82 through 84 on page 28, tediously revisits its previous assertion by focusing attention on the issue relating to the words *"and electrically"* appearing in the third paragraph on page 3 of Sea Box's September 12, 2007 letter to the Contracting Officer (AR Tab 23). This two-word characterization was inappropriately inserted by the undersigned non-engineer and was superceded by Sea Box's representation in the seventh paragraph on the same page which stated that *electrical* manufacturing processes would be performed in the U.S., not abroad. Plaintiff asserts that a single telephone conversation between the agency's Counsel and Sea Box's Director of Contracts (the undersigned) constituted improper discussions and an opportunity for Sea Box to revise its proposal.

Plaintiff refers to the single telephone conversation (and Declaration of agency's counsel) which are addressed in paragraph 48 on page 17. The inconsistency referred to was the statement within Sea Box's letter (AR Tab 46) referencing "electrical integration" being performed in China. This inconsistency (since within the same letter, Sea Box stated its intent to perform electrical work in the U.S.) was addressed and resolved. Again, this issue was addressed by the GAO in its February 13, 2008 decision denying Plaintiff's protest on all grounds. See AR Tab 45. Therein, the GAO, after considering this specific matter as well as others, concluded from the record that the information available to the Contracting Officer prior to award indicated that the RU's would simply be bolted to the containers in China - i.e., that electrical integration would <u>not</u> be done in China.

Plaintiff, in paragraph 84 on page 28, asserts that the agency's counsel's single telephone conversation constituted "discussions" under FAR 15.306 because it somehow

allowed Sea Box to revise its proposal and make its "unacceptable offer" acceptable to the agency.

As to exchanges with offerors after establishment of the competitive range, FAR 15.306(d) provides, in part:

*"Negotiations are exchanges, in either a competitive or sole source environment, between the Government and offerors, that are undertaken with the* ***intent*** *of allowing the offeror to revise its proposal."*

*"When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called* ***discussions****."*

[Emphasis added.]

In this case, there is no evidence whatsoever that the agency (or Sea Box) had any intention of allowing Sea Box to revise its proposal. The Plaintiff's assertion in paragraph 82 on page 28 that *"[T]he agency contacted Sea Box by telephone to advise that its written proposal response failed to demonstrate compliance with the TAA"* is itself a self-service and blatant misrepresentation. In fact, agency counsel's Declaration clearly stated something very different. Within his Declaration, agency counsel said: *"I contacted the Sea Box Director of Contracts* ***to clarify this issue*** *to determine whether Sea Box was compliant with the TAA…."* [Emphasis added.]

As to clarifications, FAR 15.306(a) provides, in part:

*"(1)* ***Clarifications*** *are limited exchanges, between the Government and offerors, that may occur when award* ***without*** *[further]* ***discussions*** *is contemplated."*

*"(2) If award will be made* ***without*** *conducting [further]* ***discussions****, offerors may be given the opportunity* ***to clarify certain aspects of proposals*** *…."*
[Emphasis added.]

In this case, agency counsel clearly intended to <u>clarify</u> the issue, not open discussions. Additionally, GAO's February 13, 2008 decision denying Plaintiff's protest on all grounds identified the telephonic communication interaction as a <u>clarification.</u> See AR Tab 45, B-309930.2 at line 27 on page 6.

(C) Based on the foregoing, Plaintiff's argument in paragraph 85 on page 28 that *"The agency's participation in these post-FPR communications and its award of the Contract [sic] to Sea Box was arbitrary, capricious, an abuse or [sic] discretion and otherwise contrary to law"* is not supported by the facts and should be rejected. Moreover, Plaintiff's additional claim therein as to "shepherding" and "unequal treatment" is as well contrary to the facts and should be rejected.

(D) Plaintiff asserts, in paragraph 86 on page 28, that it was prejudiced by the agency's participation in alleged post-FPR discussions. Since the telephonic interaction was not a discussion, but rather a clarification, this assertion should be rejected based on the foregoing.

