**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(Bid Protest)**

| | | |
|---|---|---|
| KLINGE CORPORATION | ) | |
| Plaintiff, | ) | |
| | ) | No. 08-134C |
| v. | ) | |
| | ) | (Judge Bruggink) |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| SEA BOX, INC. | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1(b) of the Court's Rules ("RCFC") and the Court's scheduling order, defendant, the United States, respectfully requests the Court to enter judgment in its favor based upon the administrative record, and to deny the motion for judgment upon the administrative record filed by the plaintiff. In support of our motion, we rely upon the administrative record ("AR"), the accompanying statement of facts, and this brief.

## STATEMENT OF THE CASE

### I. NATURE OF THE CASE

In this post-award protest, Klinge Corporation ("Klinge") seeks declaratory judgment that the United States Marine Corps Systems Command ("USMCSC" or "agency") decision to award a contract under Request For Proposals No. M67854-07~R-5060 ("RFP") to acquire Large Field Refrigeration Systems to Sea Box, Inc. ("Sea Box") was arbitrary, capricious, an

abuse of discretion, and otherwise contrary to law. Klinge also seeks an order from the Court that either directs the agency to award the contract to Klinge or directs the agency to re-open the competition, conduct a new best-value determination, exclude Sea Box from the competition and make award to the offeror in the competitive range that represents best value. Finally, Klinge seeks bid preparation costs, protest costs, and attorney fees.

Klinge's complaint includes five counts. In Count 1 of its amended complaint, Klinge alleges that the agency erred by misapplying the Trade Agreements Act of 1979, as amended (19 U.S.C. § 2511 et seq.), ("TAA") to Contract Line Item Number ("CLIN") 0001. Compl. at ¶¶69-73. Count 2 of the amended complaint alleges that the agency erred by basing award of the contract on a material misrepresentation concerning CLIN 0001. Compl. at ¶¶74-79. Count 3 of the amended complaint alleges that the agency erred by engaging in prejudicially unfair discussion. Compl. at ¶¶80-87. Count 4 of the amended complaint alleges that the agency erred by misapplying the TAA to CLIN 0003. ¶¶87-93. Count 5 of the complaint alleges that the agency erred by basing award of the contract on a material misrepresentation concerning CLIN 0003. ¶¶94-101.

## II. STATEMENT OF FACTS

### A. The Solicitation For Large Field Refrigeration Systems

1. The United States Marine Corps ("USMC") determined that it needed to acquire an indefinite quantity of Large Field Refrigeration Systems ("LFRS") based upon an International Standards Organization ("ISO"). AR17.[1] From September 2006 to March 2007, the United States Marine Corps Systems Command ("USMCSC" or "the agency") conducted market

[1] "AR_" is a citation to the administrative record and the page number. Pagination has been completed by use of a bates number system.

research to identify possible vendors and suppliers and to determine how they would meet the USMC's requirements. AR18. The market research revealed that the only two suppliers in the world that currently manufacture the required containers are located in the Peoples Republic of China and Singapore. Id.

2. On March 30, 2007, Terrence McGinn, the contracting officer and Source Selection Authority ("SSA"), approved a source selection plan for the purchase of an indefinite quantity of LFRS. AR 1. An LFRS consists of two principal components: (a) a 20-foot insulated container that is ISO compliant; and (b) an electrically powered refrigeration unit. AR 48.

3. On April 10, 2007, the agency released Request For Proposal No. M67854-07~R-5060 ("RFP") to purchase an indefinite quantity of LFRS and related supplies and services. AR 37.

4. The agency anticipated issuing an Indefinite-Delivery Indefinite-Quantity ("IDIQ") Firm Fixed Price ("FFP") commercial contract to the successful offeror. AR39. Once fully assembled, the LFRS would consist of a refrigeration unit integrated within an ISO-compliant, insulated container. AR 42.

5. The RFP set forth the following eight (8) Contract Line Item Numbers ("CLINs"):

| **CLIN** | **Title** |
|---|---|
| 0001 | LFRS with Warranty and Shipping |
| 0002 | Spare Refrigeration Unit |
| 0003 | 2-Year Parts Support Package |
| 0004 | Refrigeration Unit Training Aid |
| 0005 | Technical Documentation Development |
| 0006 | Training Documentation Development |
| 0007 | New Equipment Training |

0008 Technical Meetings / Reviews

AR 40. (Emphasis in original).

6. CLIN 0001 required delivery of the completed LFRS and CLIN 0003 (2-Year Parts Support Package) required each offeror to propose a list of spare parts for the LFRS. ld. That is, each offeror was required to identify and propose the components needed to maintain the LFRS outlined in CLIN 0001. ld.

7. The RFP contained the following four (4) evaluation factors:

(a) Operational Effectiveness (most important);
(b) Past Performance (less important);
(c) Supportability (least important); and
(d) Price (evaluated, but not rated).

AR 42. Notably, the RFP did not list compliance with the Trade Agreements Act ("TAA") of 1979 as an evaluation factor or as a "go/no go" prerequisite that the contracting officer would use to determine whether a prospective offeror was eligible for award.

8. The RFP incorporated by full text FAR 52.212-3, thus, requiring all representations and certifications to be completed on an internet website. AR 42. FAR 52.212-3(a) defines place of manufacture as:

> [T]he place where an end product is assembled out of components, or otherwise made or processed from raw materials into the finished product that is to be provided to the Government. If a product is disassembled and reassembled, the place of reassembly is not the place of manufacture.

Id.

9. The RFP advised all prospective offerors that Defense FAR Supplement ("DFARS”) 252.225-7021 was applicable to the procurement. AR43. The following excerpts from DFARS 252.225-7021 are relevant to the issues currently before the Court:

> (a) *Definitions.* As used in this clause
>
> ****
>
> (2) “Component” means an article, material, or supply incorporated directly into an end product.
>
> (3) “Designated country” means—
>
> ****
>
> > (ii) A Free Trade Agreement country (Australia, Bahrain, Canada, Chile, Dominican Republic, El Salvador, Guatemala, Honduras, Mexico, Morocco, Nicaragua, or Singapore);
>
> ****
>
> (4) “Designated country end product” means a WTO GPA country end product, a Free Trade Agreement country end product, a least developed country end product, or a Caribbean Basin country end product.
>
> (5) “End product” means those articles, materials, and supplies to be acquired under this contract for public use.
>
> (6) “Free Trade Agreement country end product” means an article that:
>
> > (I) Is wholly the growth, product, or manufacture of a Free Trade Agreement country; or
> >
> > (ii) In the case of an article that consists in whole or in part of materials from another country, has been substantially transformed in a Free Trade Agreement country into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was transformed. The term refers to a product offered for purchase under a supply contract, but for purposes of calculating the value of the end product includes services (except transportation services) incidental to its supply, provided that the value of those incidental services does not exceed the value of the product itself.
>
> ****

> (8) "Nondesignated country end product" means any end product that is not a U.S.-made end product or a designated country end product.
>
> ****
>
> (10) "Qualifying country end product" means
>
> > (I) An unmanufactured end product mined or produced in a qualifying country; or
> >
> > (ii) An end product manufactured in a qualifying country if the cost of the following types of components exceeds 50 percent of the cost of all its components:
> >
> > > (A) Components mined, produced, or manufactured in a qualifying country.
> > >
> > > (B) Components mined, produced, or manufactured in the United States.
> > >
> > > (C) Components of foreign origin of a class or kind for which the Government has determined that sufficient and reasonably available commercial quantities of a satisfactory quality are not mined, produced, or manufactured in the United States.

