**REDACTED VERSION**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| **KLINGE CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 08-134C** |
| **v.** | ) | |
| | ) | **Judge Eric C. Bruggink** |
| **THE UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SEA BOX, INC.** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANT AND INTERVENOR'S OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND IN OPPOSITION TO DEFENDANT AND INTERVENOR'S CROSS-MOTIONS**

Respectfully Submitted,

Dated: May 21, 2008

By: Richard P. Rector by Seamus Curley Seamus Curley

Richard P. Rector
DLA Piper US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: (202) 799-4000
Facsimile: (202) 799-5000

Counsel for Plaintiff

Of Counsel:

Seamus Curley
Samuel B. Knowles
DLA Piper US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: (202) 799-4403
Facsimile: (202) 799-5403

[redacted]

# I. INTRODUCTION

Plaintiff, Klinge Corporation ("Klinge"), respectfully submits this Memorandum Of Points And Authorities In Reply To Defendant And Intervenor's Opposition To Plaintiff's Motion For Judgment On The Administrative Record And In Opposition To Defendant and Intervenor's Cross-Motions For Judgment On The Administrative Record. Consistent with its initial moving papers, herein, Klinge refers to the Defendant, Marine Corps Systems Command, as "the agency", and the Intervenor, Sea Box, Inc., as "Sea Box." With respect to the current motion, the agency's opposition papers and cross-motion are referred to as "Agency Brief", and Sea Box's papers are referred to as "Sea Box Brief". Finally, citations to the Administrative Record are denoted as "AR", followed by the tab number and, if appropriate, the title to the document and page number.

# II. ARGUMENT

## A. *The Agency Continues To Misapply The TAA To Sea Box's LFRS Under CLIN 0001 And Its Award Decision Was Arbitrary, Capricious, An Abuse of Discretion, And Contrary To Law*

### 1. *None Of The Agency's Arguments Support A Finding Of Substantial Transformation Within The* [redacted]

While the agency acknowledges that the "substantial transformation" test requires an examination of an article has become a "different article of commerce with a name, character, or use distinct from that of the article or articles from which was transformed . . ." (*Agency Brief*, at 27), the agency repeatedly misapplies the test and the sub-factors identified in case law. First, the agency recognizes that the country of origin of the components of an end product is relevant to the ultimate determination. *Agency Brief*, at 19. However, the agency continues by asserting the following:

> In this case Sea Box's components come from [redacted] a non-designated country, and [redacted] a designated country. Thus, at this point in the analysis, Sea Box is [redacted]% TAA compliant.

*Id.* Klinge respectfully submits that this characterization of the substantial transformation test is an over-simplification, and it ignores the totality the circumstances analysis that governs the inquiry.[1]

Second, the agency identifies the location of testing as a factor to be considered (*Agency Brief*, at 30), but it then ignores the fact that ISO-testing occurs in [redacted] for Sea Box's LFRS. Further, the agency dismisses as in accurate Klinge's argument that testing under ISO Standard 1496-2 requires a "fully assembled" LFRS. *Agency Brief*, at 31. However, the fact that ISO Standard 1496-2 requires a functioning, integrated LFRS is not subject to interpretation. Rather, on its face, portions of ISO Standard 1496-2 test attributes of a functioning refrigerated container system. There simply is no way around this conclusion. Because this occurs in [redacted], along with the work to required to make Sea Box's LFRS an integrated and new article of commerce, substantial transformation occurs there.

Third, the agency, in a manner similar to Sea Box, has lumped together [redacted] and [redacted] activities to reach the conclusion that the majority of manufacturing processes do not occur within [redacted]. *See* Agency Brief, at 30. However, this argument improperly suggests that non-[redacted] manufacturing activities, costs, *etc.*, arising in [redacted], somehow support the finding that a [redacted] end product is the end result of the manufacturing process. To be clear, Sea Box has claimed that its LFRS is a U.S. end product. As such, it s the costs, manufacturing activities, and

---

1 Notably, the agency applied a similar simplified percentage construct when discussing the components of Klinge's LFRS. Specifically, because Klinge offers a [redacted] as part of its LFRS, the agency writes that "[redacted]% of Klinge's end-product originates in a non-designated country . . .." *Id.* at 7, ¶ 13. For the same reasons, this is an inaccurate characterization. The agency's use of [redacted] percent obviously relates to the identification of one of the two major components as originating in [redacted]. However, it liberally equates [redacted] describe the Container's relationship to the overall end product, when the use of such a percentage this type of analysis would normally bear a relation to costs, labor effort, or some other objective measurement.

components originating within [redacted], not the [redacted], that is determinative of whether Sea Box has offered the government [redacted] end product.

Fourth, the agency obscures Sea Box's project schedule and suggest that the entries under "Build Container" may not all denote [redacted] activities. *Agency Brief*, at 31. The agency argues that, "[n]othing in the schedule states exactly when the refrigeration unit will be attached to the container, and, therefore, any conclusions based upon this schedule are speculative." *Id.* The agency fails, however, to reconcile the fact that it characterizes the conclusions from the project drawn by Klinge to be speculative, while at the same time it draws its own conclusions from the same document. In short, if the agency now believes that the project schedule does not support a clear determination as to the location of the tasks listed, then the agency is tacitly admitting that the record was insufficient to create a basis for its TAA determination.

