# In the United States Court of Federal Claims

No. 08-134C

(Filed: June 10, 2008)[1]

* * * * * * * * * * * * * * * * * * * * * * * *

KLINGE CORPORATION,

|  |  |
|---|---|
| *Plaintiff*, | Trade Agreements Act ("TAA"); 19 U.S.C. §§ 2501 *et seq.*; 48 C.F.R. § 25.402(b); Trade Agreements Certificate; DFARS 252.225-7020; Substantial Transformation. |

v.

THE UNITED STATES,

              *Defendant,*

and

SEA BOX, INC.

              *Intervenor.*

* * * * * * * * * * * * * * * * * * * * * * * *

  *Richard P. Rector*, *Seamus Curley*, and *Samuel B. Knowles*, Washington, DC,  for plaintiff.

  *Christopher L. Krafchek*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Gregory G. Katsas*, Acting Assistant Attorney General, *Jeanne E. Davidson*,

---

  [1] This opinion was first issued under seal on June 5, 2008.  Redactions are indicated by the use of brackets.

Director, and *Kirk Manhardt*, Assistant Director, for defendant. *James B. McCloskey*, Marine Corps Systems Command, Quantico, VA, of counsel.

> *Robert Farber*, Cherry Hill, NJ, for intervenor.

## OPINION

This action is brought pursuant to the court's bid protest jurisdiction. Plaintiff, Klinge Corporation ("Klinge"), alleges that the United States, acting through the Marine Corps Systems Command ("the agency"), has acted arbitrarily, capriciously, and in violation of law, in awarding a contract for the delivery of "Large Field Refrigeration Systems" ("LFRSs") to the intervenor, Sea Box, Inc. ("Sea Box"). Plaintiff initially filed a complaint requesting permanent injunctive relief and a motion for preliminary injunction. We denied the motion for preliminary injunctive relief without prejudice on the grounds of mootness after defendant represented that the agency would voluntarily stay the procurement pending the protest. After initial review of the Administrative Record ("AR"), we canceled the planned exchange of cross-motions on the record and instead remanded to the agency for clarification of one aspect of the agency's decision. We permitted the parties to submit further explanations of their proposals to the agency for it to reconsider its decision in light of that new information. On remand, the agency confirmed the award to Sea Box. After the remand process, plaintiff was permitted to file an amended complaint.

Now pending are cross-motions for judgment on the record on plaintiff's request for permanent injunctive relief. Oral argument was held on May 29, 2008. As we announced at the oral argument, and for the reasons set out below, we grant plaintiff's motion for judgment on the administrative record and direct permanent injunctive relief.

## BACKGROUND

On April 10, 2007, the agency issued Request for Proposal ("RFP") M67854-07-R-5060. Through the RFP, the agency sought to procure an indefinite quantity of LFRSs. These are large, portable, refrigerated containers. They consist of two primary components, a refrigeration unit ("RU") and an insulated container. This part of the proposal was covered by Contract Line Item Number "(CLIN) 0001. In addition, the RFP sought, among other things, a two-year parts support package. This part of the work

2

was covered by CLIN 0003. The procurement was to be conducted in accordance with Federal Acquisition Regulation ("FAR") part 15 as a best value, negotiated procurement for a commercial product. The RFP contemplated an indefinite delivery/ indefinite quantity contract with a minimum of 10 and a maximum of 300 units. The contract would have a base period of one year with four option years.

The contract was subject to the Trade Agreements Act ("TAA"), 19 U.S.C. §§ 2501 *et seq.* (2000). 48 C.F.R. § 25.402(b) (2007). The solicitation required offerors to certify, "[f]or all line items subject to the Trade Agreements clause of this solicitation . . . each end product to be delivered under this contract . . . is a U.S.-made, qualifying country, or designated country end product." Defense Federal Acquisition Regulation Supplement ("DFARS") 252.225-7020 (Trade Agreements Certificate). The DFARS standard clause 252.225-7021(a)(12), incorporated in the solicitation by Amendment No. 1 to the RFP (AR at 43) instructs offerors that a "US-made end product" is one that is "mined, produced, or manufactured in the United States" or is "substantially transformed in the United States into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was transformed." DFARS 252.225-7021(a)(12).

The "best value" award was to be based on four evaluation factors: (a) "Operational Effectiveness" (most important), (b) "Past Performance" (less important), (c) "Supportability" (least important), and (d) "Price" (evaluated but not rated). (AR at 42.) In making its determination, the agency considered "overall technical, past performance, and supportability merit to be of significantly greater importance than evaluated price. However, the importance of price as a factor in the final determination will increase with the degree of equality in the overall merits of the proposals." *Id.* Klinge, Sea Box, and three other offerors submitted proposals.

It was clear from Sea Box's initial proposal that its container would be built in China and that the RU would be shipped from Singapore to China to be joined with the container. China was listed in the schedule of work as the place of "Final Assembly." (AR at 105 (Sea Box Initial Proposal).) Sea Box certified, however, that Singapore was the "country of origin" of its LFRS. *Id.* at 157, 160. Singapore is a "qualifying country" under the TAA. In a separate entry on its proposal form, Sea Box indicated that the "Place of Manufacture," was "Outside the United States." *Id.* at 160. After review of the initial

3

proposals, the agency determined that Sea Box's proposal provided the "best value" and awarded the contract to Sea Box on July 12, 2007.