Plaintiff further asserts that the agency permitted Sea Box an opportunity to *"cure"* its *"misrepresentation"* by modifying its proposal to use TAA-compliant sourcing for certain parts under CLIN 0003. Sea Box denies that any misrepresentation was made

to the agency with respect to CLIN 0003 and also denies that it modified its proposal in any way. Since this issue, and Plaintiff's allegations in paragraph 87 on page 29, are substantially mirrored and expanded in its Count IV, *infra*, Sea Box will consolidate its response to the CLIN 0003 issue addressed in Count III with its response to Count IV, below.

**<u>Intervenor's Response to Plaintiff's Count IV</u>**
**[Misapplication of the Trade Agreements Act**
**to CLIN 0003 (2-Year Parts Support Package)]**

(A) Plaintiff references the Court's remand in in paragraph 87 and on page 29, It is important to note and reflect here the actual language of the remand beyond the characterization "limited purpose" as cited by Plaintiff in its paragraph 87:

*"The agency is therefore ordered to obtain from Sea Box a written explanation of the entire process of manufacturing, assembly and testing of its refrigerated containers sufficient for the agency to adequately assess compliance."*

AR Tab 46 is stated to have included a presumably written request from the Contracting Officer to Sea Box for a reply providing the information required by the Court's Order. In fact, there was no request, and Sea Box provided its April 1, 2008 letter to the Contracting Officer on its own volition in a manner which it believed would be responsive to the requirement so as to demonstrate its TAA compliance with CLIN 0001. Therefore, within that reply, Sea Box specifically responded to the Court's requirement as cited, *supra.* Sea Box further provided information pertaining to CLINS 0002 through 0008.

Following that reply, on April 7, 2008, Defendant requested and was granted additional time in which to seek additional information from the parties about their respective compliance with the TAA.

On April 9, 2008, the Contracting Officer requested additional information from Sea Box, and Sea Box responded by its April 10, 2008 letter to the Contracting Officer. See AR Tab 49.

(B) Plaintiff asserts, in paragraph 89 at page 29, that *"Sea Box admitted during the remand proceedings that its pre-award offer did not comply with the TAA under CLIN 0003."* This assertion by the Plaintiff was a misrepresentation of the facts.

Sea Box offered 100% TAA-compliant CLIN 0003 product within its initial proposal and within its FPR. It was Sea Box's clear and unwavering intention at every moment during the initial acquisition and at every moment during every the subsequent GAO protests and this litigation to provide TAA-compliant product for CLIN 0003 and every other CLIN included in the agency's requirement.

On April 1, 2008, Sea Box's response to the Contracting Officer included information regarding CLIN's 0002 through 0008. Sea Box's supplier, Carrier, which had previously stipulated to Sea Box at the outset almost a year ago that the CLIN 0003 parts would be manufactured in TAA-compliant countries, advised Sea Box when the April 1, 2008 letter was being prepared that it would source several of the parts in the support package from countries other than TAA-compliant countries. Sea Box properly reported this to the Contracting Officer, although Sea Box was under the misconception that that this would satisfy the TAA and that there would be no issue.

Sea Box requests that the Court take judicial notice of the fact that the TAA is a complex law and has generated many complex and protracted litigations concerning its compliance. Therefore, while Sea Box intended to comply at all times with the contract's TAA requirements, it incorrectly assumed that not every single part need be TAA compliant, and that by furnishing 24 TAA-compliant parts out of 32 (also representing the overwhelming majority of the cost of such is parts), it would satisfy the requirements. Sea Box is not the only entity to share that view. In fact, GAO's decision in B-309930.2 (AR Tab 45) revealed that Plaintiff <u>itself</u> intended to provide several of its CLIN 0003 parts from China, a country which is not TAA-compliant. In a footnote contained in that decision, the GAO stated:

*"… as noted by the agency,* ***Klinge's proposed list of 23 spare parts (appendix F to its proposal), included two parts that were described in a separate list in its proposal (appendix B) as being "Non-Designated Country" parts and non-U.S. parts, which would appear to render its proposal not compliant with the Trade Agreements Act.*** *Klinge Comments, Jan. 23, 2008, at 3. In response to questions from GAO during this protest, Klinge explained that* ***while it intended to use two Chinese-made parts in the LFRSs it would deliver to the agency,*** *the two parts when included in the CLIN 0003 parts support package instead would be made in the U.S. or Mexico (a designated country). Klinge Comments, Jan. 23, 2008, at 3.* ***Klinge's intention was not apparent from its proposal."*** [See AR Tab 45 at page 5, footnote 5.]