Id.

10. The RFP advised offerors that, pursuant to the agency's performance specifications, "with the exception of specifications that are identified as **Critical Performance Parameters (CPP)** that cannot be violated, all other requirements are tradeable." AR 50. (Emphasis in original).

B. Receipt Of Proposals

11. On May 30, 2007, the agency received five (5) proposals in response to the RFP. AR 643. Included in this group were initial proposals from the plaintiff, Klinge Corporation ("Klinge"), and the intervenor, Sea Box, Inc. ("Sea Box"). Id.

12. Klinge's initial proposal offered to supply an LFRS that consisted of a container [redacted]

[redacted] ([redacted]. AR442. [redacted]. AR492. For CLIN 0003, Klinge initially identified and [redacted]. AR 611.

13. Despite the fact that [redacted], Klinge's initial proposal failed to specifically articulate how it would substantially transform the two component parts of its LFRS or provide a production schedule. Moreover, Klinge did not protest the lack of a Trade Agreement Certificate ("certificate") pursuant to DFARS 252.225.7020, in the RFP prior to the closing date for receipt of proposals and did not include a certificate in its initial proposal.

14. Sea Box's initial proposal offered to supply an LFRS that consisted of the identical container offered by Klinge and fully manufactured by [redacted] and a refrigeration unit manufactured [redacted], by an American-owned company, [redacted]. AR105-106. Sea Box provided a [redacted]

| | | |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

| | | |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

Id. Sea Box's proposal provides no other explanation of the work or manufacturing activities that occur in [redacted][2] The proposal indicated that the refrigeration unit would be delivered to [redacted], where the refrigeration unit would be attached to the ISO Containers prior to shipment to Sea Box's New Jersey facilities. Id. For CLIN 0003, Sea Box initially identified and proposed [redacted]. AR 123.

C. The Agency's Initial Evaluation And Award

15. In evaluating the initial proposals, the agency concluded that Klinge's Proposal did not meet a mandatory requirement of the RFP and eliminated Klinge from competition. AR 651. The evaluation team recommended award to Sea Box without discussions and advised legal review of the representations and certifications included in the proposal. Id.

16. On July 12, 2007, the agency awarded the contract to Sea Box at an evaluated price of $12,576,970.90 (for the base year plus four option years). AR 793.

17. On July 17, 2007, after learning of its elimination from the competition, Klinge requested a debriefing, which the agency provided via telephone conference On July 26, 2007. AR 1187.

[2] Kinge asserts that Sea Box's LFRS would be completed, and therefore, substantially transformed [redacted] cites AR 102-104, 106, and a container maintenance document from [redacted]. Statement of Facts, ¶ 17. However, none of the cited pages supports the contention that Sea Box ever indicated its LFRS would be fully and finally assembled and [redacted] Thus, this assertion has no support in the administrative record.

D. The First GAO Protest

18. On July 30, 2007, Klinge filed a protest at the Government Accountability Office ("GAO") asserting numerous allegations that the agency violated applicable procurement law. AR 817-833.

19. On August 18, 2007, after careful consideration of the various allegations, GAO determined that Klinge only raised one valid protest ground and directed the agency to produce an agency report on that singular issue. AR 837. However, shortly after receiving GAO's decision, the agency elected to take corrective action on the matter. AR 838. Specifically, the agency announced that it would terminate award to Sea Box, re-evaluate the proposals, establish a competitive range, hold discussions, and make a new source selection. Id. GAO subsequently dismissed the protest as academic.

E. Discussions, Final Proposal Revisions, Re-evaluation, And Award

20. On September 6, 2007, the agency issued written discussion questions to Klinge and Sea Box. See AR, Tab 20 & Tab 21. Each offeror was asked to provide a completed TAA Certificate pursuant to DFARS 252.225-7020 and respond to a series of questions concerning the offeror's proposal. AR 842 & 885.

21. The agency requested Klinge to respond to the following question concerning its compliance with the TAA:

> Question 3. As specified in amendment 01, this procurement is subject to DFARS clause 252.225.7021 regarding Trade Agreements. Please refer to the definitions for Free Trade Agreement country end products and WTO GPA country end products contained in this clause. Appendix B of your proposal appears to indicate that you will be supplying containers from Malaysia. Your proposal failed to explain how this would satisfy the requirements of DFARS 252.225.7021.

> Accordingly, you are requested to provide the completed DFARS provision 252.225.7020 which requires that you specifically identify the country of origin for each line item number and to address your compliance with DFARS 252.225.7021.

AR 842.

22. The agency requested Sea Box to respond to the following question concerning its compliance with the TAA:

> Question 2. As specified in amendment 01, this procurement is subject to DFARS clause 252.225.7021 regarding Trade Agreements. Please refer to the definitions for Free Trade Agreement country end products and WTO GPA country end products contained in this clause. Appendix B of your proposal appears to indicate that you will be supplying containers from Malaysia. Your proposal included provision 52.214-14 which indicated that Quingdao CIMC Special Reefer Co. Inc, Ltd., located in Quingdao, China was being utilized as a source of supply for the performance of this contract. Your proposal failed to explain what items were being provided from China and how they would satisfy the requirements of DFARS 252.225.7021. Accordingly, you are requested to provide the completed DFARS provision 252.225.7020 which requires that you specifically identify the country of origin for each line item number and to address your compliance with DFARS 252.225.7021.

AR 885.

23. On September 12, 2007, Klinge responded to the agency's discussion questions, provided a completed DFARS 252.225-7020 certificate, and explained its position concerning how it believed its LFRS satisfied the TAA. AR 854-860. Additionally, Klinge explained [redacted]" AR 858-859, & 879.

24. On September 12, 2007, Sea Box responded to the agency's discussion questions, provided a completed DFARS 252.225-7020 certificate, and stated that "[redacted] AR 888 & 895. Specifically, Sea Box provided a [redacted] in the following chart:

| [redacted] | [redacted] | [redacted] |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

Id. Sea Box also explained that it intended to perform [redacted]" Id. (Emphasis added). With respect to CLIN 0003, Sea Box provided the following explanation:

> [redacted]

AR 889.

25. After reviewing the respective discussion responses, the agency requested Final Proposal Revisions ("FPRs") from Klinge and Sea Box with a closing date of September 21, 2007. AR

896 & 952. On September 20, 2007, each offeror submitted an FPR to the agency. See, AR, Tabs 22 & 23.