Fifth, the agency attributes activities that are clearly identifiable under the Contracts' technical document requirement, CLIN 0005, as somehow contributing to the substantial transformation of the LFRS, such as [redacted] Clearly, the addition of these items in support of an argument that LFRS is substantially transformed in the [redacted] is a tentative, weak connection.

Simply stated, the agency's arguments lack merit. For the reasons set forth herein and in Klinge's initial Memorandum Of Points And Authorities, it was arbitrary, capricious, an abuse of discretion, and contrary to law for the agency to reach any conclusion other than that Sea Box's LFRS constitutes a [redacted] end product.[2]

[2] Additionally, the agency simply failed to reconcile any of the contradictions in the record indicating non-compliance with the TAA, including (i) the inconsistent [redacted] and Place of Manufacture Certifications; (ii) its change in the certifications without a correlating change in its manufacturing process, all without explanation, (iii) the fact that Sea Box's LFRS is ISO and CSC-certified in [redacted]; and (iv) the undisclosed information supplied to the agency after the initial award of the Contract. As set forth in Klinge's initial Memorandum Of Points And Authorities, these facts and others also establish Klinge's misrepresentation claim with respect to Sea Box's LFRS.

2. *Sea Box's Post Remand Submission Does Not Support A Finding Of Substantial Transformation Within* [redacted]

In its post-remand submission to the agency, Sea Box submitted a document purporting to illustrate the substantial transformation process Sea Box argues occurs within [redacted] *See* AR, Tab 46, CO Request to SeaBox and reply (April 1, 2008), at 1425.[3] This document, however, is self-serving and an over-stated focus and emphasis upon Sea Box's [redacted] finishing work. It is clearly intended – but fails – to characterize such activities as the sort of industrial manufacturing tasks that might form the basis for a finding of substantial transformation in a different context. Not one of the subcategories of activities identified constitutes transformative work that renders the LFRS delivered from [redacted] a new and distinct article of commerce, with a name, character, or use distinct from what it was when shipped to the [redacted] from [redacted]. Rather, Sea Box's [redacted] activities, at best, is work designed to meet the <u>specifications</u> in the solicitation (*e.g.*, [redacted] or best value features identified in its proposal (*e.g.*, [redacted], which are essentially "add-ons". The work is not, however, transformative in nature, and it is not responsible for the LFRS obtaining is essential character.[4]

---

3 It was recently revealed that Sea Box also submitted a March 28th draft of its April 1st submission to the agency, in which Sea Box supplied a less developed, shorter document purporting to outline [redacted] manufacturing activities supporting its substantial transformation argument. Klinge intends to move for leave to supplement the record to include the draft document, and has received the agency's consent to do so. Notably, in evaluating Sea Box's TAA compliance, CO McGinn failed to address Sea Box's April 1st submission, or the earlier draft. Moreover, in his Memorandum To The Record, CO McGinn only acknowledges receipt of the final, April 1st version. *See* AR, Tab 48, *Contracting Officer Statement (April 2, 2008)*, at 1459-60. As such, it is unclear what impact, if any, these documents had upon his country of origin determination.

4 Sea Box's focus on such work is consistent with the ill-conceived mantra that [redacted] activities cause a [redacted] *Sea Box Brief*, at 5 and 6. Simply stated, "fully-operational" and "mission-capable" is not test. Rather, the test is where the end product receives its essential character, and where it emerges as a new article of commerce, with a character, name, and use distinct from its parts. Without question, for Sea Box's LFRS, this essential character is branded upon the LFRS in [redacted]

Finally, there is absolutely no indication that the agency factored this document (or its earlier draft) into its substantial transformation analysis. Rather, Sea Box submitted these documents, and the agency remained silent on their content and, instead, arbitrarily based its re-award decision upon (a) its pre-remand rationale, and (b) Sea Box's promise to integrate its RU and Container in [redacted] if doing so is necessary under the TAA. *See* AR, Tab 49. Again, the agency's decision was arbitrary, capricious, an abuse of discretion, and contrary to law.

### B. *An Adverse Inference Should Be Drawn Against The Agency And Sea Box For Their Failure To Disclose The Conflicting Information On CLIN 0001 Furnished By Sea Box After The Initial Award Of The Contract*

American courts recognize the "'well settled principle of evidence which provides that, where a party fails to call a witness available to him and who has knowledge of material facts, the court may draw the inference that the testimony of the witness concerning those facts would have been unfavorable to the party.' " *Day & Zimmermann Serv. v. United States*, 38 Fed. Cl. 591, 603 (1997) (*citing* Barnett v. United States, 6 Cl. Ct. 631, 671 (1984)). The legal concept, which was established in *Graves v. United States,* 150 U.S. 118, 121 (1893), provides "that if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable."