Klinge filed a protest with the General Accountability Office ("GAO") on July 30, 2007, challenging the award to Sea Box on two principal grounds: (a) the agency wrongfully eliminated Klinge from the competition based on a technical requirement not at issue here, and (b) Sea Box's proposal was not compliant with the TAA.  (AR at 817-36.)  In response to the protest, the agency informed offerors that it would take corrective action by admitting Klinge back into the competitive range and reopening discussions with offerors.  The GAO dismissed the protest as academic.  (AR at 837-40 (Dismissal of B-309930 by the GAO and Notice of Corrective Action from USMC, Aug. 8 & 27, 2007).)

The agency then issued written discussion questions to Klinge and Sea Box on September 6, 2007, which, among other things, asked the offerors to provide a TAA Certificate[2] and to explain how their manufacturing processes satisfied the TAA.  *See* (AR at 842 (Agency Questions to Sea Box, question 3), 885 (Agency Discussion Questions to Klinge, question 2).)  Sea Box and Klinge submitted responses on September 12 & 13, 2007, respectively. Klinge submitted a completed TAA Certificate and an explanation of the place of manufacture of each component as well as where subsequent integration of the components took place.  Klinge explained that it acquires its containers from a Chinese subcontractor, [                                                    ], and integrates them with its U.S.-made refrigeration unit at its Pennsylvania facility and there conducts all testing and other finishing labor.  (AR at 854-60.)

Sea Box likewise submitted a completed TAA Certificate and accompanying narrative of its manufacturing process.  Sea Box represented that its end product would be a "U.S.-made, qualifying country, or designated country end product" and that "[n]o supplies are other [sic] nondesignated country end products."  (AR at 887.)  Sea Box explained that its refrigeration unit, manufactured by [      ] in Singapore, is sent to China where it is "ultimately . . . mechanically and electrically integrated within the basic ISO container structure."  *Id*. at 888.  The container into which the refrigeration unit is integrated is also produced by CIMC in China.  *Id*.  Following

---

[2] DFARS 252.225-7020.

integration in China, "the containers are then shipped to Sea Box's East Riverton, New Jersey facility." *Id*.  Sea Box further explained:

> Following receipt of the container at its New Jersey facility, and using its own employee labor force, Sea Box performs all additional and necessary manufacturing processes (e.g., electrical, CARC [Chemical Agent Resistant Coating] painting, finishing) and parts integration as well as quality assurance testing and preparation for inspection and final shipment to the government.

*Id*.  It also provided the following cost breakdown for each component: the RU "constitutes [                    ] percent [      ] of the cost of the LFRS;" the container constitutes "[            ]%) of the cost of the LFRS;" the parts, materials, and labor for all processes performed in New Jersey "constitute [                    ] of the cost of the LFRS."  *Id*.  It emphasized that "not less than [                              ] . . . of the CLIN 0001 LFRS cost represents manufacturing efforts performed in a designated country (Singapore) and the U.S."  *Id*.  Sea Box represented that it therefore complied "with the [TAA] provisions of the solicitation for this CLIN, and it has so certified."  *Id*.

As part of its narrative discussion, Sea Box also represented that "substantially every one" of the 32 parts to be supplied under CLIN 0003 would be manufactured in the United States.  (AR at 889.)  At odds with that statement is the following assertion: "one hundred percent (100%) of the CLIN 0003 2-Year Part Support Package cost represents manufacturing efforts performed in the U.S."  *Id*.  There is no dispute that, because the parts are provided without alteration or incorporation into a new article, they must all be TAA compliant.

At the request of the agency, Klinge and Sea Box submitted Final Proposal Revisions ("FPRs") on September 20 and 21, 2007.  *See* (AR at 897-951 (Klinge FPR), 953-1011 (Sea Box FPR).)  Sea Box included a more detailed and slightly revised project schedule.  The new schedule laid out a time line for the production and shipment of its LFRSs.  From that schedule it is apparent that the preparation of the container sub-assemblies, "Final Assembly," ISO testing, Container Safety Convention ("CSC") certification, system testing, and contractor testing were all to take place in China before

shipment to the United States.[3]  *Id*. at 991.  Once received by Sea Box in New Jersey, Sea Box represented that it would perform inspections, install interior components, paint the unit, and perform contractor testing before shipment to the Marine Corps.  *Id*. at 992.

The work schedule provided in the FPR is similar to the one included with Sea Box's initial proposal, though not identical. Of the actual manufacturing work, exclusive of shipping, [     ] take place in China, [     ] in Singapore, and [         ] in the United States.[4]  *Id*. at 991-92.  Despite the fact that the manufacturing process apparently was not changed, Sea Box replaced its original TAA certification, which stated that its LFRS was a product of Singapore, with a certification that the "Place of End Item Manufacture" was the United States.[5]  *Compare* (AR at 157 (Sea Box Initial Proposal)) *with* (AR at 1011 (Sea Box FPR).)