[Emphasis added.]

Therefore, not only was Defendant's own proposal apparently non-compliant with the TAA, but after having admittedly flip-flopped its representations via an attempted explanation to GAO, Plaintiff now argues before this Court that Sea Box allegedly did the same thing during the remand and that as a consequence, Sea Box should be kicked out with award instead made to it [Plaintiff]. That argument, espoused by Plaintiff in paragraphs 90 through 93 on page 30, should consequently fail.

Next, even Plaintiff's counsel has been confused about whether the TAA requires every spare part in the CLIN 0003 package to be TAA-compliant. As evidence of this confusion and indeed misconception, one needs to look no further than the official transcript of the Court's April 17, 2008 teleconference among the parties, filed by the Court as Document 28. Therein, the Court posed a question to Plaintiff's counsel, and he responded, as follows:

***THE COURT:*** *What about Mr. Krafchek's point that,* ***at the GAO, you took the position, with respect to CLIN 3, that it did not have to be TAA compliant?***

***MR. RECTOR:*** *We did not take that position at the GAO. This is a complicated history, but there were two protests at the GAO. We filed an initial protest, and the agency took corrective action. In between the time when that corrective action was taken and when the next award was made,* ***there were communications back and forth between us and counsel, and I think we did take the position that the CLIN 3 didn't have to be TAA compliant.***

***In fact, we were wrong,*** *and we corrected that, and* ***during the second protest at the GAO, that issued was fully litigated, and we then understood that each element of each CLIN had to be TAA complaint,*** *and that was the basis for one of our protest grounds at the GAO.*

***So we were initially wrong in some communications between counsel,*** *but we did not take that position at the GAO.*

[Emphasis added.]

Plaintiff's counsel may have attempted to reverse and correct the erroneous position initially taken, but as the GAO remarked, *supra:* ***"Klinge's intention was not apparent from its proposal."***

It is not Sea Box's present intention to revive the proceedings in B-309930.2 or to have Plaintiff's counsel's remarks to the Court modify Plaintiff's proposal. Sea Box does respectfully ask that the Court recognize that Plaintiff and its counsel have had the same misconceptions about CLIN 0003 [that not all parts must be TAA-compliant] as Sea Box during its response to the agency on April 1, 2008. Nonetheless, in the same manner as Plaintiff would argue that it always intended to provide 100% TAA-compliant product, so then does Sea Box. Moreover, Sea Box's initial proposal and its FPR continuously represented that all product would be TAA-complaint. Apparently, after reading the GAO's remarks, *supra*, Plaintiff's FPR did not propose fully-compliant product.

C. Subsequent to Sea Box's submission of its April 1, 2008 letter, it became clear that all parts in the CLIN 0003 package must be TAA-compliant, not just the majority of them, a position which the Plaintiff embraced as well. And so, when the agency conducted its further inquiries both to Plaintiff and Sea Box, Sea Box informed the agency that all CLIN 0003 parts to be supplied would indeed be TAA-compliant. See AR Tab 49. Sea Box always had the capability of TAA-compliance from the outset, never changed its proposal, and confirmed its representations as such during the remand proceedings. Sea Box never changed its proposal in any respect. Sea Box does note for the Court that in its April 10, 2008 response to the agency, there were four typographical errors in the spare parts list provided. In fact, every Carrier part, part number and part description remains unchanged from that which Sea Box provided in the initial proposal and the FPR, and the country of origin for each and every part - as represented - is a TAA-compliant country.