26. In its FPR, Sea Box affirmed its plan to acquire the ISO containers from CIMC and the refrigeration unit from Carrier, revised the quantities in its spare parts package for CLIN 0003, and provided an updated production schedule. AR 960-961, 987, & 991-993.

27. With respect to the "Build Containers" category, the following excerpt demonstrates Sea Box's updated production schedule:

| | | |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

AR 991.

28. Sea Box also revised the representations and certifications section in its proposal to reflect the following:

[redacted]-

[3] "Reefer" is synonymous with refrigeration.

[redacted]

AR 1011.

29. On October 9, 2007, after receipt of FPRs, the agency reconvened the Source Selection Evaluation Team ("SSET") to evaluate the original proposals, discussion responses, FPRs, and past performance information. AR 1012. With respect to the discussion responses submitted by Klinge and Sea Box, to include the TAA compliance issues raised in the GAO protest filed by Klinge, the SSET Chairman "deemed the answers responsive to the questions." AR 1013. At the conclusion of its evaluation, the SSET made the following recommendation:

> 6.0 Recommendation:
>
> Sea Box, Inc. is rated as the technically superior solution under this

> solicitation, based on: past performance evaluations that were highly relevant and had one of the highest ratings; the [redacted] The offeror only had one single Marginal attribute [redacted] for which the other two offerors were also rated Marginal.
>
> Based on being best technical and lowest overall price, these two elements combine to render it the Best Value to the Government.
>
> It is recommended contract award be made to Sea Box, Inc.

AR 1022.

30. On October 15, 2007, the contracting officer issued a Business Clearance Memorandum ("BCM") in which he explained his decision to accept the recommendation of the SSET and award the contract to Sea Box. AR 1023 – 1031. Additionally, in ¶19 of the BCM, the contracting officer specifically checked the "yes" box in response to the question: "[a] review of all applicable representations and certifications has taken place." AR 1026.

31. The contract was modified to reflect that the agency awarded the contract to Sea Box on October 18, 2007. AR 1032-1038. On that same date, the contracting officer memorialized his source selection decision. See, AR 1039-1041.

F. The Second GAO Protest And Supplemental Protests

32. After learning that Sea Box was awarded the LFRS contract for an evaluated price of $12,069,561.31, Klinge requested a debriefing. On November 2, 2007, pursuant to FAR 15.506(b), the agency provided Klinge with a written debriefing whereby it included all of the relevant information required by FAR 15.506(d). AR 1056-1065.

33. On November 6, 2007, Klinge filed a protest with the GAO challenging the agency's best value determination. AR 1066–1093. Specifically, Klinge asserted that it was impossible for Sea Box to prove TAA compliance under CLIN's 0001 and 0003 and alleged that the agency: failed to properly evaluate the strengths in Klinge's proposal; made award to Sea Box based upon a misrepresentation or mistake; engaged in unequal discussions; over-evaluated the strengths in Sea Box's proposal; failed to properly consider and compare price, failed to apply the required cost/technical trade off required in a best value procurement; failed to conclude that Klinge's proposal represented best value to the Government; and claimed, therefore, that Klinge suffered prejudice as a result. Id.

34. On November 26, 2007, Klinge filed a supplemental protest with the GAO wherein it raised a fresh multitude of protest allegations. AR 1094-1126. Klinge reiterated its allegations that Sea Box could not possibly demonstrate TAA compliance for CLINs 0001 and 0003, claimed that Sea Box should have been excluded from consideration for allegedly failing to include a product specification in its proposal, alleged disparate treatment, and argued that the record contained insufficient evidence to support the agency's conclusions. Id.

35. On December 10, 2007, the agency filed an agency report and legal memorandum responding to Klinge various protest allegations. AR, Tab 33. Shortly after filing of the agency report, GAO directed the agency to produce additional documents and this was completed on December 18, 2007. On December 20, 2007, Klinge filed a response to the agency report and legal memorandum. AR, Tab 34.

36. On December 28, 2007, Klinge filed a second supplement protest with the GAO based on the December 18, 2007 disclosure. AR, Tab 54. In this supplemental protest, Klinge alleged

that Sea Box committed a misrepresentation when offering its LFRS as an end product with Singapore as its country of origin. AR 1515-1517.

37. On January 9, 2008, the GAO ordered the agency to furnish a supplemental agency report and directed the agency, at a minimum, to respond to four specific questions. AR 1522.

38. On January 14, 2008, pursuant to the January 9, 2008 GAO order, the agency filed a supplemental agency report. AR, Tab 36.

39. On January 17, 2008, Klinge filed comments on the January 14, 2008 agency report. AR, Tab 37.

40. On January 22, 2008, GAO directed Klinge, at a minimum, to respond to four specific questions concerning its discussions responses. AR, Tab 38. Klinge responded to GAO's questions on January 23, 2008. Id.

41. On January 24, 2008, the agency provided GAO with a detailed explanation of the efforts taken by agency counsel, David Ingold, in communicating with Klinge and Sea Box regarding TAA certification and compliance. See, AR 1376–1379. The following excerpt from Mr. Ingold's affidavit, ¶ 6, led to a supplemental protest at the GAO by Klinge and is still an issue before the Court:

> 6. Once again, I remained quite involved in the process throughout discussions and on through the award decision. I responded to a few requests from Klinge's Counsel regarding TAA issues and some procedural issues. Moreover, I viewed several of their requests to require more detailed documentation from the offerors regarding TAA compliance as unnecessary and unsupportable given the lack of any credible evidence to justify such action. In effect, I viewed this as nothing more than a fishing expedition by Protester's Counsel which I viewed as beyond the limits of proper inquiry. I advised the Contracting Officer that the discussions need not go to the extraordinary lengths requested by the Protester's Counsel and that he could rely on the TAA certification of the offerors in the absence of any credible evidence which would

> challenge such certification. As provided in the Agency Report and Supplemental Agency Report, and the Agency's 24 January 2008 letter in response to the Protester's 17 January 2008 "Comments on the Agency's Supplemental Report," I saw no reason to challenge the TAA certification of Sea Box regarding CLIN 0003 given that nothing in its discussion responses nor its FPR was contradictory to its certification. A question was raised by Sea Box's discussion response regarding CLIN 0001. Specifically, its reference to work performed in [redacted] appeared to be inconsistent with its FPR and with previous information provided to the Government after the initial award and start of performance prior to the first protest. I contacted the Sea Box Director of Contracts to clarify this issue to determine whether Sea Box was compliant with the TAA in order to be eligible [redacted] Mr. Farber indicated that he had prepared the discussion responses and that he was not an engineer and that his discussion statement was incorrect to the extent that it indicated that mechanical and electrical integration took place in [redacted]. I believe that he consulted with Mr. Brennan, the President of Sea Box, at some point in time to verify that he was correct in saying that [redacted] I advised the SYSCOM Contracting Officer, Terry McGinn, of my legal opinion that given all the representations of Sea Box that they understood their obligations under the TAA and that the [redacted]

AR 1378. Additionally, the agency replied to new allegations raised in Klinge's January 23, 2008 filing. AR, Tab 39. The agency also filed a response to Klinge's January 17, 2008 comments on the supplemental agency report. AR, Tab 57.