In *Day & Zimmermann*, this Court drew an adverse inference against the government for failing to disclose a document until a final-hour attempt to supplement the administrative record. 38 Fed. C.l. at 602. In doing so, the Court held that an agency's "intentional delinquent production of . . . [a] document was constructively and effectively tantamount to the realistic fact that defendant had not produced the document at all." *Id.* The Court noted that it had

"considerable discretion" to determine whether an adverse inference was appropriate and that application of the concept is "more a 'product of common sense than of the common law.'" *Id.*, n.13 (*citing International Union (UAW) v. NLRB*, 459 F.2d 1329, 1335 (D.C. Cir. 1972) (providing that when a party has relevant evidence in its control, but fails to produce such evidence, that failure creates a presumption that the evidence would have been unfavorable had it been produced)).

In the instant matter, agency counsel (David P. Ingold, Esq.) submitted a Declaration to the GAO concerning his post-FPR discussions with Sea Box on its compliance with the TAA. In it, he stated the following:

> A question was raised by Sea Box's discussion response regarding CLIN 0001. Specifically, its references to work performed [redacted] appeared to inconsistent with its FPR <u>and with previous information provided to the Government after the initial award and start of performance prior to the first protest</u>. I contacted the Sea Box Director of Contracts to clarify this issue to determine whether Sea Box was compliant with the TAA in order to be eligible for award.

AR, Tab 40, *Declaration of David P. Ingold, Esquire in response to request from GAO Attorney Mr. David Ashen (January 24, 2008)*, at 1378 (emphasis added). However, having identified the existence of information furnished by Sea Box (after the <u>initial</u> award of the Contract in July 2007) that was inconsistent with Sea Box's written discussion responses, the agency failed to identify the substance or form of that information. Likewise, Sea Box never disclosed that information beyond the agency.

During the GAO protest, this failure to disclose was maintained despite Klinge's having specifically raised the issue in pleadings. *See* AR, Tab 42, *Klinge Corporation's response to Contracting Officer Statement with exhibits (January 30, 2008)*, at 1384, n. 3 (("It is unclear, for example, how many calls were conducted with Sea Box, how Mr. Farber determined that the

discussion response was 'incorrect,' who may have been consulted within Sea Box concerning the proposal, [and] what 'previous information' was provided by Sea Box to the Government after the initial award . . ..") (emphasis added)).

During the proceedings before this Court, the issue of the "previous information" supplied by Sea Box was again raised by Klinge's counsel. Specifically, during the March 18, 2008 teleconference with the Court regarding the anticipated remand, Klinge's counsel recited the above-quoted language to ensure that the supplemental information to be supplied by the agency would be meaningful and complete. The Court responded by addressing Government counsel, stating as follows:

> Well, Mr. Krafchek [Government counsel], why don't you satisfy yourself what that was a reference to.
>
> To the extent that there are unexplained things, I'll just have to take that into account not just today but whenever we get a final response from the agency. So, if you want to eliminate arguing points by Mr. Rector [plaintiff's counsel], I guess you're going to have to check with Mr. [Ingold] as to what that was a reference to and either furnish it or explain it somehow.

*Transcript, Teleconference with Court (March 18, 2008)*, at page 20, lines 5-13.

Despite the foregoing, in its post-remand supplement to the record, the agency again chose not to identify the information. Based on this refusal to produce relevant information, Sea Box also has failed to identify or otherwise address the conflicting information supplied to the agency.

A negative inference should be drawn that the undisclosed information would be damaging to the agency concerning the compliance of Sea Box's LFRS under CLIN 0001. Such information is solely in the custody and control of the agency and Sea Box. Moreover, by agency counsel's own admission, it is directly related to the critical issue of whether Sea Box's LFRS becomes a new and distinct article of commerce [redacted]. In fact, agency

counsel acknowledged that the conflicting information factored into his evaluation of Sea Box's written discussion response, which resulted in his post-FPR communications with Sea Box. Despite this, the agency and Sea Box have inexplicably chosen not to disclose such information to the Court or Klinge. As such, Klinge respectfully submits that the Court has discretion to – and, under these facts, should – draw an adverse inference against the agency and Sea Box that the undisclosed information bears negatively upon their shared argument that Sea Box's LFRS is substantially transformed in [redacted]

### *C. Klinge Must Prevail On Its CLIN 0003 Protest Grounds Because Sea Box's Proposal Was Non-Compliant At The Time Of Submission*

#### *1. Sea Box's Offer Was Non-Compliant Within Its Four Corners And Its Subjective Intent Was Irrelevant*

In *Dubinsky v. United States*, 43 Fed. Cl. 243, 268 (1999) this Court sustained a protest arising out of a negotiated procurement, when, among other violations of the FAR, the contracting officer scored a portion of the awardee's technical proposal on oral statements advancing claims unsubstantiated by the written proposal. In holding that the rating of such factors was arbitrary and capricious as a matter of law, the Court explained that such "ratings must be substantiated by material within the four corners of th[e] proposal." *Id.* Additionally, other bid protest forums have consistently observed that "the subjective intent of the bidder is immaterial and only its manifested intent is controlling." *Edwin J. McDermott*, B-168469, 1970 WL 5264 (Comp. Gen. 1970); *see also* Mark II., Inc., B-203694, 82-1 CPD ¶ 104 (Comp. Gen. 1982) (bidder required to meet requirement of the solicitation, "despite what its subjective intent at the time it submitted the bid may have been . . ."); *Bay-West Electric Company,* 88-3 BCA ¶ 20958, NASA BCA No. 287-4, 1988 WL 79213 (1988) (former NASA BCA applying the same

principle in the contract administration context – *i.e.*, subjective intent could not be used to trump the term of a contract).