There are at least three aspects of Sea Box's FPR, as supplemented by its written responses, which should have caused the CO to conclude that its TAA certification was not compliant.  First, the schedule of work included in its FPR, although slightly revised, continued to list China as the place for final assembly, ISO testing, CSC testing, system testing, and contractor testing. This was consistent with the second red-flag: Sea Box represented in its written discussion responses that the RU was shipped to China where it is

---

[3] "ISO" refers to international container standards made uniform by the International Organization for Standardization.  The solicitation required that "the LFRS system shall comply with the requirements of ISO 1496-2 as applicable."  (AR at 50 (Performance Specification for Large Field Refrigeration Systems).)  The ISO and CSC testing and certifications are performed only on the first three LFRSs to be manufactured.  Thereafter, CIMC simply confirms that the units meet the required standards.  (AR at 991-93.)

[4] Sea Box's initial proposal listed, exclusive of packing and shipping, [     ] of work in Singapore, [     ] in China, and [     ] in New Jersey. (AR at 105.)

[5] The "Place of End Item Manufacture" certification was provided for statistical purposes only.  Sea Box omitted a TAA certification from its FPR, presumably because it had provided a completed certificate attached to its Discussion Question Responses (AR at 895).

"mechanically and electrically integrated within the basic ISO container structure." (AR at 888.) Third, Sea Box failed to unequivocally state that it intended to supply 100 percent compliant parts under CLIN 0003.

Despite the questions raised by Sea Box's proposal and Klinge's protest, there are no documents in the record, as it existed during this second evaluation, reflecting any consideration by the agency of the TAA compliance issue. Instead, as only later became apparent in the agency submission during a second GAO protest, agency counsel contacted counsel for Sea Box and orally expressed reservations about Sea Box's TAA compliance, although only with respect to CLIN 0001. According to an affidavit from agency counsel, which the agency supplied late in the GAO process, he felt assured by Sea Box's counsel, who in turn was passing on information from Sea Box's President, that Sea Box had inadvertently mis-characterized its manufacturing process in its written discussion responses, and that, in fact, mechanical and electrical integration did not occur in China. (AR at 1376-79 (Decl. of David P. Ingold, Jan. 24, 2008).) Based on that information, Sea Box was found to be technically acceptable. Klinge and a third offeror were also deemed acceptable. Klinge's price was approximately [          ] more than Sea Box,[6] however, and the award to Sea Box was confirmed on October 18 and 23, 2007. (AR at 1039-49) The agency placed an order for an initial delivery of three prototype LFRSs.

In the second protest at GAO, filed on November 6, 2007, Klinge once again raised the question of Sea Box's compliance with the TAA. Only after repeated opportunities to explain how it concluded that Sea Box was compliant, did the agency reveal that its previously unexpressed concerns were only allayed after telephone conversations between counsel. The affidavit from agency counsel reveals that the agency viewed the written submissions

---

[6]A third offeror was also deemed acceptable, although its price was approximately [                              ].

to be insufficient. The oral assurances from Sea Box's counsel[7] materially disavowed the written submissions.[8]

The GAO rejected the protest. It concluded that the agency determination that Sea Box was TAA compliant was not unreasonable, given Sea Box's assertion that, after receipt of the LFRS in the United States, Sea Box would perform "all additional and necessary manufacturing processes (e.g., electrical, . . . painting, finishing) and parts integration as well as quality assurance testing and preparation for inspection and final shipment to the government." (AR at 1412 (GAO Decision, B-309930.2, Feb. 13, 2008) (quoting AR at 888).) The GAO counted it relevant that Sea Box estimated that [  ] percent of the overall cost of the LFRS was attributable to work performed and materials added in the United States, and that [  ] percent of the cost was attributable to the refrigeration unit coming from Singapore. The GAO concluded, based on Sea Box's assertions in its written explanation to GAO, that "no work is performed in China other than bolting the panel to the container for shipment purposes; all other required work, including the addition of all necessary parts and all mechanical and electrical and labor operations and integration, is performed at Sea Box's facility in the U.S." *Id.* at 1412 n.3. The GAO declined to consider Klinge's argument that the testing

---

[7] Sea Box did not retain outside counsel to represent it at the GAO and has not done so in the present action. It was and is represented by Mr. Robert Farber, who is employed by Sea Box and serves as its Director of Contracts. Mr. Farber is a licensed attorney and a member of the bar of this court. Mr. Farber had a substantial role in the preparation of Sea Box's proposal and FPR. As an employee of Sea Box, in order to prevent the disclosure of competition sensitive information, Mr. Farber was not admitted under the Protective Order at the GAO and is likewise not admitted under the Protective Order in this case.

[8] The Declaration of agency counsel indicates that, in response to an inquiry regarding the inconsistency among various documents concerning the processes performed in China, Mr. Farber "indicated that he had prepared the discussion responses and that he was not an engineer and that his discussion statement was incorrect to the extent that it indicated that mechanical and electrical integration took place in China." (AR at 1378.) After an apparent consultation with the president of Sea Box, Farber informed agency counsel that "no work other than bolting the refrigeration unit in place" took place in China. *Id.* at 1379.

performed in China could only take place if the unit was virtually completely assembled, which contradicts Sea Box's contention that the work in New Jersey fundamentally transformed the product.  The GAO found that the argument was untimely presented.  *Id.* at 1410-11 n.2.