D. Despite Plaintiff's assertion that the agency impliedly threatened Sea Box with contract termination, as per paragraph 90 on page 30, the agency never communicated that position. In fact, the agency's April 9, 2008 letter clearly states that while non-designated country parts may be used when the CLIN 0001 LFRS is substantially-transformed, they may not make up part of CLIN 0003. Sea Box responded accordingly, guaranteeing 100% TAA-compliance for CLIN 0003 as it always had, and via capabilities that it always had, and by leaving its proposal unchanged.

E. Based on the foregoing, Plaintiff's Counts III and IV should be denied.

**<u>Intervenor's Response to Plaintiff's Count V</u>**
**[Award of the Contract Based on a Material Misrepresentation Concerning CLIN 0003 (2-Year Parts Support Package)]**

A. Although hindered by significant redactions, Sea Box understands that Plaintiff asserted that Sea Box made material misrepresentations with respect to CLIN 0003. That is, Plaintiff concluded, from an intervening communication during the remand - i.e., sea Box's April 10, 2008 letter to the Contracting Officer (AR Tab 46) - that all of Sea Box's prior and subsequent representations and communications were "misrepresentations," and as a consequence, Sea Box's initial proposal, FPR and award were fatally tainted.

B. Sea Box herein incorporates all of its responses pertaining to Count IV, *supra,* so that they will pertain as well to Plaintiff's Count V.

C. Sea Box denies having made any misrepresentation to the agency. Instead, its representations were at all times intended to convey that Sea Box's proposal and the product to be furnished under the contract would fully comply with the TAA, unlike Plaintiff's proposal which the GAO indicated failed to do so.

D. Plaintiff seems to imply that if the agency reminded Sea Box that no less than 100% TAA-compliance with respect to every part in CLIN 0003 would be required after submission of proposals, that such advice would be the "Gotcha!" point at which Sea Box's promises and obligations under its proposal and contract would all be erased and its right to the contract extinguished. In fact, the agency did no such thing as its

May 9, 2008 letter (AR Tab 49) reveals. The agency asked for explanations - and satisfactory explanations were provided.

E. Plaintiff's statements in paragraph 99 on page 32 are blatant misrepresentations themselves. Plaintiff alleges that Sea Box "was unable to … reconcile the statements," that Sea Box "changed its offer," that Sea Box made a "blatant misrepresentation," and that Sea Box somehow "cured" its ineligibility. Further, Sea Box's supplier didn't have to "find" alternative sourcing; such sourcing was always available, but Carrier simply did not immediately understand the potential implications of providing some non-compliant parts with CLIN 0003 (a misconception obviously shared by Plaintiff and its counsel during the proceedings which preceded this litigation). It would be also be interesting to know when Plaintiff "cured" its own ineligibility, since its FPR ostensibly included CLIN 0003 parts manufactured in China.

F. Plaintiff's assertions in paragraphs 95 through 101 on pages 31 and 32 should consequently be rejected, and its Count V should be denied.

## **SUMMARY**

All of Plaintiff's assertions in paragraphs 69 through 101 on pages 25 through 33 in its First Amended Complaint for Declaratory Relief should be denied.

## CONCLUSION

The Motion for Judgment on the Administrative Record filed (or as will be filed) by the Government should be granted, and Plaintiff's Complaint should be dismissed.

Respectfully Submitted,

Date: May 15, 2008

s/Robert A. Farber
Robert A. Farber
1900 Frontage Road, Suite 1613
Cherry Hill, NJ 08034
Telephone: 610-349-1346
Facsimile: 267-295-9938

Counsel for Intervenor

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | |
|---|---|
| **KLINGE CORPORATION,** | |
| **Plaintiff,** | **No. 08-134C** |
| **v.** | **Judge Eric C. Bruggink** |
| **THE UNITED STATES OF AMERICA,** | |
| **Defendant,** | |
| **and** | |
| **SEA BOX, INC.** | |
| **Intervenor.** | |

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on May 15, 2008, a copy of the foregoing "MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of such filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access such filing through the Court's system.

s/Robert A. Farber
Robert A. Farber
1900 Frontage Road, Suite 1613
Cherry Hill, NJ 08034
Telephone: 610-349-1346
Facsimile: 267-295-9938

Counsel for Intervenor