42. On January 28, 2008, Klinge filed comments to the agency's supplemental reports. AR, Tab 57. Therein, Klinge reiterated many of its previous allegations concerning the agency's conduct during the procurement and claimed that Sea Box was ineligible for award. Id. Although not expressly articulated as a protest ground, Klinge specifically took issue with a communication between agency counsel, Mr. Ingold, and Sea Box's counsel, Robert Farber concerning certification of TAA compliance after discussions closed, but prior to award. AR

1551-1561. Essentially, Klinge argued that this communication constituted an unauthorized discussion and demonstrated that Sea Box was not TAA compliant at the time of award. Id.

43. On January 29, 2008, the contracting officer submitted an affidavit demonstrating that he construed the communication between Mr. Ingold and Mr. Farber's as a clarification about Sea Box's certifications, and not a discussion question because it was not related to material terms in Sea Box's proposal. AR, Tab 41.

44. On January 30, 2008, Klinge submitted a brief attacking the validity of the contracting officer's opinion. AR, Tab 42.

45. The parties were afforded the opportunity to brief the issue of whether the communication constituted a discussion or a clarification and whether the communication fell under the contracting officer's discretion when making a responsibility determination. AR, Tabs 43 & 44.

G. The GAO Decision

46. On February 13, 2008, the GAO denied the protest and found that the agency reasonably determined that Sea Box is TAA compliant under CLIN 0001. AR 1407-1416. The GAO also found that the agency's post '[redacted]." AR 1413 (Footnote 4). With respect to CLIN 0003, the GAO found that, in light of Sea Box's written discussion responses, the agency reasonably concluded that Sea Box was TAA compliant under CLIN 0003. AR 1413-1414. Finally, GAO found that there was a question about Klinge's TAA compliance under CLIN 0003 [redacted]. AR 1414 (Footnote 5).

H. Klinge's Protest With The Court

47. On March 6, 2008, Klinge filed a Complaint and a Motion For A Temporary Restraining Order And Preliminary Injunction, in this Court.

48. On March 18, 2008 the Court advised the parties that, upon review of the administrative record, a remand to the agency would be appropriate to require the agency to document the offeror's compliance with the TAA. The following day, the Court entered an Order remanding the matter to the agency "for the limited purpose of developing a more complete written record with respect to compliance with the TAA."

49. Specifically, the Court ordered the agency to obtain from the parties "a written explanation of the entire process of manufacturing, assembly, and testing of its refrigerated containers sufficient for the agency to adequately assess compliance."

50. Following the Court's Order, Sea Box provided supplemental information to the agency regarding its compliance with the TAA. AR, Tab 46. In its submission, [redacted] AR 1422. Sea Box failed to provide an explanation or reconcile this latest certification of TAA compliance with its FPR or prior submissions to GAO.

51. Despite the Court's remand and the agency's specific request that they demonstrate TAA compliance over and above what was previously submitted, Klinge elected to rely on its prior submissions and offered a one-page document citing documents already in the administrative record. AR, Tab 47.

52. In response to the submissions provided by Sea Box and Klinge, the contracting officer initially determined that both offerors were TAA compliant for CLINs 0001 and 0002. AR

1459. However, the contracting officer was unable to determine that both offerors were TAA compliant for the spare parts package under CLIN 0003. Id. Based upon his inability to determine TAA compliance under CLIN 0003 for both offerors, the contracting officer announced that it was his intent to conduct new market research, potentially change the performance specifications and Statement of Work for the LFRS acquisition, and re-compete the agency's requirement. AR 1460.

53. On April 7, 2008, after carefully considering all relevant facts and circumstances, the contracting officer determined that he did not possess sufficient information to make an informed decision regarding both offerors TAA compliance for CLIN 0003 and he subsequently sought additional information from the parties' TAA compliance. AR, Tabs 49 & 50. The agency communicated these concerns to plaintiff's counsel and subsequently filed an unopposed motion to stay proceedings, which the Court granted.

54. In its response to the second request for an explanation regarding TAA compliance for CLIN 0003, Klinge submitted a new, detailed explanation. AR 1469-80.

55. In its response to the second request for an explanation regarding TAA compliance for CLIN 0003, Sea Box explained that during the Court's initial remand it was advised, for the first time, by its subcontractor, Carrier, that "[redacted]" AR 1465. Sea Box further explained to the contracting officer that its subcontractor is fully capable of supplying all of the spare parts from either the United States or a designated country. Id. Although it contained minor changes in model or identification numbers, Sea Box's response contained the exact same number of parts, at the same price, and

delivery schedule as it included in its FPR for CLIN 0003. AR 1466. Sea Box's response changed the quantity for one of the items [redacted]) proposed for CLIN 0003, however, this appears to have been a typographical error because, despite the change in quantity, there is no change in price and Sea Box affirmatively stated in its response to the Court's initial remand order that nothing in this submission changes the FPR submitted on September 20, 2007. Id & AR 1419.

56. Based upon the responses from the offerors, the contracting officer determined that both Klinge and Sea Box are TAA compliant under CLIN 0003. AR 1482. The contracting officer specifically stated that Sea Box:

> . . . provided a clear and unambiguous statement regarding its ability to comply with the TAA. The President of Sea Box, Mr. Jim Brennan, Jr., provided a statement explaining that Sea Box understood the requirement to be TAA compliant regarding all spare parts contained in CLIN 0003. Mr. Brennan detailed the efforts of Sea Box which contacted the [redacted], to ensure that all spare parts would be from the U.S. or designated countries. . . . While it caused some concern that Sea Box previously indicated that it would be non-compliant with the TAA, I find that the statement from the president of Sea Box unequivocally documents both the intention and the ability of Sea Box to comply with the TAA regarding CLIN 0003.

AR 1482. The contracting officer also noted that Sea Box would "[redacted] required to be compliant with the TAA." Id. The contracting officer concluded:

> Moreover, it remains my opinion that Sea Box is compliant with the TAA regarding the [LFRS] CLIN 0001 by virtue of the substantial transformation that takes place at the Sea Box manufacturing facility in New Jersey. The [redacted] unit into the [redacted] to the U.S. does not in my opinion, make Sea Box noncompliant with the TAA.

Id. In light of these findings, the contracting officer determined that it was and is in the agency's best interest to allow Sea Box to continue performance of the contract.

57. On April 21, 2008, Klinge filed an amended complaint wherein it raises five counts of alleged improper agency action during the procurement of the LFRS. Specifically, Klinge alleges that the agency misapplied the TAA to CLIN 0001 and CLIN 0003, awarded of the contract based upon a material misrepresentation concerning CLIN 0001 and CLIN 003, and engaged in prejudicial discussions. Compl. at pp. 25 - 27, 29, & 31.

## ISSUES PRESENTED

1. Whether the agency's evaluation of Sea Box's proposal for CLIN 0001 was in accordance with the Trade Agreements Act of 1979.

2. Whether the agency's evaluation of Sea Box's proposal for CLIN 0003 was in accordance with the Trade Agreements Act of 1979.