In the case at bar, the Court asked Robert Farber, Sea Box's Director of Contracts and representative in this matter, the following question with respect to CLIN 0003:

> Tell me, first of all, whether or not – let's assume that the Plaintiff amends the complaint and alleges that [Sea Box] was improperly allowed to amend its proposal. So I guess the factual predicate behind that is that there was change with respect to that part, and my question is, was there?

*Transcript of April 21, 2008 teleconference with the Court*, at page 11, lines 10-16.

Mr. Farber responded as follows:

> Well, no, Your Honor, there was not. We did not, at any time, <u>characterize</u> our submissions as a change to the proposal. As a matter of fact, we did quite the opposite. We wanted to stress to the agency that we what we were submitting was not, in any way, a change to how our proposal was issued.

*Id.* at lines 17-23 (emphasis added).

The words used are telling, because they exhibit Sea Box's misconception that the way in which it characterizes modifications made to its proposal will dictate whether or not those modifications constitute a change to the proposal or the end products offered thereunder. This, of course, is simply wrong. The pertinent facts with respect to CLIN 0003 are simple: While continuously trying to parse the issue, Sea Box has for all intents and purposes admitted that its offer under CLIN 0003 was not TAA compliant when submitted. That is, 8 of the 32 parts Sea Box offered under CLIN 0003 originated [redacted] Respectfully, this should have ended the agency's analysis. The agency was presented with information – by Sea Box – that its offer was non-compliant at the time of evaluation and award. In *Esch v. Yuetter*, 976 F.2d 976, 991 (D.C. Cir. 1989), the Circuit Court of Appeals for the D.C. Circuit articulated eight scenarios where,

under an Administrative Procedure Act review, a remand is appropriate. On the CLIN 0003 issue, one such scenario is on all fours (*i.e.*, "cases where evidence arising after the agency action shows whether the decision was correct or not . . ..") *Id.* Simply stated, Sea Box was not eligible for award and, upon learning this fact during the remand, the agency should have excluded it from the competition.

Furthermore, it was wholly improper for the agency to permit Sea Box to go outside the four corners of its proposal and to reevaluate its compliance with the TAA after its parts supplier found alternative sourcing for [redacted] parts.[5] Sea Box was bound by its noncompliant proposal. Accordingly, Klinge must prevail on Count IV of its First Amended Complaint.[6]

Count V of Klinge's First Amended Complaint turns on the same core facts. Additionally, as set forth in Klinge's initial moving brief, in light of the very specific pre-award statements regarding CLIN 0003 TAA compliance (i.e., [redacted]), Sea Box should have verified these statements before making them. However, in its moving papers, Sea Box again defends its inaccurate pre-award statement of compliance. Specifically, Sea Box represents that it was unaware that TAA compliance under CLIN 0003 meant every part offered had to be from the United States or a "designated country" until after its April 1, 2008 submission to the agency. *See* Sea Box Brief, at 20 ("Subsequent to Sea Box's submission of its April 1, 2008 letter, it

---

5 At page 22 of its brief, [redacted]. However, it is worth noting that Sea Box has used this term and concept during these proceedings. *See* Transcript of April 17, 2008 telephone conference with the Court, at page 13, lines 14-20 ("But . . . [redacted] always had the ability to source these products from TAA-compliant country, or the United States, and when we insisted that they do so, they said yes, we are going to then tap into our alternative sources, which is going to result in an increased cost to use and increased inconvenience to us, but we will do it.").

6 The agency does not squarely refute these key facts and the related argument in its brief. *See* Agency Brief, at 34-39.

became clear that all parts in the CLIN 0003 package must be TAA-compliant, not just the majority of them, a position which Plaintiff embraced as well. And so, when the agency conducted its further inquires both to Plaintiff and Sea Box, Sea Box informed the agency that all CLIN 0003 parts to be supplied would indeed be TAA-compliant. See AR Tab 49.") (emphasis added).

This argument fails for two reasons. First, Sea Box's stated misunderstanding of the law was irrelevant to the issue of whether its proposal actually complied with the TAA. Sea Box's subjective intent, understanding, or misunderstanding have absolutely no bearing upon the threshold issue of whether or not its proposal was eligible for award when submitted, an issue which the record clearly resolves in the negative. In short, Sea Box was ineligible for award, yet represented itself to be eligible, and the agency relied on the representation. Therefore, the award was based upon a material misrepresentation.