Also raised in the second protest at GAO was the issue of CLIN 0003, a parts support package to support the LFRSs for up to two years.  Like the units themselves, the spare parts provided by the offerors under CLIN 0003 were to be "only U.S.-made, qualifying country, or designated country" end products.  Klinge challenged Sea Box's intent to comply with that requirement because of its statement that "substantially every one" (AR at 889) of its 32 parts or items was manufactured in the United States.  The GAO relied on the agency's determination that such language was sufficient to support the TAA certification.  In support, the GAO also quoted additional language from Sea Box's discussion responses that, "one hundred percent (100%) of the CLIN 0003 2-Year Parts Support Package cost represents manufacturing efforts performed in the U.S."  (AR at 1414 (quoting AR at 889).)

After denial of its second GAO protest, plaintiff filed its complaint in this court on March 6, 2008.  Along with its complaint, plaintiff filed a Motion for a Temporary Restraining Order and Preliminary Injunction.  The court convened an initial telephone conference on March 7, 2008, and denied without prejudice the motion for preliminary injunctive relief based on the agency's agreement not to place any additional orders under the contract or to use the LFRSs already ordered.  The AR was filed on March 11, 2008.[9]  After preliminary review of the record and the pleadings, the court advised the parties via a telephone conference held on March 18, 2008, that it would remand to the agency so that it could further develop the record and explain its analysis of the TAA compliance issue. Our concern was triggered by what we viewed as clearly contradictory indications in Sea Box's submission with respect to its TAA compliance.  We were particularly concerned that the CO dealt with these contraindications by relying on oral representations from Sea Box's in-house counsel, Mr. Farber, as to what the President of Sea Box had told him concerning the manufacturing activities that take place in China.

---

[9] The AR was twice supplemented by the agency to reflect documents added during the court ordered remand.  The AR was also the subject of two unopposed motions to supplement filed by plaintiff.  Both of those motions were granted on May 29, 2008.

Consequently, in our March 19, 2008 remand order, we directed the agency to "obtain from Sea Box a written explanation of the entire process of manufacturing, assembly, and testing of its refrigerated containers sufficient for the agency to adequately assess compliance."  Klinge was also given a chance to supplement its explanation of how its proposal satisfied the TAA certification requirement.

In Sea Box's April 1, 2008 response to the remand, it included the following explanation to the agency:

> [T]he refrigeration unit as manufactured in and shipped from Singapore and the open-ended container structure made in China remain two separate and independent parts, the country of origin of each obviously remaining the country in which it was manufactured.

> Following that, at the facility in China, and while being held in position by a forklift, the sturdy metal panel which surrounds the refrigeration unit is simply bolted to the open container, effectively closing off the open end.  This process consists of [
>
> ]. . . .

> . . . .

> The container bolts and closures of this preliminary container assembly are then sealed for Customs inspection purposes, and such assembly as it exists at that moment is transported by U.S. flagged carrier to Sea Box's facility in New Jersey so as to undergo further extensive manufacturing processes.

(AR at 1420.)

> All other work required to convert and transform these parts into the end product . . . including mechanical, electrical and painting labor operations and integration, quality assurance testing and preparation for inspection and final shipment to the government, is performed in the United States . . . .

*Id*. at 1422.  We omitted from this statement a lengthy explanation of why it is useful and efficient to bolt the refrigeration unit to the container in China. We view this as non-responsive to the order and not relevant to the issue.

We sought an explanation of the "entire process of manufacturing, assembly and testing" specifically in order to assess what Sea Box meant in its schedule of work that "Final Assembly" and testing would take place in China. The detail furnished by Sea Box is in the form of an attachment to its April 1 letter to the CO.  There it sets out in great detail, over eleven pages, activities which take place once the unit is in New Jersey.  From what the court can discern, the following work is performed in New Jersey: installation of an "E track system" on the bottom of the unit, installation of a pressure relief valve, a light and a transformer to operate the light, painting, marking, inspection, and testing.   By contrast, no detail is furnished concerning what Sea Box earlier described in its FPR and its responses to agency inquiries as the "Final Assembly," testing, and "mechanical and electrical" integration which would take place in China.

In order to respond to potential confusion concerning CLIN 0003 (spare parts), Sea Box, after consultation with its parts supplier, admitted that 29 percent[10] of the costs of its parts included in CLIN 0003 were not sourced from the United States or from a designated country.[11] *Id*. at 1422.  Because of this admission and the fact that nearly one year had passed since the solicitation had been issued, the record reflects that the CO intended to cancel the award to Sea Box and the solicitation and do new market research with the idea of issuing a new solicitation at a later time.  (AR at 1460 (First CO Mem., Apr. 2, 2008).)   The agency, however, changed course shortly thereafter and defendant filed a motion to extend the stay of proceedings in order to give the agency more time to solicit further information from both offerors regarding TAA compliance.  We granted that motion on April 8, 2008.

_____

[10] In the previous paragraph, Sea Box stated that "three-quarters" of its CLIN 0003 parts were "manufactured in the United States or designated countries."  It is not exactly clear where the inconsistency arises, but it may be the difference between the actual percentage of parts and the percentage of the overall costs of the parts package that those parts represent.

[11] As defendant concedes in its latest brief, "Sea Box failed to provide an explanation or reconcile this latest certification of TAA compliance with its FPR or prior submissions to GAO."  (Def.'s Br. in Resp. 19.)