3. Whether lack of a required certification requires an agency to immediately eliminate an offeror from consideration for award of a contract or terminate award of an already existing contract.

4. Whether an agency is prohibited from communicating with offerors about representations and certifications after the close of discussions and prior to award of the contract.

## SUMMARY OF ARGUMENT

The administrative record demonstrates that the USMCSC did not commit any errors in evaluating Sea Box's proposal and properly applied the TAA at all times during the evaluation of proposals. Indeed, the agency rationally determined that Sea Box's manufacturing process substantially transformed the two core elements of the LFRS, the container and refrigeration

unit, into a new end-product at its New Jersey facility. USMCSC also rationally determined that Sea Box's proposal for CLIN 0003, the spare parts package, complied with the requirements of the TAA.

Additionally, lack of a representation or certification in an offeror's proposal or during performance of an already-existing contract does not require the immediate elimination of an offeror from consideration for award and does not require termination of the contract.

Moreover, the agency did not engage in discussions with Sea Box when it sought information that was strictly limited to Sea Box's certifications under the TAA. Even if Klinge can prove a discussion did take place, Klinge cannot demonstrate that it suffered prejudice as a result of this alleged discussion. Finally, Klinge cannot prove that it is entitled to permanent injunctive relief because the harm to the agency would greatly outweigh any harm to Klinge and granting Klinge's requests for injunctive relief would not be in the public interest.

## ARGUMENT

### I. Governing Legal Standards

Pursuant to the Tucker Act, the Court will not disturb a contract award unless it determines the action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), cited in 28 U.S.C. § 1491(b)(4). To consider granting relief, the Court must find that USMCSC committed a clear violation of law or abuse of discretion and that the error materially prejudiced a protestor by depriving it of a "substantial chance" of obtaining an award. Alfa Laval Sep'n, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999); CACI, Inc. Fed. v. United States, 719 F.2d 1567, 1573 (Fed. Cir. 1983); see also 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error").

Indeed, prejudice, as an aspect of standing, "must be [addressed] before reaching the merits." Information Tech. & Applics. Corp. v United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003). This Court should make findings concerning prejudice to a protestor, as necessary, "as if it were conducting a trial on the record." Bannum, Inc. v. United States, 404 F.3d 1346, 1354 (Fed. Cir. 2005) (construing former RCFC 56.1); see also RCFC 52.1 (2006 drafters note). Notwithstanding ambiguous or erroneous dicta in Bannum, 404 F.3d at 1354, "the 'substantial evidence' standard" of 5 U.S.C. § 706(2)(E) for review of agency factual conclusions "does not apply" in procurement protests. Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000) (emphasis added).

Because this a post-award protest, plaintiff may not challenge an alleged "patent error" or ambiguity in the RFP solicitation. Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313-14 (Fed. Cir. 2007) ("[This] waiver rule . . . prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation.").

Contract awards based upon best value should be sustained if "grounded in reason . . . even if the [reviewing body] might have chosen a different proposal." Widnall v. B3H Corp., 75 F.3d 1577, 1580 (Fed. Cir. 1996). The Court should not reassess "minutiae of the procurement process," such as "technical ratings." E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996). It should accord the procurement a "presumption of regularity" and ask whether the agency made rational use of the record. Emery W.W. Airlines, Inc. v. United States, 264 F.3d 1071, 1085 (Fed. Cir. 2001) (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971)); see generally Camp v. Pitts, 411 U.S. 138, 144 (1973) (per curiam).

Finally, even if prejudicial error is found, in order to obtain injunctive relief, a protestor

must establish that it would suffer irreparable harm in the absence of an injunction; that the balance of harms among the parties favors granting the relief; and that the relief will not harm the public interest. PGBA, LLC v. United States, 389 F.3d 1219, 1229 (Fed. Cir. 2004).

Pursuant to RCFC 52.1, this Court reviews the agency's procurement decisions to determine whether they are supported by the already-existing administrative record. The standards applicable to a motion for judgment upon the administrative record differ from those applied in the context of a Rule 56 motion for summary judgment. Bannum, 404 F.3d at 1355-56; Lions Raisins, Inc. v. United States, 51 Fed. Cl. 238, 246-47 (2001); Tech Systems, Inc. v. United States, 50 Fed. Cl. 216, 222 (2001) (explaining basis for summary judgment on the administrative record). Unlike a Rule 56 motion, "proceeding under RCFC [52.1] merely restricts the evidence to the agency record . . . ." Bannum, 404 F.3d at 1356. "Thus, the central inquiry on a motion for summary judgment -- whether the movant has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes summary judgment -- has no bearing on a review of the administrative record . . . ." Tech Systems, 50 Fed. Cl. at 222; accord Bannum, 404 F.3d at 1356 (holding that RCFC [52.1] requires a different standard of review without the burden-shifting and presumptions required pursuant to RCFC 56).

Unlike a motion for summary judgment, the question of whether an issue of material fact is disputed has no bearing upon a review of the administrative record in a record review case, such as a bid protest. The inquiry, instead, is whether, given all the disputed and undisputed facts, the plaintiff has met its burden of proof that the contracting officer's decision was arbitrary, capricious, or contrary to law. Id. (citing CCL Serv. Corp. v. United States, 48 Fed. Cl. 113, 119 (2000)). In reviewing the agency's action under this narrow, deferential standard,

"the focal point for judicial review should be the administrative record already in existence, not some record made initially by the reviewing court." Florida Power & Light v. Lorion, 470 U.S. 729, 743-44 (1985) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)); see also Bannum, 404 F. 3d at 1356 (holding that RCFC [52.1] is designed to provide for expedited trial upon a paper record and that the trial court is required to make factual findings based upon the record evidence).

Here, Klinge requests permanent injunctive relief. Injunctive relief is appropriate "only in extremely limited circumstances." CCL Serv. Corp. v. United States, 48 Fed. Cl. 113, 120 (2000) (quoting CACI, Inc. , 719 F.2d at 1581). In order to obtain a permanent injunction, a plaintiff must carry the burden of establishing entitlement to this extraordinary relief based upon the following factors: (1) actual success on the merits; (2) that plaintiff will suffer irreparable injury if injunctive relief is not granted; (3) that, if the injunction is not granted, the harm to plaintiff will outweigh the harm to the Government and third parties; and (4) that granting the injunction serves the public interest. Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. 303, 320-21 (2000). The decision whether to grant an injunction is within the sound discretion of the trial court. FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).

## II. The USMCSC Properly Applied The TAA During The Procurement

The threshold issue before the Court is whether the USMCSC properly applied the TAA during the procurement. In instances when the TAA is applicable, agencies are required to determine if the end product proposed by a particular offeror:

> (I) Is wholly the growth, product, or manufacture of that country; or
>
> (ii) In the case of an article that consists in whole or in part of materials from another country, **has been substantially transformed**

> **in that country into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was transformed**. The term refers to a product offered for purchase under a supply contract, but for purposes of calculating the value of the end product includes services (except transportation services) incidental to its supply, provided that the value of those incidental services does not exceed the value of the product itself.