Second, Sea Box's claim that it did not understand how the TAA applied to CLIN 0003 until after April 1st is inconsistent with the record, including that:

- Klinge's initial CLIN 0003 protest ground (advanced in July 2007) was based upon an understanding that CLIN 0003 TAA compliance required that all spare parts originate in the United States or a designated country. See AR, Tab 18, *GAO Protest filed by Klinge Corporation B-309930 (July 30, 2007)*, at 830.

- Following the agency's corrective action, Sea Box responded to discussion questions by implying its understanding that all CLIN 0003 parts had to originate within the U.S. or a designated country.

- After the agency re-awarded the Contract to Sea Box, Klinge's follow-on protest, which also advanced a CLIN 0003 protest ground (advanced in November 2007), clearly did so based upon an understanding that CLIN 0003 required that all parts originate in the United States or a designated country.

- The agency took the position pre-award and during the protest that CLIN 0003 TAA compliance required that every part originate or be substantially transformed in the United States or a designated country. AR, Tab 57, Agency's *Response to Klinge's January 17, 2008 Comments on the Agency's Supplemental Report (1 of 2 Agency*

*Submissions From January 24, 2008)"*, at 1536-37 (acknowledging agreement between agency counsel and counsel for Klinge – both pre and post-award – that the TAA as applied to CLIN 0003 required that each part comply individually).

- In its final decision, GAO clearly expressed the parties' understandings that CLIN 0003 TAA compliance required that every part offered originate in the United States or a TAA-compliant country. AR, Tab 45, *GAO Decision denying Klinge Corporation's protest on all ground (February 13, 2008)*, at 1414.

In light of the foregoing, it is clear that application of the TAA to CLIN 0003 was a litigated issue and that Sea Box knew or should have known how it applied to CLIN 0003. It is simply inconceivable that Sea Box was unaware how Klinge, the agency, and the GAO were assessing its compliance with the TAA under CLIN 0003, until after the Court's remand. However, even if this were somehow possible, it is clear that Sea Box understood how the TAA applied to CLIN 0003 before April 1st, contrary to its most recent representation. Specifically, Sea Box modified its March 28th draft cover letter to CO McGinn prior to April 1st to delete a sentence indicating that it believed [redacted] constituted compliance with the TAA (*compare* the attached March 28th Sea Box letter *and* AR, Tab 46, *CO Request to Sea Box and reply (April 1, 2008)*, at 1422).

2. <u>*The Spare Parts List Furnished By Sea Box On April 10th Contained Different Parts Than Those Offered In Its Initial Proposal, Not "Typographical Errors"*</u>

In Klinge's *Statement Of Facts In Support Of Plaintiff's Motion For Judgment On The Administrative Record,* Klinge identified the following three spare parts offered under CLIN 0003, the parts numbers for which were changed by Sea Box in its April 10th post-remand offer to the agency:

[redacted]

[redacted]

*See* Fact, ¶¶ 124-126 and *compare* AR, Tab 49, *Co Request to Sea Box and reply (April 9, 2008)*, at 1476, *with* AR, Tab 23, *Request for Final Proposal Revision to Sea Box, Inc. and Sea Box, Inc.'s Final Proposal Revision (September 18 & 20, 2007)*, at 987.

Specifically the following changes were made:

- [redacted] in Sea Box's FPR bearing part number [redacted] (*see* AR at 987, at Item # 27) was changed in Sea Box's April 10th offer to a part also described as [redacted] but it bears the different part number of [redacted] (*see* AR at 1466, 11 lines from the bottom of the spare parts list).

- [redacted] in Sea Box's FPR bearing part number [redacted] (*see* AR at 987, at Item # 24) was changed in Sea Box's April 10th offer to a part also described as [redacted], but it bears the different part number of [redacted] (*see* AR at 1466, 16 lines from the bottom of the spare parts list.

- [redacted] in Sea Box's FPR bearing part number [redacted] (*see* AR at 987, at Item # 9) was changed in Sea Box's April 10th offer to a part described as [redacted], which bears a different (a) part description because the quantity is different (*i.e.*, 25 as opposed to 5) and (b) part number of [redacted] (*see* AR at 1466, 22 lines from the bottom of the spare parts list).

In addressing this discrepancy, Sea Box has offered the following explanation:

> Sea Box always had the capability of TAA-compliance from the outset, never changed its proposal, and confirmed its representations as such during the remand proceedings. Sea Box never changed its proposal in any respect. Sea Box does note for the Court that in its April 10, 2009 response to the agency, there were four typographical errors in the spare parts list provided. In fact, every Carrier part, part number and part description remains unchanged from that which Sea Box provided in its initial proposal and the FPR, and the country of origin for each and every part – as represented – is a TAA-compliant country.

*Sea Box Brief*, at 20 (emphasis added). In its papers, the agency has partially endorsed the "typographical error" theory espoused by Sea Box, as it relates to the quantity offered for the [redacted]. The agency apparently has accepted the other changes because it deems them to be "minor." Specifically, the Government states:

> Although it contained minor changes in model or identification numbers, Sea Box's response contained the exact same number of parts, at the same price, and delivery schedule as it included in its FPR for CLIN 0003. AR 1466. Sea Box's response changed the quantity for one of the items [redacted] proposed for CLIN 0003, however, this appears to have been a typographical error because, despite the change in quantity, there is no change in price and Sea Box affirmatively stated in its response to the Court's initial remand order that nothing in this submission changes the FPR submitted on September 20, 2007. Id & AR 1419.