Both Sea Box and Klinge provided further supplementation regarding their TAA compliance on April 10 and 11 respectively. Sea Box changed its prior explanations by representing that "the country of origin for each and every one of the thirty-two (32) individual parts . . . is either the United States or a designated country." (AR at 1464 (Sea Box letter to the CO, Apr. 10, 2008).) In order to make this representation, however, it explained that it had to get assurance from its primary supplier that the supplier would source all parts from compliant locations, albeit at higher cost to itself. This assurance meant that all 32 spare parts were now to be acquired from the United States or other designated countries. The change also resulted in minor changes in the part descriptions and catalog numbers. Based on this representation, the agency confirmed the award to Sea Box.

The CO wrote on April 14, 2008, that, "it is my intent to allow Sea Box to continue performance of this contract based on its most recent representations." (AR at 1483 (Second CO Mem., Apr. 14, 2008).) With respect to concerns about CLIN 0003, the CO was satisfied that he could deal with any possible failure to furnish compliant spare parts in the future, should the need arise. With respect to CLIN 0001, he relied on Sea Box's representation that, "it would ship its containers and refrigeration units directly to the U.S. if required to be compliant with the TAA." *Id*. at 1482. It remained his view, however, that

> Sea Box is compliant with the TAA regarding . . . CLIN 0001 by virtue of the substantial transformation that takes place at the Sea Box manufacturing facility in New Jersey. The mere bolting of the Singapore refrigeration unit into the Chinese ISO container for shipment to the U.S. does not in my opinion make Sea Box noncompliant with the TAA.

*Id*. We take this to mean that, left to its own, the agency would not insist on manufacture in the United States.

In response, Klinge has filed an amended complaint. It contains five counts. Count I concerns the agency's acceptance of Sea Box's proposal, despite asserted problems with CLIN 0001's compliance with the TAA. Count II asserts that Sea Box made material misrepresentations to the agency with respect to CLIN 0001, which were relied on by the agency. Count III alleges that the conversations held after the cutoff date for FPRs constituted improper discussions. Count IV contends that CLIN 0003, the two year parts support

package, independently failed to meet the requirements of the TAA.  Count V alleges a material misrepresentation by Sea Box in connection with the parts support package, which, once again, is alleged to have been relied on by the agency.  It is sufficient for our purposes to address only Count I.

## DISCUSSION

To obtain injunctive relief in this bid protest, Klinge must demonstrate four things.  First, it must demonstrate success on the merits, which in this case means that the agency's conduct was arbitrary, capricious, or not in accordance with law.[12]  Second, it must show that plaintiff will suffer irreparable injury if relief is not granted.  Third, the harm to plaintiff must outweigh the harm to the government and intervenor.  Fourth, the public interest should weigh in favor of relief.  *PGBA v. United States*, 389 F.3d 1219, 1229-30 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)).

*Success on the Merits*

In the context of a bid protest, the court reviews agency action under the standards of the Administrative Procedure Act ("APA"), 28 U.S.C. § 706(2)(A) (2000).  *See* 28 U.S.C. § 1491(b)(4) (2000).  Deference is generally given to the agency upon a showing of a "reasoned explanation for its decision which is in accord with material facts contained in the administrative record." *Nutech Laundry & Textile, Inc. v. United States*, 56 Fed. Cl. 588, 593 (2003). If the record before the court does not provide an "adequate basis for review," *id.*, the court should "remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *accord Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (stating that a remand is proper under the APA when, *inter alia*, the agency's action is not

_____

[12]This test comes from the Administrative Procedure Act, 28 U.S.C. § 706(2)(A), which this court applies under the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, now codified at 28 U.S.C. § 1491(b)(4).  The more particularized test that has evolved with respect to bid protests is that the award may be set aside if either the procurement official's decision lacked a rational basis, or the procurement involved a prejudicial violation of law.  *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004).

adequately explained in the record).  The lack of an adequate explanation for how the agency found Sea Box compliant with the TAA is what prompted the remand here.

In light of Sea Box's offer during remand to move its manufacturing operation entirely to the United States, a question arises: must the court consider Sea Box's proposal as it existed in October 2007 or as it existed after the remand.  During oral argument, plaintiff and government expressed the view that the question before the court is the reasonableness *vel non* of the CO's original award decision.[13]  We agree. The purpose of the remand was to obtain clarification of the proposals as they existed, not to turn clarification into an opportunity for modification.  The remand order called for the agency to obtain a description of the "entire process of manufacturing, assembly and testing."  The agency thus could supplement its understanding of what the parties had offered at the time of award.  Sea Box did not, however, limit itself to explaining its existing proposals.  Instead it offered, in the April 1, 2008 letter from Sea Box's counsel to the CO, the possibility that Sea Box could completely alter its method of manufacture by shipping the refrigeration unit and the container to the United States. *See* (AR at 1424.)  We do not view this as properly part of Sea Box's FPR.  We note also that the offer was reluctant and conditional, and, in any event, not accepted by the agency.

For the agency to compare proposals fairly and equally, and to give competitive offerors a fair basis for comparison, they cannot continue to be in flux.  If Sea Box is allowed, after award, to change its place of manufacture, it has benefitted from costing a proposal on the assumption it was made in China.  Altering the location of manufacture is not a "clarification" of a proposal, it is a material change.  We are not dealing here with a clerical error or omission.  Even an inadvertent misrepresentation would be prejudicial to other bidders who priced their proposals on the assumption that the agency would enforce the TAA.  It is fundamentally unfair for Sea Box to receive the award, and only if challenged, be forced to comply.