See, TAA and DFARS 252.225-7021. (Emphasis added).

Accordingly, the country of origin of an article is the country in which it was wholly manufactured or, if processed in several countries, the country in which the article last underwent a substantial transformation. The well-established test for determining whether a substantial transformation has occurred is derived from language enunciated in Anheuser-Busch Brewing Association v. United States, 207 U.S. 556 (1908), which defined the term "manufacture" as follows:

> Manufacture implies a change, but every change is not manufacture and yet every change in an article is the result of treatment, labor and manipulation. But something more is necessary, as set forth and illustrated in Hartranft v. Wiegmann, 121 U.S. 609. There must be transformation; a new and different article must emerge, having a distinctive name, character or use.

Id. at 562.

"Simply stated, a substantial transformation occurs 'when an article emerges from a process with a new name, character, or use different from that possessed by the article prior to processing." See, Texas Instruments, Inc. v. United States, 69 CCPA 152, 681 F.2d 778 (1982) (cited with approval in Torrington Co. v. United States, 764 F. 2d 1563, 1568 (1985)). The issue of whether a substantial transformation occurs is determined on a case-by-case basis." United States Customs and Border Protection Advisory Ruling, HQ563127, December 15, 2004. See also, United States v. Gibson-Thomsen Co., 27 CCPA 267 at 270 (1940), and National Juice

Products v. United States, 10 CIT 48, 628 F. Supp. 978 (CIT 1986).

In determining whether the combining of parts or materials constitutes a substantial transformation, the determinative issue is the extent of operations performed and whether the parts lose their identity and become an integral part of the new article. Belcrest Linens v. United States, 6 CIT 204, 573 F. Supp. 1149 (1983), aff"d, 741 F.2d 1368 (Fed. Cir. 1984). If the manufacturing or combining process is a minor one which leaves the identity of the imported article intact, a substantial transformation has not occurred. Uniroyal Inc. v. United States, 3 Ct. Int'l Trade 220, 542 F. Supp. 1026 (1982). "Assembly operations that are minimal or simple, as opposed to complex or meaningful, will generally not result in a substantial transformation." United States Customs and Border Protection Advisory Ruling, HQ W563587 (February 8, 2007) (internal citations omitted).

Pursuant to 19 C.F.R. § 177.21 et seq.,which implements Title III of the TAA, the United States Customs and Border Protection ("CBP") issues country of origin advisory rulings and final determinations on whether an article is or would be a product of a designated foreign country or instrumentality for the purpose of granting waivers of certain "Buy American" restrictions in U.S. law or practice for products offered for sale to the U.S. Government.[4] In order to determine whether a substantial transformation occurs when components of various origins are assembled to form completed articles, CBP considers:

> [**T]he totality of the circumstances and makes such decisions on a case-by-case basis**. The country of origin of the article's components, the extent of the processing that occurs within a given country, and

[4] We note that, pursuant to 19 C.F.R. § 177.21, CBP's advisory rulings are information letters and CBP's final determinations are subject to judicial review by the Court of International Trade and, therefore, contrary to Plaintiff's assertion, the CBP does not have "jurisdiction," as used in the traditional sense, "to make country of origin determinations in relation to federal procurement and beyond. Pl. Br. at 14.

> whether such processing renders a product with a new name, character, or use are primary considerations in such cases. Additionally, facts such as resources expended on product design and development, extent and nature of post-assembly inspection procedures, and worker skill required during the actual manufacturing process will be considered when analyzing whether a substantial transformation has occurred; however, **no one such factor is determinative**.

United States Customs and Border Protection Advisory Ruling, HQ W563587 (February 8, 2007) (internal citations omitted) (emphasis added).

A. The Agency Properly Concluded That Sea Box's LFRS Under CLIN 0001 Was Compliant With The TAA

The agency rationally and reasonably determined that Sea Box's proposal for CLIN 0001 is TAA compliant for CLIN 0001. In its initial proposal and FPR, discussion response, and two responses to the agency made under the Court's remand, Sea Box consistently stated its intention to comply with the TAA. AR, Tabs 8, 21, 23, 46, & 49. Moreover, application of the test used by the CBP demonstrates that the agency properly found Sea Box TAA compliant for CLIN 0001. The first part of CBP's analysis for determining country of origin and substantial transformation, and thereby TAA compliance, looks at the country of origin. In this case [redacted]. Thus , at this point in the analysis, Sea Box is 50% TAA compliant. The next part of the analysis focuses on the extent of the processes that occur in a given country. Sea Box's FPR indicates that the processes will occur in three countries, China, Singapore, and the United States. Id. Sea Box represents that the ISO Container will be manufactured in [redacted] while its refrigeration unit will be manufactured in [redacted] and [redacted], once the LFRS is fully assembled **"all** additional and necessary manufacturing processes . .. testing, and preparation for inspection" will be completed.

AR 888. Next, the analysis requires examination of the resources expended on product design and development. The record shows that Sea Box's technical proposal would result in [redacted]. AR 993. The fourth factor requires review of the extent and nature of the post assembly inspection procedures. Here, Sea Box has proposed that its component parts will be [redacted]. AR 991 - 993. Here, testing and inspection of the completed LFRS occurs in the United States and, therefore, there is no doubt this factor is satisfied. Finally, the analysis calls for a review of the skill of a company's workers during the actual manufacturing process. Under Sea Box's proposal, we have to look at the skill level for [redacted] employees, as they all provided skilled labor during the manufacturing process. Thus, at least two-thirds of the skilled labor that contributed to the completion of the LFRS reside in either the [redacted] or [redacted] and, accordingly, Sea Box's proposal is TAA compliant for this factor. When we view these facts in a totality, there is no doubt that Sea Box's LFRS is properly designated as originating in the United States or a designated country and, therefore, Sea Box's proposal for CLIN 0001 complies with the TAA.

B. Klinge's Allegations Are Not Supported In The Record

As we demonstrate, Klinge's arguments regarding the agency's determination that Sea Box's LFRS is TAA compliant makes numerous factual allegations that are not supported in the record.

First, Klinge makes the false allegation that Sea Box stated in its initial proposal that "Final Assembly and System Testing of the LFRS occu[redacted]." Pl. Mot. at 15. The record demonstrates that Sea Box has never expressly or implicitly stated that its LFRS undergoes final

assembly and system testing in [redacted]. See, AR 102-104, 106, and 991-993. Indeed, this assertion is nothing more than an assumption that the tests, assembly, and inspections outlined in the production schedule in the "build container" section of Sea Box's FPR will occur after the refrigeration unit is attached to the container. Nothing in the schedule states exactly when the refrigeration unit will be attached to the container and, therefore, any conclusions based upon this schedule are speculative. See, AR 991.