*Agency Brief*, at 20-21 (emphasis added).

Respectfully, neither the agency's nor Sea Box's positions are credible. The truth is that each new part number identified by Sea Box is an existing [redacted] part number on the parts service lists for other Carrier RUs.[7] That is, the part number changes were not mere typographical errors; rather, they reflect the deliberate incorporation of specific, different parts offered by [redacted] for RU models other than the one offered by Sea Box in its proposal. To illustrate:

> [redacted] (which is what Sea Box offered in its April 10th submission) exists; it bears the description of [redacted] *See* [redacted]

> [redacted] (which is what Sea Box offered in its April 10th submission) exists; it bears the description [redacted]. *See* [redacted]

[7] The respective parts service lists, which are described in the above text, can be accessed at the following websites: [redacted]

- [redacted] (which is what Sea Box offered in its April 10th submission) exists; it bears the description of [redacted], and, consistent with the change in Sea Box's April 10, 2008 offer, [redacted] literature shows it as including a quantity of [redacted], not [redacted]. Accordingly, the quantity change was also not a mere "typo". *See* [redacted] (Also, it should be noted that while Sea Box's April 10th submission included the suffix [redacted] at the end of the above part number ending in [redacted], [redacted] indicates that this merely indicates that the part is designated as a serviced replacement part. [redacted]

None of these three new parts identified in Sea Box's April 10th offer are identified in the document entitled [redacted] which (a) was included in Sea Box's initial proposal (*see* AR, Tab 8, at 178 [redacted], and (b) is the corresponding service parts list for the model RU offered by Sea Box in its proposal (*i.e.*, [redacted]). Therefore, barring a coincidence of inconceivable odds (*i.e.*, that all four "typographical errors" – the three new part numbers and the quantity for one of those numbers – just happened to match existing [redacted] part numbers and information for other [redacted] RU models), it is clear that Sea Box changed its proposal. Specifically, it substituted into its April 10th submission [redacted] parts for RU models different than the RU offered as part of its LFRS. Such substitution of parts constituted clear confirmation of the changes in Sea Box's proposal. Sea Box's facile suggestion that these changes were merely "typographical errors" is specious. And the agency's acceptance of this sham was arbitrary, unreasonable, an abuse of discretion, and contrary to the law.

3. *Klinge's Proposal Was TAA Compliant Under CLIN 0003*

During the GAO protest, agency counsel (David P. Ingold, Esq.) stated the following with respect to CLIN 0003 in a submission dated January 24, 2008:

> The Government has and continues to be in agreement with the Protester that all parts must be TAA compliant. Specifically, in the

> second paragraph of Enclosure 2 of the Supplemental Agency Report, Mr. Curley provided the following summary regarding of our early conversations regarding TAA issues:
>
> > You expressed your general agreement that our assertion that if Sea Box's parts under CLIN 0003 are products of China and/or Malyasia, Sea Box would have to demonstrate that a substantial transformation occurs in a designated country in order to both supply those parts and comply with the TAA.
>
> Moreover, the Government found Sea Box's Final Proposal Revision to be TAA compliant with regard to CLIN 0003.
>
> * * *
>
> [Agency counsel continued by citing to Sea Box's execution of the TAA certificate indicating that no non-U.S. or non-designated country end products would be delivered as well as Sea Box's discussion response, which [redacted] Finally, Mr. Ingold wrote that:]
>
> * * *
>
> Nowhere does Sea Box provide any indication that it is providing end products from nondesignated countries. The Protester has steadfastly refused to provide any evidence to support its mere allegation [redacted]. Without more than the baseless allegations of a competitor made during the conduct of a bid protest, the Government may reasonably rely on the TAA certification of an awardee.

AR, Tab 57, Agency's *Response to Klinge's January 17, 2008 Comments on the Agency's Supplemental Report (1 of 2 Agency Submissions From January 24, 2008)"*, at 1536-37. Clearly, as demonstrated by the above, Klinge and the agency counsel shared the view that TAA compliance with respect to CLIN 0003 required that each individual part independently satisfy the TAA, and this view was shared both pre- and post-award. Moreover, contrary to the agency and Sea Box's arguments, Klinge's proposal unequivocally complied with the TAA under CLIN 0003 and any issue with respect to same was clarified in Henrik Klinge's Declaration, dated February 23, 2008. AR, Tab 38, at 1345-48.

***D. Klinge Was Prejudiced By The Agency's Failure To Exclude Sea Box***

In *Dubinsky v. United States*, 43 Fed. Cl. 243 (Fed. Cl. 1999), this Court considered the tipping point at which communications between an offeror and an agency become discussions, as defined by the FAR Part 15. Additionally, the Court addressed the concept of competitive prejudice within the context of unfair discussions. In *Dubinsky*, the plaintiff protested the award of an Air Force contract for two electronic scoreboards to be used in the Air Force Academy's football stadium. *Dubinsky*, 43 Fed. Cl. at 259. During the procurement, the agency's contracting officer engaged in discussions with offerors and requested submissions of amended proposals. After receipt of same, the agency requested additional information solely from the awardee. Specifically, the agency asked the awardee, in a telephone conversation, to address inadequate past performance data, the omission of certain representations and certifications, and the lack of a required software license agreement.