---

[13]In fairness, the government also argues that there were insufficient indicators of non-compliance to turn this into a protestable issue.  It argues that the matter was one of contract performance.  We agree with the government that certifications issues are typically matters of performance.  As we explain below, however, an exception arises when the deficiency is patent.

The TAA gives effect to the World Trade Organization Government Procurement Agreement. Pursuant to the TAA, the United States Trade Representative waives the Buy American Act ("BAA")[14] and other statutory provisions for products and services provided by vendors of signatory nations. When an acquisition meets the TAA threshold, the article to be acquired must be either "wholly the growth, product, or manufacture of [a signatory or designated] country" or, in cases where the article "consists in whole or in part of materials from another country . . . , it has been substantially transformed into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed." 19 U.S.C. § 2518(4)(B) (2000). The relevant inquiry here is where the article last underwent a substantial transformation. The test contained in the statute itself is drawn from the Supreme Court's definition of the term "manufacture" under the Tariff Act of 1890: "Manufacture implies a change, but every change is not a manufacture and yet every change in an article is the result of treatment, labor and manipulation. . . . There must be transformation; a new and different article must emerge, 'having a distinctive name, character, or use.'" *Anheuser-Busch Brewing Ass'n. v. United States*, 207 U.S. 556, 562 (1908) (quoting *Jos. Schlitz Brewing Co. v. United States*, 181 U.S. 584 (1901)). The proper inquiry is thus at what point the article acquires its distinct name, character, or use. In this instance, we think that it was plainly China.

The government argues that compliance with the TAA is a matter strictly between the agency and the contractor to be dealt with after performance begins. Typically, that would be the case. When a solicitation contains a TAA certification requirement, the agency is entitled to rely upon an offeror's certification. The certification in turn will give rise to a contractual obligation on the part of the successful offeror to provide a TAA compliant product. *Wyse Technology, Inc.*, B-297454, 2006 CPD ¶23, at *13 (Comp. Gen. 2006). When, however, prior to the award, the agency has "reason to believe that a firm will not provide compliant products, the agency should go beyond a firm's representation of compliance." *Leisure-Lift, Inc.*, 2003 B-291878.3, B-292448.2, 2003 U.S. Comp. Gen. LEXIS 178, at *19 (Comp. Gen. 2003); *see also Harris Corporation Broadcast Division*, B-255302, 94-1 CPD ¶107, at *12 (Comp. Gen. 1994) ("An agency may reasonably rely upon an offeror's certification of compliance . . . in the absence

---

[14] 41 U.S.C. §§ 10a-10d (2000).

15

of information indicating that the certification is inaccurate."). This means that if an offeror's submission contains information that calls into question its TAA compliance, the agency has a duty to make reasonable inquiry and satisfy itself that the product offered meets the terms of the act. Failure to do so in the face of clear indications of non-compliance would be arbitrary and capricious and not in accordance with law. Consequently, we agree with plaintiff, that in such a circumstance, a bid protest can be lodged predicated on the argument that either the successful offeror was not in fact TAA complaint or that the agency could not have reasonably determined that it was compliant.

In this case, beginning with Sea Box's original proposal, the agency had cause to inquire further into Sea Box's TAA compliance. Sea Box's initial certification that its LFRS was an end-product of Singapore was fundamentally inconsistent with the rest of its proposal. Sea Box offered a RU manufactured in Singapore, which was then shipped to its subcontractor in China where it was, at the very least, physically combined with the container. The container is never physically present in Singapore and thus it is impossible for the constituent parts to have been substantially transformed in Singapore. On the face of Sea Box's initial proposal, therefore, the agency could not have relied on the TAA certification without further inquiry. In addition, Sea Box's schedule of work listed China as the place of "Final Assembly." (AR at 105.) Despite this patent inconsistency, the agency did not make further inquiry until after Klinge's first protest at the GAO.

After the filing of the first protest at the GAO, the agency did set about on a course of corrective action. It specifically asked both Klinge and Sea Box to explain how their proposals were TAA compliant. Sea Box once again provided information that was inconsistent with TAA compliance: "Following its manufacture in Singapore, the refrigeration system is then shipped to [China] where it will ultimately be mechanically and electrically integrated within the basic ISO container structure." (AR at 888 (Sea Box Discussion Question Resps. Sept. 12, 2007).) The statement that the ultimate mechanical and electrical integration takes place in China supports the representation that China would be the place of "Final Assembly." This statement makes sense given the additional representation that the LFRS would be operationally tested in China. These factors strongly suggest that Sea Box's LFRSs come into existence in name, character and use while they are in China.

Sea Box also provided a cost breakdown for activities performed in each country, concluding that "[                                    ] . . . represents

manufacturing efforts performed in a designated country (Singapore) and the U.S. Sea Box thus represents that it complies with the [TAA] . . . and it has so certified." *Id*. As we explain below, the agency should have realized that this purported test was not drawn from the TAA. The listing of respective percentages of costs attributable to each country is unresponsive to the relevant TAA inquiry of "substantial transformation."