Next, Klinge applies its own interpretation of the testing requirements of ISO Standard 1496-2 and argues that, since testing under this standard can only be done after the LFRS is fully assembled, and since "ISO standards" will be tested [redacted], then it follows that the LFRS is fully assembled in [redacted] Pl. Mot. at 16. This assertion also lacks support in the record. Plaintiff's underlying assertion, that ISO Standard 1496-2 can only be tested after full assembly, is inaccurate. Nothing in ISO Standard 1496-2 requires full assembly of LFRS prior to testing. See, Appendix In Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, Tab 24. Furthermore, the agency's performance specifications did not list full assembly of the LFRS prior to testing as a critical performance parameters, and Sea Box was thus free to test the two components separately and again in its New Jersey facilities once it was completely assembled. See, AR 46-73 & 991.

Klinge also mis-characterizes or ignores a relevant portion of Sea Box's production schedule by asserting that "[redacted]." Pl. Br. at 17. Klinge's depiction of Sea Box's production schedule is

inaccurate in that it ignores lines 5 - 17 in the production schedule. These lines include [redacted] which increase the number of activities in the United States by [redacted] to the manufacturing schedule. AR 991. These types of activities fall squarely within the "resources expended on product design and development" test applied by the CBP and must be considered when evaluating substantial transformation under the TAA. Thus, if we apply the additional [redacted], a TAA compliant country, and the United States. Thus, Klinge's assertion that the "lion's share" of work is performed [redacted] its entire analysis that evolves from its ignorance of the information contained in Sea Box's FPR is, quite simply, lacking in merit.

C. The Agency Properly Documented Its Finding That Sea Box Was Compliant With The TAA

The agency rationally and reasonably documented its finding that Sea Box certified its compliance with the TAA. The record shows that the SSET reviewed Sea Box's September 12, 2007 response to the discussion questions and "deemed them responsive" and the contracting officer specifically reviewed the "applicable representations and certifications" in Sea Box's proposal. See, 1013 & 1026. Despite this clear language in the record, Klinge asserts that the record lacks a "reasoned, contemporaneous analysis . . . concerning the agency's TAA determination" and cites to two contemporaneous documents in the record that are allegedly "devoid of analysis." Pl. Mot. At 19. Plaintiff goes on to argue that this purported failure by the agency to document its analysis makes the award decision irrational. Contrary to Klinge's assertions, the contracting officer's and SSET's efforts at documenting their respective

evaluation of Sea Box's TAA compliance, which is nothing more than a certification, was reasonable and in accordance with law. Indeed, other than DFARS 252.225.7020, which was incorporated into the RFP by amendment, we are unaware of any specific requirement for an agency to supply a narrative explanation detailing its evaluation of an offerors representations and certifications. See, FAR §§ 14.201-5 and 15.204-5. For these reasons, the agency reasonably documented its evaluation of Sea Box's TAA compliance.

## III. Sea Box Did Not Materially Misrepresent The Country Of Origin For Its LFRS In Its Initial Proposal

Klinge alleges that Sea Box made a material misrepresentation in its original proposal when it represented the country of origin for its LFRS as the United States . Pl. Br. at 24-25. In support of this allegation, Klinge relies upon the fact that Sea Box's initial proposal identified [redacted] as the country of origin and the place of manufacture as a combination [redacted]. Id. Klinge argues that the alleged misrepresentation was material because "TAA compliance was a requirement in the solicitation and that Sea Box's changes to its FPR constitute proof that it committed a material misrepresentation.

As demonstrated above, Sea Box's LFRS is substantially transformed into a United States end product, in accordance with the TAA, when the components parts tested separately in [redacted] Thus, the contracting officer's reliance upon Sea Box's good faith assertions was not arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law.

Contrary to Klinge's assertion, we are unaware of any rule, regulation, or case law that stands for the proposition that changes to the representations and certifications in an offerors

final revised proposal after discussions have closed, as happened in this case, constitutes a material misrepresentation. Also contrary to Klinge's assertions, TAA compliance was not a stated evaluation factor and, applying Klinge's reasoning, could not have been a "material" item relied upon by the agency. In the context of the RFP, TAA compliance is nothing more than a required certification.

Pursuant to 41 U.S.C. § 601, a "misrepresentation of fact" is defined as a false statement or misleading conduct that leads to a belief of a substantive fact material to proper understanding made with the intend to deceive." See, Northup Grumman Corp. v. United States, 50 Fed. Cl. 443, 468 (2001). There is nothing in the record that supports Klinge's contention that Sea Box committed an intentional misrepresentation of fact. This is borne out in the record because all the parties, including Klinge, were unsure about the exact application of the TAA in the early stages of the procurement. Indeed, Klinge initially argued to the agency that the Buy American Act and FAR § 25.401(a)2, rather than the TAA, applied to the procurement. AR 1377. Thus, Sea Box's inclusion of legal standards other than the TAA and subsequent deletion of those standards, is based upon nothing more than an innocent misapplication of the applicable law.

**IV. <u>The Agency Was Not Required To Terminate The Award To Sea Box</u>**

The contracting officer rationally determined that he did not possess sufficient information to adequately assess Klinge's and Sea Box's TAA compliance for CLIN 0003. AR 1482. Moreover, after receiving Sea Box's April 9, 2008 response to his request for additional information, and thereby learning that Sea Box's subcontractor informed it for the first time that [redacted] the contracting officer reasonably concluded that he was required to solicit additional information from Sea Box. Citing Mantech Telecommunications and Information Systems

Corp. v. United States, 49 Fed. Cl. 57, 71 (2001), Klinge argues that Sea Box's lack of certification for TAA compliance made its proposal materially noncompliant. Klinge asserts that, once the agency learned of Sea Box's alleged material noncompliance, [redacted], Klinge argue that the agency should have terminated the award to Sea Box. Furthermore, Klinge argues that the agency's award initial award, and subsequent reaffirmation of that award, was contrary to law.

Klinge's assertions are without merit. Klinge's reliance upon Mantech is misplaced because nothing in that case supports the contention that the temporary lack of certification in a an offeror's proposal requires the immediate termination of a contract in a post-award context. Moreover, Mantech does not support the contention that a certificate of conformity with an applicable statute or regulation is material in the context of a procurement. The situation that occurred between [redacted], is best described as an immaterial defect or minor informality pursuant to FAR § 14.405 because the end result of [redacted] action is that it had no effect on the price, quantity, quality, or delivery of the items listed in Sea Box's proposal.[5] Id.

An offeror's material misrepresentation in its proposal can provide a basis for disqualification of the proposal and cancellation of a contract award based upon the proposal. A misrepresentation is material where the agency relied upon it and it likely had a significant impact upon the evaluation. Integration Techs. Group, Inc., B- 291657, Feb. 13, 2003, 2003 CPD ¶ 55 at 2-3. Initially, it is important to point out that Sea Box was not aware of [redacted]

[5] We are mindful that FAR § 14.405 applies to sealed bids. However, we still believe this is the appropriate manner in which o classify the events that transpired between Carrier and Sea Box.

intention to procure the spare parts from non-designated countries and evinced no intention to deceive the agency. AR 1465. In this case, while the agency relied upon the representation with respect to Sea Box's TAA compliance, it had no impact the evaluation of Sea Box's proposal. Contrary to Klinge's various assertions, certification was not an evaluation factor.