A threshold question before the Court was whether the telephone communication between the agency and the eventual awardee after the submission of amended proposals constituted discussions. *Id.* at 261. The Court found that discussions had in fact occurred, in part, because the communication had afforded the awardee an opportunity to bring its proposal into compliance with the RFP, an opportunity not afforded to others. Further, the Court rejected the agency's assertion that the communication was a mere "clarification", affording little weight to the agency's characterization of its own actions and finding that its *post hoc* rationalization was not determinative. The Court explained that "any exchanges which provide an offeror with an opportunity to revise a material aspect of its proposal constitute discussions, regardless of whether the revisions address its compliance with technical criteria." *Id.*, n.48 (emphasis added).

Having determined discussions occurred, the Court was faced with the issue of whether

the plaintiff had suffered competitive prejudice. On alternative grounds, the Court ultimately found that it had. First, the Court concluded that, had the improper discussions not occurred, the agency would have had to eliminate the awardee from the competition as an unacceptable proposal. Plaintiff, having submitted a technically acceptable proposal, would have then been in a strong position to receive the contract award. As such, the agency's failure to exclude the non-compliant offeror prejudiced the plaintiff. Alternatively, the Court found it reasonable to conclude that the plaintiff would have strengthened its offer had discussions been reopened with the plaintiff as well. This conclusion was based on plaintiff's assertions that, had it been given the opportunity, it would have offered more robust training and warranties.

Here, the agency was duty-bound to exclude Sea Box based upon its written discussion responses and other proposal materials, which indicated substantial transformation of the LFRS [redacted] Rather than do so, the agency permitted Sea Box to orally modify its offer to purport to eliminate its non-compliance with the TAA. The agency effectively engaged in the same behavior post-remand, when it permitted Sea Box to again amend its proposal to bring the CLIN 0003 portion of its proposal into compliance with the TAA. Because these communications served as the basis for the agency determining that Sea Box's otherwise ineligible proposal was eligible for award, they constituted discussions. Because the agency only engaged in such discussions with Sea Box to purport to bring its proposal to acceptability, they were fundamentally unfair. Finally, because – in the absence of such discussions – Sea Box would have been eliminated from the competition, and award would have been made to Klinge, Klinge suffered prejudice. As such, the agency's actions were arbitrary, capricious, an abuse of discretion, and contrary to law.

### *E.* ***Klinge Is Entitled To Permanent Injunctive Relief***

To obtain a permanent injunction, Klinge must demonstrate (1) actual success on the merits; (2) irreparable harm if injunctive relief is not granted; (3) that the harm to Klinge without an injunction outweighs the harm to the agency with an injunction; and (4) that the injunction serves the public interest. *Aeroplate Corp. v. United States*, 67 Fed. Cl. 4, 13 (2005) (citation omitted). With the exception of the requirement to demonstrate actual success on the merits as opposed to a likelihood of success, it has been observed that the standards for permanent and preliminary injunctions are essentially the same. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n. 12 (1987). As set forth below, contrary to the agency's position,[8] should Klinge prevail on any of its protest grounds, it is entitled to permanent injunctive relief. In short, the agency will suffer absolutely no harm, while the absence of an injunction will permit the agency yet another opportunity to maneuver away from awarding the Contract to the lawful awardee, Klinge. Moreover, the entry of an injunction will best serve the public interest, by restoring the rule of law to this procurement and by re-introducing fairness and integrity to a process that has been plagued by agency error.

*1. Klinge Will Suffer Irreparable Harm Without Injunctive Relief*

The Court recently explained that, "[w]hen assessing irreparable harm, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" *Weeks Marine Inc. v. United States*, 79 Fed. Cl. 22, 36 (2007) (*quoting Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993)). In addition, the failure of an offeror to have its proposal "fairly and lawfully considered constitutes irreparable injury." *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed.Cl. 350, 370 (2004) (citation omitted). In this case, should

---

[8] The agency argues that "Klinge cannot prove that it is entitled to permanent injunctive relief because the harm to the agency would greatly outweigh any harm to Klinge and granting Klinge's requests for injunctive relief would not be in the public interest." *Agency Brief*, at 23. However, no substantiation for this claim is provided.

Klinge succeed on the merits, it would suffer irreparable harm absent injunctive relief. Short of an injunction requiring the termination of the Sea Box Contract, exclusion of Sea Box from the competition, and award of the Contract to the next eligible offeror representing "best value," Klinge would not have had its proposal "fairly and lawfully" considered and it would be without an adequate remedy.