Despite the continued inconsistencies in Sea Box's written submissions, agency counsel advised the CO that given Sea Box's representation that "they understood their obligations under the TAA and that the mere shipment of the Singapore refrigeration unit to China for placement in the container there did not serve to make them TAA noncompliant." (AR at 1379 (Decl. of David P. Ingold).) There are three problems with this statement. First, it was up to the agency to decide whether there was a TAA problem, not Sea Box. Second, the summary statement that the refrigeration unit is merely "placed" in the container is contradicted by the representation that "Final Assembly" and electrical and mechanical integration occur in China and are sufficient to permit operational testing. Third, it should have been apparent from Sea Box's reference to a legal test drawn from the BAA[15], rather than the TAA, that it was applying the wrong inquiry, hence its reference to the percentage of cost attributable to Singapore and the United States.

In its briefing in response to plaintiff's motion for judgment on the AR, Sea Box again disavows its earlier representations. The statement in the September 12, 2007 discussion responses that the unit is mechanically and electrically integrated in China is, according to Sea Box, a statement that should be ignored as coming from counsel. If we ignored counsel's representations, however, we would have no reason to credit counsel's statement in the same submission that "all additional and necessary manufacturing processes (e.g., electrical . . . ) and parts integration as well as quality assurance testing and preparation for inspection and final shipment to the government." (AR at 888.) At some point, Sea Box must be held to its written representations.

---

[15] Under the BAA, offerors are generally required to offer domestically manufactured products. *See* 41 U.S.C. §§ 10a-10d (2006). "For manufactured end products . . . The cost of domestic components must exceed 50 percent of the cost of all the components." 48 C.F.R. § 25.101(a) (2007).

It is apparent that the LFRS is substantially transformed in China.  In its initial proposal, Sea Box included a schedule for production of its LFRS. It reflected that the containers are "finally assembled" in China and that the "system" is tested there.  (AR at 105.)  The total amount of work time in China was to be [       ].  Work time for the refrigerated unit in Singapore is listed as [     ].  Only [          ] were to be spent working on the combined unit after it arrives in the United States.  In its FPR, Sea Box lists the following activities to take place over the course of [      ] in China: "Prepare sub-assemblies" [      ], "Receive Reefer Units" [        ], "Final Assembly" [       ], "ISO Tested" [        ], "CSC Certified" [        ], "Test System" [        ], and "Contractor Test" [        ].[16]  (AR at 991.)  In its March 28 and April 1, 2008 letters to the CO, Sea Box states that "*[t]he LFRS* is tested and certified for ISO purposes.  This testing was performed in China on the container structure with the refrigeration unit installed."[17]  (AR at 1423, 1579 (emphasis supplied).)  ISO Standard 1496-2 testing has a number of elements, but any reasonable construction of them makes it clear that the "unit" being tested is an operational LFRS.[18]  In fact, the RFP specifically required that "the LFRS system shall comply with the requirements of ISO 1496-2."  (AR at 50.)  At the point at which a unit is ISO certified, it must be capable of functioning as a LFRS.

As we also explained at the conclusion of oral argument, a number of considerations offered by Sea Box and apparently accepted by the CO, we find

---

[16] An additional [       ] are listed for packing and shipping to Sea Box in New Jersey.

[17] The March 28 letter was apparently a draft that was inadvertently sent to the agency.  Sea Box sent an additional and nearly identical letter shortly thereafter on April 1.  The March 28 letter was the subject of plaintiff's second motion to supplement the AR.

[18] For example, Test No. 12–Weatherproofness–requires:  "On completion of the test, no water shall have leaked into the thermal container, and the refrigeration or heating unit shall function properly."  Test No. 13–Airtightness–requires that the refrigeration unit be in place.  Test No. 15a)–Test of performance of a thermal container under refrigeration by a mechanical refrigeration unit–is particularly telling as it requires the running of the "unit" for a period of eight hours with "the temperature cycling about a constant level."

irrelevant.  First, the fact that ISO testing is only of the three prototypes does not alter the result.  We take account of the ISO testing, not as an item of work, but, as we explained above, because it demonstrates conclusively that the LFRS was sufficiently functional in China to be tested for its ultimate purpose.  Indeed, the intervenor itself refers to it as a LFRS at that point.  *See* (AR at 1423, 1579.)

Second, the fact that "[                                        ]%) . . . represents manufacturing efforts performed in a designated country (Singapore) and the United States" (AR at 1422) is also not controlling.  Because of the assembly of the unit in China, the inquiry under the TAA has to be where the substantial transformation takes place.  The origin of parts or the expenditure of labor prior to arrival in the transforming-country becomes immaterial.

Third, the fact that the container can be broken apart into its two primary constituent components, which then revert to their pre-assembly character, is also irrelevant.  The question is what the name, character and use of the unit is after assembly.