## V. Sea Box Did Not Commit A Material Misrepresentation

As previously demonstrated, a "misrepresentation of fact" is defined as a false statement or misleading conduct that leads to a belief of a substantive fact material to proper understanding made with the intend to deceive." 41 U.S.C. § 601. Moreover, intent is a necessary element when if an offeror has committed a material misrepresentation. Northup Grumman Corp. v. United States, 50 Fed. Cl. 443, 468 (2001). There is nothing in the record that supports Klinge's contention that Sea Box committed an intentional misrepresentation of fact with respect to its proposal for CLIN 0003. Indeed, if Sea Box had any intention to deceive the agency, it certainly would not have been so forthcoming with the fact that [redacted]. The very fact that Sea Box faithfully reported the information supplied [redacted] is proof positive that Sea Box lacked the requisite intent to deceive the agency.

Klinge attempts to challenge the veracity of Sea Box's president by arguing that since this issue was raised in prior litigation before the GAO, Sea Box's president, Jim Brennan, knew or should have known of [redacted]. The record offers no support for Klinge's speculation that Mr. Brennan knew or should have either known that its subcontractor would respond in the manner in which it did. Additionally, there is no evidence in the record to suggest that Mr. Brennan, and Sea Box for that matter, have

been anything but completely honest throughout the procurement.

## VI. The Agency Did Not Engage In Unequal Discussions With Sea Box

Discussions, unlike clarifications, must be extended to all bidders "to prevent a bidder from gaining an unfair advantage over its competitors by making its bid more favorable to the government in a context where the other bidders have no opportunity to do so." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1561 (Fed. Cir. 1996). The Federal Circuit addressed the meaning of clarifications and discussions in Information Technology & Applications Corp. v. United States, 316 F.3d 1312, 1320-21 (Fed. Cir. 2003). "[U]nlike clarifications, discussions 'are undertaken with the intent of allowing the offeror to revise its proposal.' " Id. at 1321 (citing 48 C.F.R. § 15.306(d) (2002)). The definition of clarifications has been expanded to permit greater exchanges between the government and bidders, however, bid revisions still fit squarely into the classification of discussions. Id. (comparing 48 C.F.R. § 15.601 (1991), with 48 C.F.R. § 15.306(a)(2) (2002)).

The GAO has held that the Buy American Act ("BAA") and TAA compliance are matters of affirmative responsibility. LSL Industries. Inc, B-237710, Mar. 6 1990, 90-1 CPD ¶ 254. Moreover, GAO has consistently held that where an agency is required to investigate further, it will review the evaluation and resulting determination as to whether the item offered is a domestic end product to ensure that they were reasonable. Leisure-Lift, Inc., B-291878.3, Sep. 25, 2003, 2003 U.S. Comp. Gen. Lexis 178; citing General Kinetics, Inc., Cryptek Div., B-242052.2, May 7, 1991, 91-1 CPD ¶ 445. Additionally, GAO has consistently held that an agency properly may obtain information from a contractor regarding its responsibility at any time until award is made. Caddell Construction Company, Inc., B-298949.2, June 15, 2007, 2007 Comp. Gen. Proc. Dec. ¶ 119; citing Dock Express Contractors, Inc., B-227685.3, Jan. 13,

1988, 88-1 CPD ¶ 23. More importantly, GAO has consistently held that a request for information by an agency that relates to an offeror's responsibility, rather than its proposal evaluation, does not constitute discussions and, therefore, does not trigger the requirement to hold discussions with other offerors in the competitive range. Computer Sciences Corporation; B-298494.2, B-298494.14, May 10, 2007, 2007 Comp. Gen. Proc. Dec. ¶ 103.

Here, the agency, through its counsel, did not contact for Sea Box, with the intent of allowing the offeror to revise its proposal. AR 1378. The record demonstrates that Mr. Ingold contacted Sea Box for the express purpose of addressing a discrepancy in TAA compliance. Id. Thus, there can be no debate that the agency had any intention of affording Sea Box an unfair opportunity to revise its proposal at the expense of any other offeror.

Additionally, in light of the discrepancy in Sea Box's discussion response and FPR that specifically related to TAA compliance, a matter of responsibility, Mr. Ingold's request for information to Sea Box prior to award was not a discussion question. Mr. Ingold subsequently advised the contracting officer that, in his considered legal opinion, it was reasonable to "[redacted]." AR 1380. Mr. Ingold also advised the contracting officer of the following:

> [redacted].

Id. Based upon Mr. Ingold's advise, the contracting officer made the following determination:

> As a DAWIA Level III Contracting Officer, I am fully aware of the difference between discussions and clarification as those terms are defined

> in the FAR. Mr. Ingold's communication with Mr. Farber did not in anyway constitute discussions. Rather, it was considered an obvious clarification relating to TAA compliance, which is a responsibility issue. In addition, Sea Box was never afforded the opportunity to change or amend their RFP.

Id. The foregoing demonstrates that the contracting officer reasonably concluded that the exchange between Sea Box did not constitute discussions.

## VII. The Court Cannot Direct The Award Of The Contract To Klinge

Klinge requests declaratory relief in the nature of an order from the Court directing the USMCSC to award the contract to Klinge. Such an order is outside the Court's authority. It is settled that the Court does not possess jurisdiction to consider claims for specific performance. Logan Canyon Cattle Assoc. v U. S., 34 Fed. Cl. 165 (1995) (citing Nicholson v. United States, 29 Fed. Cl. 180, 185 (1993)); United States v. Testan, 424 U.S. 392, 397-98, (1976); United States v. King, 395 U.S. 1, 3 (1969)); IM Services, Inc. v U.S., 32 Fed. Cl. 388, 400 (1994); Cleveland v. United States, 9 Cl. Ct. 741, 746 (1986). In Scanwell Laboratories, Inc. v. Shaffer, the Court stated that "[i]t is indisputable that the ultimate grant of a contract must be left to the discretion of a Government agency; the courts will not make contracts for the parties. It is also incontestable that that discretion may not be abused." 424 F.2d 859, 869 (DC. Cir. 1970). While this court may exercise its authority, pursuant to 28 U.S.C.§ 1491(a)(3), to grant injunctive relief in appropriate post-award claims, the remedies do not extend to specific performance.

## CONCLUSION

For the foregoing reasons, the defendant respectfully requests that the Court deny Klinge's motion for judgement upon the administrative record and grant the Government's motion for judgment upon the administrative record.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kirk Manhardt
KIRK MANHARDT
Assistant Director

/s/ Christopher L. Krafchek
CHRISTOPHER L. KRAFCHEK
Trial Attorney
Civil Division,
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-0041 (Phone)
(202) 514-8624 (Facsimile)

OF COUNSEL:
James B. McCloskey
Associate Counsel
Marine Corps Systems Command
2200 Lester Street
Quantico, Virgina 22134-6050

May 15, 2008

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 15th day of May, 2008, a copy of the foregoing "DEFENDANT'S FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Christopher L. Krafchek