2. *The Harm To Klinge Outweighs Any Harm To The Agency*

Under this factor, the Court must consider the harm, if any, an injunction would cause the Government and weigh that against the harm caused to the plaintiff in the event the injunction is not granted. *See Parcel 49 Limited Partnership v. United States*, 31 F.3d 1147, 1154 (Fed. Cir. 1994). Simply stated, the entry of an injunction would cause no harm to the government. Rather, the government would be precluded from continuing forward with an illegal contract award and, instead, it would have its requirement met by the next eligible offer representing "best value" to the agency, per the Solicitation. Conversely, the absence of an injunction would provide the agency with room to potentially maneuver around Klinge's success on the merits with respect to one or more of its protest grounds. Accordingly, the equities and applicable balancing test favor a permanent injunction.

3. *The Public Interest Is Served By Entering A Permanent Injunction*

This Court recognizes that, "[i]t is in the public interest for the Government to conduct fair procurement procedures, and to give honest and fair consideration to all bids." *Aeroplate Corp.*, 67 Fed. Cl. at 13 (*citing Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1152 (Fed. Cir. 1994); *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 846 n. 9 (D.C. Cir. 1982)). Moreover, safeguarding the integrity of the procurement process is a matter of high public interest that is best served by enjoining arbitrary and capricious agency action, or

prohibited action inconsistent with procurement law and regulations. *See, e.g., Day & Zimmerman Servs. v. United States,* 38 Fed. Cl. 591, 610 (1997) (*citing PCI/RCI v. United States*, 36 Fed. Cl. 761, 776 (1996); *MVM, Inc. v. United States*, 46 Fed. Cl. 137, 143 (2000); *and Informatics Corp. v. United States*, 40 Fed. Cl. 508, 519 (1998)). Additionally, when "comparing hardships of an injunction," the Court has held that the government and awardee "are not harmed by aborting a flawed award process." *Hawaiian Dredging Construction Co. Inc. v. United States*, 59 Fed. Cl. 305, 317 (2004).

Here, there are several indicia of agency mistakes and award improprieties that, collectively, represent significant harm to the integrity of the procurement process and should overwhelm the Court's normal reluctance to infringe upon an agency's award decision, including: the agency's patent misapplication of the substantial transformation test under the TAA; its shepherding Sea Box to an oral statement of TAA compliance; its disregard of inconsistent country-of-origin certifications (for the same end product under the same manufacturing process), narratives, and other unspecified information; the agency's reliance upon a non-required [redacted] certification [redacted]; the agency's conducting post-FPR discussions with only one offeror, which communications were not revealed to Klinge or the GAO until well after the filing of the Agency Report in the preceding protest; the lack of contemporaneous documents in the record supporting or memorializing the agency's pre-award TAA determination; and the agency's refusal to produce evidence that it has acknowledged is inconsistent with a finding of CLIN 0001 compliance.

While the strong public interest in maintaining the integrity of the procurement process must be weighed against the caution by which courts should approach matters of agency

discretion (*see Aero Corp. v. United States*, 38 Fed. Cl. 237, 242 (1997)), the agency's wrongful actions here were not merely matters of discretion. They involved a misapplication of the governing law, a failure to fulfill its duty to create a contemporaneous record for its decision, a willingness to accept unsubstantiated and conflicting representations by Sea Box, and a failure to disclose adverse information.

Finally, the TAA implements the WTO GPA and limits the countries from which the United States may accept offers of certain end products. By implementing this duly ratified treaty through a statute, Congress issued a clear mandate regarding its country-of-origin policies. In light of the facts underlying this protest and the agency's violation of the TAA and procurement regulations, the public interest can be preserved only if an injunction is issued requiring the agency to terminate its Contract with Sea Box, exclude Sea Box from the competition, and award the Contract to Klinge, as the next eligible offeror who represents "best value" to the agency. Regretfully, despite the fact that the law and equities require such an outcome, the agency has remained unwavering in its determination to award the Contract to Sea Box. As such, the public interest requires entry of an injunction.

## III. CONCLUSION

In light of the foregoing and for the reasons set forth in its initial brief, Klinge respectfully requests that the Court enter a Declaratory Judgment decreeing that: (a) the award of the Contract under Solicitation No. M67854-07-R-5060 to Sea Box by the agency was arbitrary, capricious, an abuse of discretion, and not in accordance with the law; (b) Sea Box is ineligible for award; and (c) the Contract should be awarded to the next eligible offeror representing "best value" to the agency, who the agency has identified as Klinge. Additionally, Klinge seeks injunctive relief consistent with such a judgment, including an order enjoining the

agency from (a) accepting performance under the Contract by Sea Box and (b) taking any procurement action inconsistent with the declaratory relief issued by the Court; and directing the agency to (c) terminate the Contract to Sea Box and (d) award the Contract to the next eligible offeror representing "best value".

Respectfully Submitted,

Dated: May 21, 2008

By: Richard P. Rector by Seamus Curley

Richard P. Rector
DLA PIPER US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: 202.799.4000
Facsimile: 202.799.5000

Counsel for Plaintiff

Seamus Curley

Of Counsel:

Seamus Curley
Samuel K. Knowles
DLA PIPER US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: 202.799.4403
Facsimile: 202.799.5403