Fourth, the intervenor's motivations for how it organizes the process of manufacture is not material for purposes of testing TAA compliance.  As we explain above, the fact that it is convenient for Sea Box to stabilize the container prior to shipment by uniting it to the refrigeration unit in China is irrelevant to the question of substantial transformation.[19]

At no point has the CO given a satisfactory justification for his reliance upon the  characterization of what occurs in China as the "mere bolting of the Singapore refrigeration unit into the Chinese container for shipment to the U.S."  It should have been readily apparent to the CO that Sea Box's informal oral characterizations of its proposal were inaccurate.  Nor has the government offered an explanation during the protest for how the character, use or name of the unit is any different on its way from China, than it is after the finishing work in New Jersey.  Although the most recent submission by Sea Box provides much greater detail about the work in New Jersey, we view none of this as transformative of the name, character or use of the LFRS.  Painting,

---

[19] We note, in any event, that Klinge ships the same container from China to the United States prior to assembly.

installation of an interior light and accompanying transformer, and bolting on of skids, for example, are simply finishing work.  By the time it arrives in New Jersey, the unit has been "mechanically and electrically integrated" and "finally assembled" and functionally tested.  The fact that the unit did not meet all the contract requirements is not controlling.  The government did not make the case that the additional elements performed in New Jersey meet the "substantial transformation" test.

In sum, there can be no question that, up until April 1, 2008, when Sea Box offered to make the LFRS in New Jersey, the CO could not have treated the proposal as clearly TAA compliant with respect to CLIN 0001.  At a minimum, there were so many statements suggesting that the critical functions of turning the product into an LFRS occurred in China, that the CO should have insisted on more information.  We view Sea Box's counsel's disavowals of these contraindications as not a substantial basis for eliminating concern.  Sea Box's submissions to the agency, to the GAO, and to this court have been materially inconsistent and confusing, and they have been predicated on an incorrect understanding of the relevant test.  It was arbitrary and capricious to ignore this fact.   We conclude that it was arbitrary and capricious of the agency to accept Sea Box's proposal as satisfying the TAA certification requirement.  In light of our conclusions with respect to CLIN 0001, it is unnecessary to address CLIN 0003 or any of the other arguments in Counts II-V of the amended compliant.

*Klinge Will Suffer Irreparable Injury Without Injunctive Relief*

It is well established in this court when considering the issue of irreparable injury that the question is whether the "plaintiff has an adequate remedy in the absence of an injunction."  *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993); *see also Serco Inc. v. United States*, Nos. 07-691C, et al., 2008 U.S. Claims LEXIS 69, at *132-33 (Fed. Cl. Mar. 5, 2008); *Weeks Marine, Inc. v. United States*, 79 Fed. Cl. 22, 36 (2007).  The only other relief available in a bid protest is bid preparation costs.  Bid preparation costs have been held inadequate for two reasons: loss of opportunity to earn profits on the contract, *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 369-70 (2004), and/ or failure to have a bid "fairly and lawfully considered."  *Id*. at 370 (citing *e.g.*, *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 n.25 (2000); *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 398 (1999)).

Here, plaintiff alleges that without an injunction it will not have its bid "fairly and lawfully considered." Defendant baldy asserts to the contrary but provides no reasoning as to why. We agree with plaintiff. When, as here, the agency has failed to properly consider one of the offeror's compliance with a statutory requirement of the procurement, the protestor loses the opportunity to have had its bid "fairly and lawfully considered." That injury is irreparable outside of injunctive relief.

*The Harm to Klinge Outweighs the Harm to the Agency*

As cited above, the harm to the plaintiff must outweigh the harm to the government and intervenor. Although the defendant asserts that the harm to the agency would be outweighed by any harm to the protestor, it provides no basis for such a conclusion. The agency will undoubtedly still be able to procure LFRSs in a timely manner under the same solicitation if it so chooses. As plaintiff points out, during the initial March 7, 2008 status conference, government counsel stated that, "[i]f the agency finds that the systems are noncompliant, then the intent is to terminate for convenience, and award to the next offeror, who in this case is plaintiff . . . ." (Status Conf. Tr. 45, Mar. 7, 2008). Delay is also apparently not a concern given that, as late as April 2, 2008, the CO planned to terminate the contract and do new market research in anticipation of an entirely new solicitation. Additionally, any harm suffered by the defendant or intervenor is entirely of their own making. *See Serco Inc.*, 2008 U.S. Claims LEXIS at *135-36. The failure to "fairly and lawfully consider" plaintiff's proposal outweighs any potential harm to the agency or the intervenor.

*Protecting the Integrity of the Procurement Process Serves the Public Interest*

The public interest must weigh in favor of injunctive relief. The public interest is served by ensuring that the government conduct fair and legal procurement procedures, giving honest and fair consideration to all bids. *Aeroplate Corp. v. United States*, 67 Fed. Cl. 4, 13 (2005). Preserving the integrity of the public procurement system is in the public interest. *MVM, Inc. v. United States*, 46 Fed. Cl. 137, 143 (2000); *Day & Zimmerman Servs. v. United States*, 38 Fed. Cl. 591, 610 (1997). The integrity of the procurement process necessarily includes the requirement that government officials follow applicable procurement law and regulation. *Rotech Healthcare, Inc. v. United States*, 71 Fed. Cl. 393, 431 (2006). Here, the interest weighs in favor of preventing the government from awarding a contract in contravention of the

TAA and in preventing the government from failing to make proper inquiry into TAA compliance when it had a duty to do so.

CONCLUSION

For the reasons expressed above and as stated on the record on May 29, 2008, plaintiff's motion for judgment on the administrative record is granted. The award to Sea Box was arbitrary, capricious, and not in accordance with law.  The Marine Corps is enjoined from accepting further performance of the contract with Sea Box and is directed to terminate the contract to Sea Box. Costs to plaintiff.


s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge

22