**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| **KLINGE CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 08-134C** |
| | ) | |
| | ) | **Judge Eric G. Bruggink** |
| **v.** | ) | |
| | ) | |
| **THE UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SEA BOX, INC.** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |
| | ) | |

**PARTIALLY UNOPPOSED MOTION FOR LEAVE OF COURT TO RELEASE TO THE GOVERNMENT ACCOUNTABILITY OFFICE <u>TABS 46 – 51 OF THE ADMINISTRATIVE RECORD</u>**

Plaintiff, Klinge Corporation ("Klinge"), by its undersigned counsel, respectfully moves for leave of Court to release certain documents more fully described below, which fall under the Court's Protective Order, to the Government Accountability Office ("GAO") in connection with a Request For Partial Reconsideration currently pending there. Defendant, the United States Marine Corps Systems Command ("the agency") has indicated that it consents to this request and does not oppose this Motion. The consent of the Intervenor, Sea Box, Inc. ("Sea Box") was requested via e-mail to Robert Farber, its representative in this matter, but Mr. Farber has not yet responded.

## BACKGROUND

After oral argument on May 29, 2008, this Court sustained Klinge's bid protest by Opinion and Judgment dated June 5, 2008. The Court released a public version of its Opinion on June 10, 2008. On July 3, 2008, Klinge filed an application for attorneys' fees and costs under the Equal Access To Justice Act ("EAJA"). The EAJA application is currently pending.

Prior to the proceedings before this Court, the contested procurement was the subject of two bid protests before the GAO. The first resulted in corrective action by the agency (*i.e.*, the agency, having excluded Klinge from the competitive range, placed Klinge into the competitive range, suspended its award to Sea Box, and re-opened discussions with the offerors). Ultimately, however, the agency re-awarded the contract to Sea Box. The second protest followed, which – like the first protest – raised allegations that Sea Box's end products failed to comply with the Trade Agreement Act ("TAA"). Klinge's TAA-related protest grounds primarily challenged two aspects of Sea Box's proposal: First, Klinge alleged that the Large Field Refrigeration System ("LFRS"), which comprised contract line item number ("CLIN") 0001 was non-compliant with the TAA. Second, Klinge alleged that the 2-Year Spare Parts Support Package, which comprised CLIN 0003, was non-compliant with the TAA.

At the conclusion of the protest, the GAO determined that the agency had reasonably determined that Sea Box complied with the TAA under CLINs 0001 and 0003. On CLIN 0003, the GAO explicitly relied upon specific pre-award representations made by Sea Box to the agency concerning the country of origin of the parts it offered (*i.e.*, that "substantially every one of which is manufactured in the United States" and that they represented "(100%) . . . manufacturing efforts performed in the U.S.").

Following the GAO decision, Klinge filed the action before this Court. Ultimately, the

Court sustained the protest and entered an injunction requiring the agency to terminate its contract with Sea Box. The Court's ruling was chiefly based upon its determination that Sea Box's LFRS under CLIN 0001 was substantially transformed in China, not the United States (as argued by Sea Box and the agency) and, therefore, was non-compliant with the TAA. While the Court also found that Sea Box's admitted – during the Court-ordered remand – that it offered non-TAA-compliant parts under CLIN 0003, in light of the Court's ruling with respect to CLIN 0001, the Court declined to rule on the other protest grounds.

As noted, following the Court's ruling, Klinge filed an EAJA application to recover attorneys' fees arising out of the proceedings before the U.S. Court of Federal Claims. However, due to limitations set forth in the EAJA and related decisional law, Klinge was precluded from including attorneys' fees arising out of the GAO protest as part of its EAJA application.

Generally, a party before the GAO must prevail on the merits of the protest <u>at the GAO</u> to obtain a recommendation of attorneys' fees. However, Sea Box's admission regarding non-compliant CLIN 0003 parts did not occur until the proceedings before this Court, after the GAO proceedings had concluded. Because the GAO, in denying Klinge's protest, specifically found that Sea Box's contrary representations (*i.e.*, "substantially all" and "(100%)") supported the agency's finding of TAA compliance under CLIN 0003, Klinge filed a Request For Partial Reconsideration of the GAO's decision on June 13, 2008 based upon Sea Box's admission.[1] Essentially, Klinge has argued that Sea Box's admission, if made during the GAO proceedings (and if made to the agency pre-award), would have precluded an award to Sea Box and would

---

[1] Klinge's application to the GAO is attached hereto as **Exhibit A**. The Request has four attachments, which include: (i) the GAO's public decision, dated February 13, 2008; (ii) the Court's public decision, dated June 10, 2008; (iii) the Court's Termination Order, dated May 29, 2008; and (iv) the Court's Final Judgment, dated June 5, 2008. A complete recitation of the factual background and legal issues underlying this protest are set forth in the Court's June 10th decision.

have caused the GAO to sustain the protest on the CLIN 0003 issue. In light of this, Klinge has requested that the GAO reverse is decision with respect to CLIN 0003 and recommend the recovery of attorneys' fees arising out of the GAO proceedings.

## RELIEF REQUESTED

The Court's public decision makes clear that Sea Box's admission that some parts offered under CLIN 0003 were not compliant with the TAA was a new fact that surfaced during the Court-ordered remand. The GAO's public decision makes clear that the non-existence of this fact was a basis for its denying Klinge's CLIN 0003 protest ground. Therefore, to provide the GAO with a full opportunity to (a) review this post-remand admission and (b) make a determination concerning its inconsistency with (i) Sea Box's pre-award representations to the agency and (ii) the basis of the GAO's decision on CLIN 0003, Klinge seeks leave of Court to release to the GAO the post-remand documents for the purpose of such a review. The post-remand documents include the following tabs of the Administrative Record, all of which fall under the Protective Order issued by the Court:

**Tab 46** -- CO Request to SeaBox and reply (April 1, 2008);

**Tab 47** -- CO Request to Klinge and reply (April 1, 2008);

**Tab 48** -- Contracting Officer Statement (April 2, 2008);

**Tab 49** -- CO Request to SeaBox and reply (April 9, 2008);

**Tab 50** -- CO Request to Klinge and reply (April 9, 2008); and

**Tab 51** -- Contracting Officer Statement (April 14, 2008).

Importantly, Klinge is not seeking to publicly release these documents. Rather, Klinge would release them to the GAO under the GAO's Protective Order, which was entered during the course of the bid protest there.

## CONCLUSION

Klinge respectfully submits that the release of Tabs 46 – 51 of the Administrative Record to the GAO would assist the GAO in fully evaluating the merits of Klinge's Request For Partial Reconsideration. Klinge further submits that no party would be prejudiced by such a release, as the documents would be subject to the terms of the GAO's Protective Order.

**WHEREFORE,** Klinge respectfully requests leave of Court to release to the GAO Tabs 46 – 51 of the Administrative Record under the terms of the GAO's Protective Order.

Respectfully Submitted,

Dated: July 11, 2008

By: Richard P. Rector by Seamus Curley Seamus Curley

Richard P. Rector
DLA Piper US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: (202) 799-4400
Facsimile: (202) 799-5400

Counsel for Plaintiff

Of Counsel:

Seamus Curley
Samuel B. Knowles
DLA Piper US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: (202) 799-4403
Facsimile: (202) 799-5400

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| **KLINGE CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 08-134C** |
| | ) | |
| | ) | **Judge Eric G. Bruggink** |
| **v.** | ) | |
| | ) | |
| **THE UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SEA BOX, INC.** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |
| | ) | |

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on the 11th of July, 2008, a copy of the foregoing Partially Unopposed Motion For Leave Of Court To Release To The Government Accountability Office Tabs 46 – 51 Of The Administrative Record was filed with the United States Court of Federal Claim. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

By: Richard P. Rector by Seamus Curley

Richard P. Rector
DLA PIPER US LLP
500 8th Street, NW
Washington, DC 20004
Telephone: 202.799.4400
Counsel for Plaintiff

# EXHIBIT A

DLA PIPER

**DLA Piper US LLP**
500 8th Street, NW
Washington, DC 20004
www.dlapiper.com

Richard P. Rector
richard.rector@dlapiper.com
**T** 202.799.4400
**F** 202.799.5400

June 13, 2008
*VIA FAX AND E-MAIL*

General Counsel
U.S. Government Accountability Office
441 G Street, N.W.
Washington, DC 20548
Attention: Procurement Law Control Group

**Re: Request for Partial Reconsideration of B-309930.2, Matter of Klinge Corporation**

Dear Sir/Madam:

Pursuant to 4 C.F.R. §21.14 and 4 C.F.R. §21.11, Klinge Corporation ("Klinge") requests partial reconsideration of GAO's decision, dated February 13, 2008, denying the above-referenced protest. ATTACHMENT 1: GAO Decision. Specifically, Klinge requests reconsideration – based on newly available evidence – of whether the proposal submitted by Sea Box, Inc. ("Sea Box") in response to Contract Line Item Number ("CLIN") 0003 of Request for Proposals No. M67854-07-R-5060 ("RFP") issued by the U.S. Marine Corps. ("USMC") complied with the Trade Agreements Act ("TAA") clause of the solicitation, requiring delivery of "only U.S.-made, qualifying country, or designated country end products." 19 U.S.C. §2501 *et seq.*; Defense Federal Acquisition Regulation Supplement ("DFARS") §252.225-7021(c), Trade Agreements; *see also* DFARS §252.225-7020, Trade Agreements Certificate.

Klinge understands that to prevail on a request for reconsideration, partial or otherwise, it must either show that the GAO decision contains errors of fact or law, or present information not previously considered that warrants the decision's reversal or modification. 4 C.F.R. §21.14(a); *Department of Housing and Urban Dev.—Recon.*, B-279575.2, Nov. 4, 1998, 98-2 CPD ¶ 105, at 2; *Department of the Army—Recon.*, B-271492.2, Nov. 27, 1996, 96-2 CPD ¶ 203, at 5. Klinge can satisfy this burden as Sea Box recently admitted in proceedings before the U.S. Court of Federal Claims that its CLIN 0003 proposal did not comply with the TAA at the time of award. This information, which is inconsistent with both Sea Box's written proposal and the position it advanced before the GAO, was not previously considered by the GAO; rather, the GAO relied on the erroneous representation in Sea Box's proposal.

As detailed below, reconsideration and partial reversal of the decision as to CLIN 0003 is warranted for three reasons: (1) to account for the new information demonstrating Sea Box's non-compliance with the TAA; (2) to provide Klinge the opportunity to recover the substantial attorneys' fees it incurred in the GAO protest; and (3) to protect the integrity of GAO's protest process. Klinge respectfully requests a partial reconsideration and reversal to address these important issues.

**FACTUAL BACKGROUND**

The GAO's decision, dated February 13, 2008, sets forth key facts related to the Large Field Refrigeration System ("LFRS") procurement and protests. In addition, on June 5, 2008, the U.S.

DLA PIPER



Court of Federal Claims (Judge Bruggink) issued a decision sustaining Klinge's protest of the LFRS procurement. The public version of that decision, published on June 10, 2008, also sets forth key facts related to the procurement and protests. ATTACHMENT 2: Court Decision. The court's decision addressed only the merits of Klinge's claim that Sea Box's CLIN 0001 proposal failed to comply with the TAA. Although the court made findings of fact related to CLIN 0003, it did not decide the merits of Klinge's additional protest ground concerning Sea Box's TAA compliance for CLIN 0003. The following factual summary, which focuses on CLIN 0003, is based on the GAO's and the court's publicly released findings of fact.

On April 10, 2007, USMC issued RFP No. M67854-07-R-5060. Through the RFP, USMC sought to procure an indefinite quantity of LFRSs. These are large, portable, refrigerated containers. They consist of two primary components, a refrigeration unit ("RU") and an insulated container. The LFRS are covered by CLIN 0001. In addition, the RFP sought, among other things, a two-year parts support package. This part of the work was covered by CLIN 0003.

The contract was subject to the TAA. The solicitation required offerors to certify, "[f]or all line items subject to the Trade Agreements clause of this solicitation ... each end product to be delivered under this contract ... is a U.S.-made, qualifying country, or designated country end product." DFARS 252.225-7020, Trade Agreements Certificate. The DFARS standard clause 252.225-7021(a)(12) was incorporated into the solicitation by Amendment No. 1 to the RFP. The clause instructs offerors that a "US-made end product" is one that is "mined, produced, or manufactured in the United States" or is "substantially transformed in the United States into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was transformed." DFARS 252.225-7021(a)(12).

After review of the initial proposals, the agency determined that Sea Box's proposal provided the "best value" and awarded the contract to Sea Box on July 12, 2007. Klinge filed a protest with the GAO on July 30, 2007, challenging the award to Sea Box on two principal grounds: (1) the agency wrongfully eliminated Klinge from the competition based on a technical requirement not at issue here, and (2) Sea Box's proposal was not compliant with the TAA. In response to the protest, USMC informed offerors that it would take corrective action by admitting Klinge back into the competitive range and reopening discussions with offerors. As a result, the GAO dismissed the protest as academic.

USMC then issued written discussion questions to Klinge and Sea Box on September 6, 2007, which, among other things, asked the offerors to provide a TAA Certificate and to explain how their manufacturing processes satisfied the TAA. Sea Box and Klinge submitted responses on September 12 and 13, 2007, respectively. Sea Box submitted a completed TAA Certificate and accompanying narrative of its manufacturing process (included as Tab 20 of the Agency Report). As part of its discussion response, Sea Box represented that "substantially every one" of the 32 parts to be supplied under CLIN 0003 would be manufactured in the United States. Also included in Sea Box's narrative is the following assertion: "<u>one hundred percent (100%) of the CLIN 0003 2-year Parts Support Package cost represents manufacturing efforts performed</u>

DLA PIPER



in the U.S." *Id.* (emphasis added). There is no dispute that, because the CLIN 0003 parts are provided without alteration or incorporation into a new article, they must all be TAA compliant.

Without documented consideration by USMC that Sea Box was TAA compliant, USMC confirmed award to Sea Box on October 18, 2007. Klinge filed a second protest at GAO on November 6, 2007, once again raising the question of Sea Box's compliance with the TAA. Klinge challenged Sea Box's intent to comply with the TAA requirement for CLIN 0003 based largely on its statement that "substantially every one" of its 32 parts or items would be manufactured in the United States.

USMC defended against this protest ground, relying largely on the statement in Sea Box's discussion response that 100% of the CLIN 0003 costs represent manufacturing efforts performed in the United States. Sea Box also contested this protest ground, representing to the GAO that its proposal was fully compliant with the TAA.

In deciding the CLIN 0003 (Spare Parts) protest ground, the GAO expressly relied on the USMC's determination that Sea Box's representation regarding CLIN 0003 costs was sufficient to support the TAA certification:

> We have no reason to question the agency's determination that the reference in Sea Box's FPR, when discussing the parts support package, to "substantially every one of which is manufactured in the United States," did not call into question Sea Box's commitment to furnish a compliant parts support package as reflected in Sea Box's overall certification that "each end product to be delivered under this contract ... is a U.S.-made, qualifying country, or designated country end product. Not only did the "substantially every one of which" language not clearly evidence an intention to take exception to Sea Box's overall certification of compliance, but, in addition, Sea Box specifically stated in its discussion response that "one hundred percent (100%) of the CLIN 0003 2-Year Parts Support Package cost represents manufacturing efforts performed in the U.S. (citations omitted).

ATTACHMENT 1: GAO Decision, at 8 (emphasis added).

**Sea Box's Subsequent Admissions Regarding TAA Non-Compliance for CLIN 0003**

After denial of its second GAO protest, Klinge filed a Complaint in the U.S. Court of Federal Claims on March 6, 2008. After preliminary review of the administrative record and the pleadings, the court advised the parties that it would remand to the USMC so that it could further develop the record and explain its analysis of the TAA compliance issue. In the court's remand order, dated March 19, 2008, USMC was directed to "obtain from Sea Box a written explanation of the entire process of manufacturing, assembly, and testing of its refrigerated containers sufficient for the agency to adequately assess compliance."

DLA PIPER



In Sea Box's April 1, 2008, response to the remand, Sea Box, after consultation with its parts supplier, admitted that 29 percent of the costs of its parts included in CLIN 0003 were not sourced from the United States or from a designated country. In the same response, Sea Box stated that only "three-quarters" of its CLIN 0003 parts were "manufactured in the United States or designated countries." Despite the fact that Sea Box confessed TAA non-compliance for CLIN 0003, USMC decided not to cancel the award to Sea Box; instead, USMC solicited further information from both offerors, pursuant to the court's remand order, regarding TAA compliance.

Both Sea Box and Klinge provided further supplementation regarding their TAA compliance on April 10 and 11, respectively. Sea Box changed its prior explanations by representing that "the country of origin for each and every one of the thirty-two (32) individual parts ... is either the United States or a designated country." In order to make this representation, however, Sea Box explained that it had to get assurance from its primary supplier that the supplier would source all parts from compliant locations, albeit at higher cost to itself. This assurance meant that all 32 spare parts were now to be acquired from the United States or other designated countries. The change also resulted in minor changes in the part descriptions and catalog numbers. Based on this representation, the agency confirmed the award to Sea Box. The Contracting Officer wrote on April 14, 2008, that, "it is my intent to allow Sea Box to continue performance of this contract based on its most recent representations."

In response, Klinge filed an Amended Complaint with the U.S. Court of Federal Claims. Count I concerned USMC's acceptance of Sea Box's proposal, despite asserted problems with Sea Box's TAA compliance for CLIN 0001. Count II asserted that Sea Box made material misrepresentations to the agency with respect to CLIN 0001, which were relied on by the agency. Count III alleged that the conversations held after the cutoff date for FPRs constituted improper discussions. Count IV contended that CLIN 0003, the two-year parts support package, independently failed to meet the requirements of the TAA. Count V alleged a material misrepresentation by Sea Box in connection with the parts support package.

On May 29, 2008, the court held oral argument on the protest and, at the conclusion of the argument, advised the parties that it intended to sustain the protest on Klinge's Count I argument.[1] The court explained that it was not sure whether it would reach the merits of the CLIN 0003 protest grounds. Also on May 29, 2008, the court issued an order directing the agency to terminate the contract awarded to Sea Box under RFP No. M67854-07-R-5060. ATTACHMENT 3: Court Termination Order. On June 5, 2008, the court issued a non-public version of its decision in which it reached the merits of Klinge's Count I protest ground concerning CLIN 0001, but did not decide the merits of Klinge's CLIN 0003 protest grounds. A public version of the court's decision with minor redactions was issued on June 10, 2008. *See*, ATTACHMENT 2: Court Decision. In addition, on June 5, 2008, the court issued final judgment stating "award to Sea Box was arbitrary, capricious, and not in accordance with law." ATTACHMENT 4: Court Judgment.

---

[1] A transcript of the oral argument was made and can be produced, if needed, to confirm this fact. Klinge would have to seek the court's permission to share this transcript with the GAO.

DLA PIPER



**TIMELINESS AND NECESSITY**

This request for partial reconsideration is timely filed pursuant to 4 C.F.R. §21.14(b) and 4 C.F.R. §21.11. On June 5, 2008, upon issuance of the court's non-public decision, Klinge learned for the first time that Counts IV and V of its Amended Complaint concerning CLIN 0003 were not decided on the merits. *See,* ATTACHMENT 2: Court Decision, at 12-13. Although Judge Bruggink's recitation of the facts outlined Sea Box's admissions concerning its lack of TAA compliance regarding CLIN 0003, the decision only addresses Count I of Klinge's Amended Complaint. Because the court decided only the merits of Klinge's protest ground concerning CLIN 0001, Klinge herein requests reconsideration and reversal only of its CLIN 0003 protest grounds.

The GAO bid protest regulations require that a request for reconsideration be timely filed "no later than 10 days after the basis for reconsideration is known or should have been known." 4 C.F.R. §21.14(b). However, pursuant to 4 C.F.R. §21.11, GAO is required to dismiss any case, including cases on reconsideration, "where the matter involved is the subject of litigation before, or has been decided on the merits by, a court of competent jurisdiction." On April 1, 2008, when Sea Box admitted its TAA non-compliance for CLIN 0003, Klinge did not have a viable "basis for reconsideration" pursuant to 4 C.F.R. §21.14(b). At that time, the court proceeding was well underway and Klinge's CLIN 0003 protest grounds were the subject of litigation before the court. Therefore, pursuant to 4 C.F.R. §21.11, Klinge could not raise its request for reconsideration with the GAO; indeed, had it done so, such request would have been dismissed by the GAO pursuant to 4 C.F.R. §21.11. Not until Judge Bruggink issued his June 5, 2008, decision, which revealed that the court would not decide the CLIN 0003 protest grounds on their merits, did Klinge have a viable basis for GAO reconsideration. Accordingly, this request is timely filed within 10 days of June 5, 2008.

**BASIS FOR PARTIAL RECONSIDERATION AND REVERSAL**

Partial reconsideration and reversal of the GAO's decision is warranted because: (1) the new, additional information provided by Sea Box during the court's remand (i.e., that only "three-quarters" of its CLIN 0003 parts were manufactured in the United States or other designated countries) demonstrates conclusively that Sea Box's CLIN 0003 proposal was not complaint with the TAA and, therefore, Sea Box was ineligible for award; and (2) GAO expressly relied on Sea Box's material misrepresentations regarding CLIN 0003 in order to arrive at its decision to deny the above-referenced protest. Because the TAA requires 100% compliance, but for Sea Box's misrepresentations, the GAO would not have denied the protest.

Partial reconsideration and reversal is further warranted because, but for Sea Box's misrepresentations, Klinge would have been entitled to recover costs of pursuing its GAO protest, including attorneys' fees. While Klinge is entitled to recover the costs of its court protest, such costs do not include costs incurred in connection with the GAO protest. *See, California Marine Cleaning, Inc. v. United States*, 43 Fed. Cl. 724 (1999) (attorneys' fees relating to the pursuit of a bid protest at GAO are not recoverable at the court under the Equal Access to

DLA PIPER



Justice Act). Thus, Klinge has been directly harmed by Sea Box's misrepresentations, and partial reversal is appropriate to protect Klinge from this harm.[2]

Finally, partial reconsideration and reversal are appropriate in this unusual case to protect the integrity of the protest process. The CLIN 0003 issue was directly litigated before the GAO, yet Sea Box consistently represented its full compliance with the TAA and never revealed that its proposal representations regarding CLIN 0003 were materially inaccurate. Had Sea Box admitted before the GAO – as it did before the court – that its CLIN 0003 proposal was not compliant with the TAA, the protest could have been resolved fairly and efficiently before the GAO. Instead, Sea Box dissembled, the USMC and GAO were misled, and Klinge suffered significant financial harm. This result is unfair and antithetical to the protest process.

Klinge respectfully requests that the GAO reverse its decision regarding Sea Box's TAA compliance with regard to CLIN 0003 and sustain that aspect of the protest. In addition, Klinge requests that GAO recommend recovery of reasonable attorneys' fees.

Respectfully submitted,

**DLA Piper US LLP**

for

Richard P. Rector
Seamus Curley
Counsel for Klinge Corp.

Attachments

cc: Robert A. Farber, for Sea Box, Inc.
David P. Ingold, Esq., U.S. Marine Corps, for the agency.

---

[2] Note that an award of fees related to the GAO protest would not necessarily be borne by USMC. Under FAR 33.102(b)(3)(i), "[w]hen a protest is sustained by GAO under circumstances that may allow the Government to seek reimbursement for protest costs, the contracting officer will determine whether the protest was sustained based on the awardee's negligent or intentional misrepresentations. If the protest was sustained on several issues, protest costs shall be apportioned according to the costs attributable to the awardee's actions." This provision properly places responsibility for a protester's fees where it belongs: with the offeror whose material misrepresentations misled the agency and ultimately resulted in the fee award. Respectfully, this is exactly the case here.

DLA PIPER

# ATTACHMENT 1:
## U.S. Government Accountability Office Decision
## (February 13, 2008, redacted version)

GAO
Accountability • Integrity • Reliability

United States Government Accountability Office
Washington, DC 20548

Comptroller General
of the United States

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below was subject to a GAO Protective Order. This redacted version has been approved for public release.

# Decision

**Matter of:** Klinge Corporation

**File:** B-309930.2

**Date:** February 13, 2008

Richard P. Rector, Esq., and Seamus Curley, Esq.,with the law firm of DLA Piper, for the protester.
Robert A. Farber, for Sea Box, Ltd., the intervenor.
David P. Ingold, Esq., and James McCloskey, Esq., U.S. Marine Corps, for the agency.
David A. Ashen, Esq., and John M. Melody, Esq., Office of the General Counsel, GAO, participated in the preparation of the decision.

## DIGEST

Protest that awardee's proposed large field refrigeration system (LFRS) did not meet requirements of Trade Agreements Act is denied where agency, after requesting further information from awardee, reasonably determined that components of awardee's LFRS would be substantially transformed in U.S. and thus qualify as a U.S.-made end product.

## DECISION

Klinge Corporation protests the U.S. Marine Corps's (USMC) award of a contract to Sea Box, Ltd., under request for proposals (RFP) No. M67854-07-R-5060, for large field refrigeration systems (LFRS). Klinge asserts that Sea Box's proposal should have been rejected as unacceptable.

We deny the protest.

The solicitation provided for award of an indefinite-delivery/indefinite-quantity contract for a base period of 1 year, with four 1-year options, to furnish up to 300 LFRSs, as well as spare parts and training. Each LFRS was to be comprised of two primary components: (1) a 20-x-8-x-8-foot insulated container, compliant with International Organization for Standardization (ISO) standards, with double doors at one 8-x-8-foot end, and (2) (to be installed at the opposite end of the container) an electrically-powered refrigeration/freezing/heater unit (RU).

The solicitation included a performance specification that divided the specified performance characteristics into Critical Performance Parameters that "must be met

for minimum acceptability," and other parameters that were only objectives and were subject to tradeoff in the best value analysis. RFP at 1; Performance Specification §§ 1.0, 3.0, 3.1, 3.2. The solicitation also incorporated the standard Trade Agreements Act (19 U.S.C. § 2501 et seq.) clauses requiring (1) that offerors certify, "[f]or all line items subject to the Trade Agreements clause of this solicitation," that "each end product to be delivered under this contract, except those listed in paragraph (c)(2) of this provision, is a U.S.-made, qualifying country, or designated country end product," Defense Federal Acquisition Regulation Supplement (DFARS) § 252.225-7020, Trade Agreements Certificate; and (2) that the contractor "deliver under this contract only U.S.-made, qualifying country, or designated country end products," absent exceptions not applicable here, DFARS § 252.225-7021(c), Trade Agreements. In this regard, DFARS standard clause 252.225-7021(a)(12), Trade Agreements, incorporated in the solicitation, provided that:

> U.S.-made end product means an article that –
>
> (1) Is mined, produced, or manufactured in the United States; or
>
> (2) Is substantially transformed in the United States into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was transformed.

Award was to be made to the offeror whose proposal represented the "best value" based on four evaluation criteria: operational effectiveness, past performance, supportability, and price. RFP, Federal Acquisition Regulation (FAR) § 52.212-2, Evaluation–Commercial Items. Sea Box, Klinge and three other offerors submitted proposals. Based on its evaluation of the initial proposals, the Corps determined that Sea Box's proposal represented the best value and made award to that firm on July 16, 2007.

Klinge filed a protest with our Office challenging the award, asserting that (1) the agency had improperly determined Klinge's proposal to be unacceptable for failure to satisfy a Critical Performance Parameter in the performance specification–the requirement that the RU start and operate in ambient temperatures from -25° Fahrenheit (F.) to +131° F, Performance Specification § 3.9.1, and (2) Sea Box's proposal did not comply with the Trade Agreements provisions included in the RFP. In response to Klinge's protest, the USMC determined to take corrective action; it suspended performance under Sea Box's contract, established a competitive range of three offerors (including Klinge and Sea Box), and conducted discussions. We dismissed the protest as academic (B-309930, Aug. 27, 2007).

In its September 6 letters opening discussions, the agency requested that Klinge and Sea Box (1) "[p]lease provide specific test data or analysis that supports your claim of meeting the 131 degrees F. operating temperature Critical Performance Parameter"; and (2) "specifically identify the country of origin for each line item

number and . . . address your compliance with DFARS 252.225-7021," Trade Agreements. Discussion Letters to Klinge and Sea Box, Sept. 6, 2007. Thereafter, the USMC requested final proposal revisions (FPR). Based upon its evaluation of FPRs, the agency again determined that Sea Box's proposal offered the best overall value. In this regard, while both Sea Box's and Klinge's proposals received acceptable ratings for the operational effectiveness and supportability evaluation factors, Sea Box's proposal was evaluated as offering four value added features and five exceptional attributes, while Klinge's was evaluated as offering only two "value added" features and three exceptional attributes. Further, while Sea Box was rated low risk for past performance based on 57 outstanding, 4 satisfactory, 15 meets expectations, and 8 neutral past performance ratings from 12 references, Klinge was rated moderate risk for past performance based on 3 satisfactory, 3 meets expectations, 8 unsatisfactory, and 1 neutral rating from 3 references. Overall, Sea Box's proposal was evaluated as technically superior to Klinge's, and its evaluated price ($[REDACTED]) was lower than Klinge's ($[REDACTED]). Upon learning of the resulting award to Sea Box, Klinge filed this protest with our Office.

We have considered each of Klinge's arguments and find that they are without merit. We discuss Klinge's primary arguments below.

TRADE AGREEMENTS REQUIREMENTS

LFRS

Klinge asserts that Sea Box's proposal should have been rejected for failure to demonstrate compliance with the Trade Agreements requirement in the solicitation requiring that the offeror provide "only U.S.-made, qualifying country, or designated country end products." DFARS § 252.225-7021(c).[1] We find Klinge's protest in this regard to be without merit.

Both Sea Box and Klinge proposed to utilize insulated containers manufactured (by the same company) in China, which is neither a qualifying country, nor a designated country. However, both proposals as revised included the DFARS § 252.225-7020 Trade Agreements Certificate in which, by inserting "NA" or "None," Sea Box and Klinge certified that "each end product to be delivered under this contract, except those listed in paragraph (c)(2) of this provision, is a U.S.-made, qualifying country, or designated country end product." DFARS § 252.225-7020(c)(1).

Klinge proposed to ship the Chinese containers to the U.S., where a special chemical agent resistant coating (CARC) paint would be applied and U.S.-made Klinge RUs would be mounted onto and integrated into the containers to form the LFRS end

---

[1] Designated countries are listed at DFARS § 252.225-7021(a)(3); qualifying countries are listed in DFARS § 225-872-1. China is not included on either list.

products. In contrast, Sea Box stated in its discussion response that it would (1) acquire RUs made (by a subsidiary of United Technologies) in Singapore, a designated country; (2) ship the RUs to China; (3) there, the RUs "will ultimately be mechanically and electrically integrated within the basic ISO container structure"; (4) "[f]ollowing integration," ship the containers to the U.S.; (5) and there, perform "all additional and necessary manufacturing processes (e.g., electrical, CARC . . . painting, finishing) and parts integration as well as quality assurance testing and preparation for inspection and final shipment to the government." Sea Box Discussions Response, Sept. 12, 2007, at 3.

As discussed above, the solicitation required an offeror either to (1) produce an item in the United States (or other designated or qualifying country), or (2) show that the item was substantially transformed in the U.S. DFARS § 252.225-7021(a)(12). Since one of the two primary components of Sea Box's proposed LFRS–the insulated container–was manufactured in China, which is neither a designated nor a qualifying country, and the two components were first joined in China before being shipped to the U.S., it is clear that, for Sea Box's proposed LFRS to be compliant with the Trade Agreements requirements in the solicitation, the LFRS must qualify as a U.S.-made end product through a substantial transformation of the Chinese-made insulated container in the U.S.

The record indicates that the USMC determined that, under Sea Box's proposed approach, a substantial transformation would occur in the U.S. such that its LFRS would qualify as a U.S.-made end product. Klinge challenges that determination, asserting that, under Sea Box's proposal, the Chinese insulated container was to be substantially transformed into the LFRS in China, not in the U.S. In support of its position, Klinge primarily relies upon the language in Sea Box's discussion response stating that the Singapore refrigeration unit would be "mechanically and electrically integrated within the basic ISO container structure" in China.[2]

---

[2] Klinge also asserts that because Sea Box indicated in its FPR that testing would occur in China, the LFRS must have been essentially complete by that time. Sea Box's FPR, however, also provided for substantial testing to occur in the U.S., including 6 days of "Contractor Testing," after the 10 days allotted to "Install[ing] Interior components." Sea Box FPR, Work Breakdown Structure, at 1-2. In any case, Klinge's additional, testing argument was raised for the first time in Klinge's December 20, 2007 submission, which was filed more than 1 month after counsel for Klinge had received a copy of Sea Box's FPR on November 16 (and after Klinge had made a filing responsive to the November 16 document distribution and the agency had filed its report). As a general matter, under our Bid Protest Regulations, protests based on other than solicitation improprieties must be filed within 10 calendar days of when the protester knew or should have known their bases. 4 C.F.R. § 21.2(a)(2) (2007). Moreover, where a protester initially files a timely protest, and later supplements it with independent grounds of protest, the later-raised allegations must (continued...)

When a bidder or offeror represents that it will furnish end products of designated or qualifying countries (including domestic end products) in accordance with the Trade Agreements Act, it is obligated under the contract to comply with that representation. If prior to award an agency has reason to believe that a firm will not provide compliant products, the agency should go beyond the firm's representation of compliance with the Act; however, where the contracting officer has no information prior to award that would lead to such a conclusion, the contracting officer may properly rely upon an offeror's representation without further investigation. Leisure-Lift, Inc., B-291878.3; B-292448.2, Sept. 25, 2003, 2003 CDP ¶ 189 at 8. Where an agency is required to investigate further, we will review the evaluation and resulting determination regarding compliance with the requirements of the Act to ensure that they were reasonable. See Pacific Lock Co., B-309982, Oct. 25, 2007, 2007 CPD ¶ 191 at 4; cf. General Kinetics, Inc., Cryptek Div., B-242052, B-242052.2, May 7, 1991, 91-1 CPD ¶ 445 at 7 (GAO reviews the evaluation and resulting determination of country of origin under the Buy American Act to ensure they were reasonable).

The agency's evaluation and resulting determination of compliance was reasonable. As we noted in a recent decision, Pacific Lock Co., supra, at 3, neither the FAR nor DFARS provides guidance or examples to illustrate the circumstances under which an article is "substantially transformed" into a new and different item. Here, the contracting agency, in determining whether under Sea Box's proposal there would be a substantial transformation in the U.S., looked to whether significant work or processes necessary to the functioning as a refrigerated container system would occur in the U.S. Agency Supplemental Report, Jan. 24, 2008, at 13.

In this regard, our review of the record supports the agency's determination that the information available to contracting officials concerning Sea Box's production process indicated that significant production activity would take place in the U.S. before Sea Box's LFRS could be delivered to the agency. Specifically, as noted by the agency, while the work breakdown structure included in Sea Box's FPR allotted

---

(...continued)
independently satisfy the timeliness requirements. FR Countermeasures, Inc., B-295375, Feb. 10, 2005, 2005 CPD ¶ 52 at 9. Likewise, where a protester raises a broad ground of protest in its initial submission but fails to provide details within its knowledge until later, so that a further response from the agency would be needed for us to adequately review the matter, these later, more specific arguments and issues cannot be considered unless they independently satisfy the timeliness requirements under our Regulations. Planning and Development Collaborative Int'l, B-299041, Jan. 24, 2007, 2007 CPD ¶ 28 at 11; Biospherics, Inc., B-285065, July 13, 2000, 2000 CPD ¶ 118 at 12-13. Accordingly, Klinge's additonal argument, filed more than 10 days after it learned the basis for the argument, is untimely.

5 days for "Final Assembly" after the Chinese manufacturer of the containers received the first 3 refrigeration units, 10 days were allotted to "Install[ing] Interior components" after the joined refrigeration units and containers were received at Sea Box's facility in the U.S. (in New Jersey). Sea Box FPR, Work Breakdown Structure, at 1-2. Likewise, as noted above, Sea Box's discussion response stated that once the joined refrigeration units and containers were received in the U.S., Sea Box would perform "all additional and necessary manufacturing processes (e.g., electrical, CARC . . . painting, finishing) and parts integration as well as quality assurance testing and preparation for inspection and final shipment to the government." Sea Box Discussions Response, Sept. 12, 2007, at 3. Further, Sea Box estimated in its discussion response that "[t]he parts, materials and labor for those manufacturing processes which Sea Box performs in New Jersey so as to render the end item into a fully-functioning LFRS," accounted for a significant portion of the overall cost of LFRS, amounting to approximately [REDACTED] percent, with the cost of the Singapore refrigeration unit accounting for another [REDACTED] percent of overall cost and the "cost of the basic [Chinese] ISO container" itself accounting for [REDACTED] percent of the overall cost. Id.

Finally, the record indicates that the agency verified with Sea Box prior to award that significant, essential production activity remained to take place in the U.S. In this regard, agency counsel contacted Sea Box's director of contracts, who had prepared the firm's discussion response, to reconcile the detailed information showing substantial production activity in the U.S. with the general reference in Sea Box's discussion response to the Singapore RU's being "mechanically and electrically integrated within the basic ISO container structure" in China. The record indicates that counsel for the agency was advised by Sea Box's director of contracts, apparently after verification by the company's president, that, in fact, no work other than bolting the refrigeration unit in place onto the container was to be accomplished at the Chinese container factory. Declaration of Agency Counsel, Jan. 24, 2008.[3] Agency counsel advised the contracting officer of this clarification. Declaration of Contracting Officer, Jan. 29, 2008. The agency ultimately concluded that the joined unit subsequently shipped to the U.S. amounted to only two components bolted together, and not an LFRS, since, absent the significant work performed at the Sea Box facility in New Jersey, the two components could not perform as a refrigerated container system. Agency Report, Jan. 24, 2008, at 13.

---

[3] As further explained by Sea Box in response to the protest, the Chinese container is manufactured with one end open; the refrigeration unit is seated in a metal panel and the panel is simply bolted to the end of the container so as to close off the container and thereby facilitate shipment to the U.S. According to Sea Box, no work is performed in China other than bolting the panel to the container for shipment purposes; all other required work, including the addition of all other necessary parts and all mechanical and electrical labor operations and integration, is performed at Sea Box's facility in the U.S. Sea Box Comments, Dec. 24, 2007, at 3-4.

Thus, it appears from the record that the information available to the contracting agency prior to award concerning Sea Box's contemplated production process indicated that the Singapore refrigeration units would be simply bolted to the Chinese containers in China, and that the work and processes necessary to combine the two components into a functioning refrigerated container systems, which would be substantial in terms of effort (whether measured by time required or cost), instead would first occur in the United States. Based on this information, the USMC determined that the components of Sea Box's LFRS would be substantially transformed in the U.S. and thus meet the U.S.-made end product requirement. Given the information available to the agency, the agency's ultimate determination that there was no basis on which to question Sea Box's Trade Agreement Certificate of compliance with the Trade Agreements requirements was reasonable.[4]

---

[4] Klinge asserts that the communications between agency counsel and Sea Box's director of contracts, which occurred after the closing time for receipt of FPRs, amounted to discussions such that the agency was required to reopen discussions with Klinge as well. Klinge states that, had it been provided further discussions, "this would have included another opportunity to potentially revise its pricing and, perhaps more importantly, to address past performance, which was an area where the agency raised a concern and essentially discredited all explanatory information supplied in Klinge's written discussion responses." Klinge Comments, Jan. 28, 2008, at 19. Competitive prejudice is an essential element of a viable protest; where the protester fails to demonstrate that, but for the agency's actions, it would have had a substantial chance of receiving the award, there is no basis for finding prejudice, and our Office will not sustain the protest. Trauma Serv. Group, B-254674, B-254674.2, Mar. 14, 1994, 94-1 CPD ¶ 199 at 6; see Statistica, Inc. v. Christopher, 102 F.3d 1577 (Fed. Cir. 1996). Here, the protester's general contention that it might have "potentially revise[d] its pricing" during further discussions is insufficient to show competitive prejudice. M & M Investigations, Inc., B-299369.2, B-299369.3, Oct. 24, 2007, 2007 CPD ¶ 200at 5 n.3; see Myers Investigative and Sec. Servs., Inc., B-286971.2, B-286971.3, Apr. 2, 2001, 2001 CPD ¶ 59 at 3. In this regard, we note that Klinge, having already reduced its initial pricing in its FPR by [REDACTED] percent, makes no claim that it would have proposed during reopened discussions the still larger further reduction (approximately [REDACTED] percent absent a further reduction by Sea Box) required to displace Sea Box's low price. Likewise, Klinge had already been afforded an opportunity to address the very significant reported deficiencies in its past performance, and the protester has made no showing that there was additional, previously unavailable information that it could have furnished that would have shown the reports of unsatisfactory performance to be erroneous so as to overcome Klinge's significant evaluated disadvantage in this area.

Spare Parts

Klinge asserts that language in Sea Box's proposal also called into question Sea Box's commitment to provide "only U.S.-made, qualifying country, or designated country" end products under Contract Line Item Number (CLIN) 0003, under which offerors were to propose and price a parts support package sufficient to support the LFRSs for a period of up to 2 years operation at a rate of 600 hours per year. DFARS § 252.225-7021(c). Klinge notes that Sea Box stated in its discussion response that its package "is comprised of 32 discrete parts or items, substantially every one of which is manufactured in the United States." Sea Box Discussions Response, Sept. 12, 2007, at 4. Klinge asserts that each individual part in the support package was required to be U.S.-made, or the product of a qualifying or designated country, and that the "substantially every one of which" language called into question Sea Box's commitment to furnish only compliant parts.

We have no reason to question the agency's determination that the reference in Sea Box's FPR, when discussing the parts support package, to "substantially every one of which is manufactured in the United States," did not call into question Sea Box's commitment to furnish a compliant parts support package as reflected in Sea Box's overall certification that "each end product to be delivered under this contract . . . is a U.S.-made, qualifying country, or designated country end product." Defense Federal Acquisition Regulation Supplement (DFARS) § 252.225-7020, Trade Agreements Certificate. Not only did the "substantially every one of which" language not clearly evidence an intention to take exception to Sea Box's overall certification of compliance, but, in addition, Sea Box specifically stated in its discussion response that "one hundred percent (100%) of the CLIN 0003 2-Year Parts Support Package cost represents manufacturing efforts performed in the U.S." Sea Box Discussions Response, Sept. 12, 2007, at 4.[5]

AMBIENT TEMPERATURE REQUIREMENT

Klinge asserts that the agency unreasonably determined that Sea Box's proposed LFRS satisfied a Critical Performance Parameter in section 3.9.1 of the performance

---

[5] In contrast, as noted by the agency, Klinge's proposed list of 23 spare parts (appendix F to its proposal), included two parts that were described in a separate list in its proposal (appendix B) as being "Non-Designated Country" parts and non-U.S. parts, which would appear to render its proposal not compliant with the Trade Agreements Act. Klinge Comments, Jan. 23, 2008, at 3. In response to questions from GAO during this protest, Klinge explained that while it intended to use two Chinese-made parts in the LFRSs it would deliver to the agency, the two parts when included in the CLIN 0003 parts support package instead would be made in the U.S. or Mexico (a designated country). Klinge Comments, Jan. 23, 2008, at 3. Klinge's claimed intention was not apparent from its proposal.

specification–the requirement that the RU "start and operate in ambient external temperatures from -25° F. to +131° F." Specifically, Klinge questions whether the agency had a basis for determining that Sea Box's LFRS could start and operate in ambient temperatures up to 131° F.

In this regard, market research conducted by the agency prior to issuance of the solicitation led the agency to conclude that it was "uncertain" whether Klinge and Sea Box could meet the ambient temperature requirement with a commercial product. Market Research, LFRS, at 12. However, Sea Box included in its initial proposal a specification matrix indicating "[f]ull compliance" with respect to the ambient temperature requirement. Sea Box Initial Proposal, Specification Matrix. In its discussion letter to Sea Box (after the agency undertook discussions as part of its corrective action in response to Klinge's initial protest), the USMC referred to a Carrier specification for the Carrier refrigeration unit proposed by Sea Box that had not been included in Sea Box's proposal. Agency Report, Dec. 10, 2007, at 3-4. Noting that this specification indicated an "Ambient Range" of -22° F. to +130° F., Carrier Container Refrigeration Unit Technical Specifications, ThinLine Model 69NT40-541, the agency requested that Sea Box, "[p]lease provide specific test data or analysis that supports your claim of meeting the 131 degrees F. operating temperature Critical Performance Parameter." Discussion Letter to Sea Box, Sept. 6, 2007. (The agency likewise asked in its discussion letter to Klinge that it "[p]lease provide specific test data or analysis that supports your claim of meeting the 131 degrees F. operating temperature Critical Performance Parameter." Discussion Letter to Klinge, Sept. 6, 2007.) In response, Sea Box furnished a letter from Carrier stating that the refrigeration unit it was supplying to Sea Box had the ability to maintain the required temperatures in an ambient temperature of up to 132° F. because Sea Box's proposed container had a better "heat leakage" rate than a standard container. Sea Box Discussion Response, Letter from Carrier to Sea Box, Sept. 10, 2008. Sea Box's proposal was found to be compliant with the ambient temperature requirement.

Klinge asserts that the Carrier letter did not furnish a reasonable basis for finding Sea Box's proposal compliant with the ambient temperature requirement. We disagree. Although Klinge maintains that Sea Box was required to support its stated compliance with test data (similar to the data Klinge supplied in its own proposal), the language in the discussion letter on which Klinge relies did not establish a solicitation requirement for an offeror to furnish test data in support of its proposal such that failure to furnish such data required rejection of the proposal as unacceptable. Instead, as noted above, the agency's discussion letter simply requested that Sea Box (and Klinge) "[p]lease provide specific test data or analysis." Discussion Letters, Sept. 6, 2007. Here, consistent with the request, Sea Box furnished an analysis supporting its statement of compliance with the ambient temperature range requirement. In this regard, we conclude that, given that the Carrier standard commercial specification for Sea Box's proposed refrigeration unit had indicated an ambient range of up to 130° F., only 1 degree below that required,

Carrier's explanation that because Sea Box's proposed container had a better "heat leakage" rate than a standard container, the resulting LFRS would have a higher (and thereby compliant) ambient temperature range than otherwise, provided the agency with a reasonable basis for finding Sea Box's proposed LFRS compliant with the ambient temperature requirement.

The protest is denied.

Gary L. Kepplinger
General Counsel

DLA PIPER

# ATTACHMENT 2:
# U.S. Court of Federal Claims Decision
# (June 10, 2008, redacted version)

# In the United States Court of Federal Claims

No. 08-134C

(Filed: June 10, 2008)[1]

* * * * * * * * * * * * * * * * * * * * * * * *

KLINGE CORPORATION,

*Plaintiff,*

Trade Agreements Act ("TAA"); 19 U.S.C. §§ 2501 *et seq.*; 48 C.F.R. § 25.402(b); Trade Agreements Certificate; DFARS 252.225-7020; Substantial Transformation.

v.

THE UNITED STATES,

*Defendant,*

and

SEA BOX, INC.

*Intervenor.*

* * * * * * * * * * * * * * * * * * * * * * * *

*Richard P. Rector*, *Seamus Curley*, and *Samuel B. Knowles*, Washington, DC, for plaintiff.

*Christopher L. Krafchek*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Gregory G. Katsas*, Acting Assistant Attorney General, *Jeanne E. Davidson*,

---

[1] This opinion was first issued under seal on June 5, 2008. Redactions are indicated by the use of brackets.

Director, and *Kirk Manhardt*, Assistant Director, for defendant. *James B. McCloskey*, Marine Corps Systems Command, Quantico, VA, of counsel.

*Robert Farber*, Cherry Hill, NJ, for intervenor.

OPINION

This action is brought pursuant to the court's bid protest jurisdiction. Plaintiff, Klinge Corporation ("Klinge"), alleges that the United States, acting through the Marine Corps Systems Command ("the agency"), has acted arbitrarily, capriciously, and in violation of law, in awarding a contract for the delivery of "Large Field Refrigeration Systems" ("LFRSs") to the intervenor, Sea Box, Inc. ("Sea Box"). Plaintiff initially filed a complaint requesting permanent injunctive relief and a motion for preliminary injunction. We denied the motion for preliminary injunctive relief without prejudice on the grounds of mootness after defendant represented that the agency would voluntarily stay the procurement pending the protest. After initial review of the Administrative Record ("AR"), we canceled the planned exchange of cross-motions on the record and instead remanded to the agency for clarification of one aspect of the agency's decision. We permitted the parties to submit further explanations of their proposals to the agency for it to reconsider its decision in light of that new information. On remand, the agency confirmed the award to Sea Box. After the remand process, plaintiff was permitted to file an amended complaint.

Now pending are cross-motions for judgment on the record on plaintiff's request for permanent injunctive relief. Oral argument was held on May 29, 2008. As we announced at the oral argument, and for the reasons set out below, we grant plaintiff's motion for judgment on the administrative record and direct permanent injunctive relief.

BACKGROUND

On April 10, 2007, the agency issued Request for Proposal ("RFP") M67854-07-R-5060. Through the RFP, the agency sought to procure an indefinite quantity of LFRSs. These are large, portable, refrigerated containers. They consist of two primary components, a refrigeration unit ("RU") and an insulated container. This part of the proposal was covered by Contract Line Item Number "(CLIN") 0001. In addition, the RFP sought, among other things, a two-year parts support package. This part of the work

was covered by CLIN 0003. The procurement was to be conducted in accordance with Federal Acquisition Regulation ("FAR") part 15 as a best value, negotiated procurement for a commercial product. The RFP contemplated an indefinite delivery/ indefinite quantity contract with a minimum of 10 and a maximum of 300 units. The contract would have a base period of one year with four option years.

The contract was subject to the Trade Agreements Act ("TAA"), 19 U.S.C. §§ 2501 *et seq.* (2000). 48 C.F.R. § 25.402(b) (2007). The solicitation required offerors to certify, "[f]or all line items subject to the Trade Agreements clause of this solicitation . . . each end product to be delivered under this contract . . . is a U.S.-made, qualifying country, or designated country end product." Defense Federal Acquisition Regulation Supplement ("DFARS") 252.225-7020 (Trade Agreements Certificate). The DFARS standard clause 252.225-7021(a)(12), incorporated in the solicitation by Amendment No. 1 to the RFP (AR at 43) instructs offerors that a "US-made end product" is one that is "mined, produced, or manufactured in the United States" or is "substantially transformed in the United States into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was transformed." DFARS 252.225-7021(a)(12).

The "best value" award was to be based on four evaluation factors: (a) "Operational Effectiveness" (most important), (b) "Past Performance" (less important), (c) "Supportability" (least important), and (d) "Price" (evaluated but not rated). (AR at 42.) In making its determination, the agency considered "overall technical, past performance, and supportability merit to be of significantly greater importance than evaluated price. However, the importance of price as a factor in the final determination will increase with the degree of equality in the overall merits of the proposals." *Id.* Klinge, Sea Box, and three other offerors submitted proposals.

It was clear from Sea Box's initial proposal that its container would be built in China and that the RU would be shipped from Singapore to China to be joined with the container. China was listed in the schedule of work as the place of "Final Assembly." (AR at 105 (Sea Box Initial Proposal).) Sea Box certified, however, that Singapore was the "country of origin" of its LFRS. *Id.* at 157, 160. Singapore is a "qualifying country" under the TAA. In a separate entry on its proposal form, Sea Box indicated that the "Place of Manufacture," was "Outside the United States." *Id.* at 160. After review of the initial

proposals, the agency determined that Sea Box's proposal provided the "best value" and awarded the contract to Sea Box on July 12, 2007.

Klinge filed a protest with the General Accountability Office ("GAO") on July 30, 2007, challenging the award to Sea Box on two principal grounds: (a) the agency wrongfully eliminated Klinge from the competition based on a technical requirement not at issue here, and (b) Sea Box's proposal was not compliant with the TAA. (AR at 817-36.) In response to the protest, the agency informed offerors that it would take corrective action by admitting Klinge back into the competitive range and reopening discussions with offerors. The GAO dismissed the protest as academic. (AR at 837-40 (Dismissal of B-309930 by the GAO and Notice of Corrective Action from USMC, Aug. 8 & 27, 2007).)

The agency then issued written discussion questions to Klinge and Sea Box on September 6, 2007, which, among other things, asked the offerors to provide a TAA Certificate[2] and to explain how their manufacturing processes satisfied the TAA. *See* (AR at 842 (Agency Questions to Sea Box, question 3), 885 (Agency Discussion Questions to Klinge, question 2).) Sea Box and Klinge submitted responses on September 12 & 13, 2007, respectively. Klinge submitted a completed TAA Certificate and an explanation of the place of manufacture of each component as well as where subsequent integration of the components took place. Klinge explained that it acquires its containers from a Chinese subcontractor, [ ], and integrates them with its U.S.-made refrigeration unit at its Pennsylvania facility and there conducts all testing and other finishing labor. (AR at 854-60.)

Sea Box likewise submitted a completed TAA Certificate and accompanying narrative of its manufacturing process. Sea Box represented that its end product would be a "U.S.-made, qualifying country, or designated country end product" and that "[n]o supplies are other [sic] nondesignated country end products." (AR at 887.) Sea Box explained that its refrigeration unit, manufactured by [ ] in Singapore, is sent to China where it is "ultimately . . . mechanically and electrically integrated within the basic ISO container structure." *Id.* at 888. The container into which the refrigeration unit is integrated is also produced by CIMC in China. *Id.* Following

---

[2] DFARS 252.225-7020.

integration in China, "the containers are then shipped to Sea Box's East Riverton, New Jersey facility." *Id.* Sea Box further explained:

> Following receipt of the container at its New Jersey facility, and using its own employee labor force, Sea Box performs all additional and necessary manufacturing processes (e.g., electrical, CARC [Chemical Agent Resistant Coating] painting, finishing) and parts integration as well as quality assurance testing and preparation for inspection and final shipment to the government.

*Id.* It also provided the following cost breakdown for each component: the RU "constitutes [ ] percent [ ] of the cost of the LFRS;" the container constitutes "[ ]%) of the cost of the LFRS;" the parts, materials, and labor for all processes performed in New Jersey "constitute [ ] of the cost of the LFRS." *Id.* It emphasized that "not less than [ ] . . . of the CLIN 0001 LFRS cost represents manufacturing efforts performed in a designated country (Singapore) and the U.S." *Id.* Sea Box represented that it therefore complied "with the [TAA] provisions of the solicitation for this CLIN, and it has so certified." *Id.*

As part of its narrative discussion, Sea Box also represented that "substantially every one" of the 32 parts to be supplied under CLIN 0003 would be manufactured in the United States. (AR at 889.) At odds with that statement is the following assertion: "one hundred percent (100%) of the CLIN 0003 2-Year Part Support Package cost represents manufacturing efforts performed in the U.S." *Id.* There is no dispute that, because the parts are provided without alteration or incorporation into a new article, they must all be TAA compliant.

At the request of the agency, Klinge and Sea Box submitted Final Proposal Revisions ("FPRs") on September 20 and 21, 2007. *See* (AR at 897-951 (Klinge FPR), 953-1011 (Sea Box FPR).) Sea Box included a more detailed and slightly revised project schedule. The new schedule laid out a time line for the production and shipment of its LFRSs. From that schedule it is apparent that the preparation of the container sub-assemblies, "Final Assembly," ISO testing, Container Safety Convention ("CSC") certification, system testing, and contractor testing were all to take place in China before

shipment to the United States.[3] *Id.* at 991. Once received by Sea Box in New Jersey, Sea Box represented that it would perform inspections, install interior components, paint the unit, and perform contractor testing before shipment to the Marine Corps. *Id.* at 992.

The work schedule provided in the FPR is similar to the one included with Sea Box's initial proposal, though not identical. Of the actual manufacturing work, exclusive of shipping, [ ] take place in China, [ ] in Singapore, and [ ] in the United States.[4] *Id.* at 991-92. Despite the fact that the manufacturing process apparently was not changed, Sea Box replaced its original TAA certification, which stated that its LFRS was a product of Singapore, with a certification that the "Place of End Item Manufacture" was the United States.[5] *Compare* (AR at 157 (Sea Box Initial Proposal)) *with* (AR at 1011 (Sea Box FPR).)

There are at least three aspects of Sea Box's FPR, as supplemented by its written responses, which should have caused the CO to conclude that its TAA certification was not compliant. First, the schedule of work included in its FPR, although slightly revised, continued to list China as the place for final assembly, ISO testing, CSC testing, system testing, and contractor testing. This was consistent with the second red-flag: Sea Box represented in its written discussion responses that the RU was shipped to China where it is

---

[3] "ISO" refers to international container standards made uniform by the International Organization for Standardization. The solicitation required that "the LFRS system shall comply with the requirements of ISO 1496-2 as applicable." (AR at 50 (Performance Specification for Large Field Refrigeration Systems).) The ISO and CSC testing and certifications are performed only on the first three LFRSs to be manufactured. Thereafter, CIMC simply confirms that the units meet the required standards. (AR at 991-93.)

[4] Sea Box's initial proposal listed, exclusive of packing and shipping, [ ] of work in Singapore, [ ] in China, and [ ] in New Jersey. (AR at 105.)

[5] The "Place of End Item Manufacture" certification was provided for statistical purposes only. Sea Box omitted a TAA certification from its FPR, presumably because it had provided a completed certificate attached to its Discussion Question Responses (AR at 895).

"mechanically and electrically integrated within the basic ISO container structure." (AR at 888.) Third, Sea Box failed to unequivocally state that it intended to supply 100 percent compliant parts under CLIN 0003.

Despite the questions raised by Sea Box's proposal and Klinge's protest, there are no documents in the record, as it existed during this second evaluation, reflecting any consideration by the agency of the TAA compliance issue. Instead, as only later became apparent in the agency submission during a second GAO protest, agency counsel contacted counsel for Sea Box and orally expressed reservations about Sea Box's TAA compliance, although only with respect to CLIN 0001. According to an affidavit from agency counsel, which the agency supplied late in the GAO process, he felt assured by Sea Box's counsel, who in turn was passing on information from Sea Box's President, that Sea Box had inadvertently mis-characterized its manufacturing process in its written discussion responses, and that, in fact, mechanical and electrical integration did not occur in China. (AR at 1376-79 (Decl. of David P. Ingold, Jan. 24, 2008).) Based on that information, Sea Box was found to be technically acceptable. Klinge and a third offeror were also deemed acceptable. Klinge's price was approximately [ ] more than Sea Box,[6] however, and the award to Sea Box was confirmed on October 18 and 23, 2007. (AR at 1039-49). The agency placed an order for an initial delivery of three prototype LFRSs.

In the second protest at GAO, filed on November 6, 2007, Klinge once again raised the question of Sea Box's compliance with the TAA. Only after repeated opportunities to explain how it concluded that Sea Box was compliant, did the agency reveal that its previously unexpressed concerns were only allayed after telephone conversations between counsel. The affidavit from agency counsel reveals that the agency viewed the written submissions

---

[6]A third offeror was also deemed acceptable, although its price was approximately [ ].

to be insufficient. The oral assurances from Sea Box's counsel[7] materially disavowed the written submissions.[8]

The GAO rejected the protest. It concluded that the agency determination that Sea Box was TAA compliant was not unreasonable, given Sea Box's assertion that, after receipt of the LFRS in the United States, Sea Box would perform "all additional and necessary manufacturing processes (e.g., electrical, . . . painting, finishing) and parts integration as well as quality assurance testing and preparation for inspection and final shipment to the government." (AR at 1412 (GAO Decision, B-309930.2, Feb. 13, 2008) (quoting AR at 888).) The GAO counted it relevant that Sea Box estimated that [ ] percent of the overall cost of the LFRS was attributable to work performed and materials added in the United States, and that [ ] percent of the cost was attributable to the refrigeration unit coming from Singapore. The GAO concluded, based on Sea Box's assertions in its written explanation to GAO, that "no work is performed in China other than bolting the panel to the container for shipment purposes; all other required work, including the addition of all necessary parts and all mechanical and electrical and labor operations and integration, is performed at Sea Box's facility in the U.S." *Id.* at 1412 n.3. The GAO declined to consider Klinge's argument that the testing

---

[7] Sea Box did not retain outside counsel to represent it at the GAO and has not done so in the present action. It was and is represented by Mr. Robert Farber, who is employed by Sea Box and serves as its Director of Contracts. Mr. Farber is a licensed attorney and a member of the bar of this court. Mr. Farber had a substantial role in the preparation of Sea Box's proposal and FPR. As an employee of Sea Box, in order to prevent the disclosure of competition sensitive information, Mr. Farber was not admitted under the Protective Order at the GAO and is likewise not admitted under the Protective Order in this case.

[8] The Declaration of agency counsel indicates that, in response to an inquiry regarding the inconsistency among various documents concerning the processes performed in China, Mr. Farber "indicated that he had prepared the discussion responses and that he was not an engineer and that his discussion statement was incorrect to the extent that it indicated that mechanical and electrical integration took place in China." (AR at 1378.) After an apparent consultation with the president of Sea Box, Farber informed agency counsel that "no work other than bolting the refrigeration unit in place" took place in China. *Id.* at 1379.

performed in China could only take place if the unit was virtually completely assembled, which contradicts Sea Box's contention that the work in New Jersey fundamentally transformed the product. The GAO found that the argument was untimely presented. *Id.* at 1410-11 n.2.

Also raised in the second protest at GAO was the issue of CLIN 0003, a parts support package to support the LFRSs for up to two years. Like the units themselves, the spare parts provided by the offerors under CLIN 0003 were to be "only U.S.-made, qualifying country, or designated country" end products. Klinge challenged Sea Box's intent to comply with that requirement because of its statement that "substantially every one" (AR at 889) of its 32 parts or items was manufactured in the United States. The GAO relied on the agency's determination that such language was sufficient to support the TAA certification. In support, the GAO also quoted additional language from Sea Box's discussion responses that, "one hundred percent (100%) of the CLIN 0003 2-Year Parts Support Package cost represents manufacturing efforts performed in the U.S." (AR at 1414 (quoting AR at 889).)

After denial of its second GAO protest, plaintiff filed its complaint in this court on March 6, 2008. Along with its complaint, plaintiff filed a Motion for a Temporary Restraining Order and Preliminary Injunction. The court convened an initial telephone conference on March 7, 2008, and denied without prejudice the motion for preliminary injunctive relief based on the agency's agreement not to place any additional orders under the contract or to use the LFRSs already ordered. The AR was filed on March 11, 2008.[9] After preliminary review of the record and the pleadings, the court advised the parties via a telephone conference held on March 18, 2008, that it would remand to the agency so that it could further develop the record and explain its analysis of the TAA compliance issue. Our concern was triggered by what we viewed as clearly contradictory indications in Sea Box's submission with respect to its TAA compliance. We were particularly concerned that the CO dealt with these contraindications by relying on oral representations from Sea Box's in-house counsel, Mr. Farber, as to what the President of Sea Box had told him concerning the manufacturing activities that take place in China.

---

[9] The AR was twice supplemented by the agency to reflect documents added during the court ordered remand. The AR was also the subject of two unopposed motions to supplement filed by plaintiff. Both of those motions were granted on May 29, 2008.

Consequently, in our March 19, 2008 remand order, we directed the agency to "obtain from Sea Box a written explanation of the entire process of manufacturing, assembly, and testing of its refrigerated containers sufficient for the agency to adequately assess compliance." Klinge was also given a chance to supplement its explanation of how its proposal satisfied the TAA certification requirement.

In Sea Box's April 1, 2008 response to the remand, it included the following explanation to the agency:

> [T]he refrigeration unit as manufactured in and shipped from Singapore and the open-ended container structure made in China remain two separate and independent parts, the country of origin of each obviously remaining the country in which it was manufactured.
>
> Following that, at the facility in China, and while being held in position by a forklift, the sturdy metal panel which surrounds the refrigeration unit is simply bolted to the open container, effectively closing off the open end. This process consists of [
>
> ]. . . .
>
> . . . .
>
> The container bolts and closures of this preliminary container assembly are then sealed for Customs inspection purposes, and such assembly as it exists at that moment is transported by U.S. flagged carrier to Sea Box's facility in New Jersey so as to undergo further extensive manufacturing processes.

(AR at 1420.)

> All other work required to convert and transform these parts into the end product . . . including mechanical, electrical and painting labor operations and integration, quality assurance testing and preparation for inspection and final shipment to the government, is performed in the United States . . . .

*Id.* at 1422. We omitted from this statement a lengthy explanation of why it is useful and efficient to bolt the refrigeration unit to the container in China. We view this as non-responsive to the order and not relevant to the issue.

We sought an explanation of the "entire process of manufacturing, assembly and testing" specifically in order to assess what Sea Box meant in its schedule of work that "Final Assembly" and testing would take place in China. The detail furnished by Sea Box is in the form of an attachment to its April 1 letter to the CO. There it sets out in great detail, over eleven pages, activities which take place once the unit is in New Jersey. From what the court can discern, the following work is performed in New Jersey: installation of an "E track system" on the bottom of the unit, installation of a pressure relief valve, a light and a transformer to operate the light, painting, marking, inspection, and testing. By contrast, no detail is furnished concerning what Sea Box earlier described in its FPR and its responses to agency inquiries as the "Final Assembly," testing, and "mechanical and electrical" integration which would take place in China.

In order to respond to potential confusion concerning CLIN 0003 (spare parts), Sea Box, after consultation with its parts supplier, admitted that 29 percent[10] of the costs of its parts included in CLIN 0003 were not sourced from the United States or from a designated country.[11] *Id.* at 1422. Because of this admission and the fact that nearly one year had passed since the solicitation had been issued, the record reflects that the CO intended to cancel the award to Sea Box and the solicitation and do new market research with the idea of issuing a new solicitation at a later time. (AR at 1460 (First CO Mem., Apr. 2, 2008).) The agency, however, changed course shortly thereafter and defendant filed a motion to extend the stay of proceedings in order to give the agency more time to solicit further information from both offerors regarding TAA compliance. We granted that motion on April 8, 2008.

---

[10] In the previous paragraph, Sea Box stated that "three-quarters" of its CLIN 0003 parts were "manufactured in the United States or designated countries." It is not exactly clear where the inconsistency arises, but it may be the difference between the actual percentage of parts and the percentage of the overall costs of the parts package that those parts represent.

[11] As defendant concedes in its latest brief, "Sea Box failed to provide an explanation or reconcile this latest certification of TAA compliance with its FPR or prior submissions to GAO." (Def.'s Br. in Resp. 19.)

Both Sea Box and Klinge provided further supplementation regarding their TAA compliance on April 10 and 11 respectively. Sea Box changed its prior explanations by representing that "the country of origin for each and every one of the thirty-two (32) individual parts . . . is either the United States or a designated country." (AR at 1464 (Sea Box letter to the CO, Apr. 10, 2008).) In order to make this representation, however, it explained that it had to get assurance from its primary supplier that the supplier would source all parts from compliant locations, albeit at higher cost to itself. This assurance meant that all 32 spare parts were now to be acquired from the United States or other designated countries. The change also resulted in minor changes in the part descriptions and catalog numbers. Based on this representation, the agency confirmed the award to Sea Box.

The CO wrote on April 14, 2008, that, "it is my intent to allow Sea Box to continue performance of this contract based on its most recent representations." (AR at 1483 (Second CO Mem., Apr. 14, 2008).) With respect to concerns about CLIN 0003, the CO was satisfied that he could deal with any possible failure to furnish compliant spare parts in the future, should the need arise. With respect to CLIN 0001, he relied on Sea Box's representation that, "it would ship its containers and refrigeration units directly to the U.S. if required to be compliant with the TAA." *Id.* at 1482. It remained his view, however, that

> Sea Box is compliant with the TAA regarding . . . CLIN 0001 by virtue of the substantial transformation that takes place at the Sea Box manufacturing facility in New Jersey. The mere bolting of the Singapore refrigeration unit into the Chinese ISO container for shipment to the U.S. does not in my opinion make Sea Box noncompliant with the TAA.

*Id.* We take this to mean that, left to its own, the agency would not insist on manufacture in the United States.

In response, Klinge has filed an amended complaint. It contains five counts. Count I concerns the agency's acceptance of Sea Box's proposal, despite asserted problems with CLIN 0001's compliance with the TAA. Count II asserts that Sea Box made material misrepresentations to the agency with respect to CLIN 0001, which were relied on by the agency. Count III alleges that the conversations held after the cutoff date for FPRs constituted improper discussions. Count IV contends that CLIN 0003, the two year parts support

package, independently failed to meet the requirements of the TAA. Count V alleges a material misrepresentation by Sea Box in connection with the parts support package, which, once again, is alleged to have been relied on by the agency. It is sufficient for our purposes to address only Count I.

DISCUSSION

To obtain injunctive relief in this bid protest, Klinge must demonstrate four things. First, it must demonstrate success on the merits, which in this case means that the agency's conduct was arbitrary, capricious, or not in accordance with law.[12] Second, it must show that plaintiff will suffer irreparable injury if relief is not granted. Third, the harm to plaintiff must outweigh the harm to the government and intervenor. Fourth, the public interest should weigh in favor of relief. *PGBA v. United States*, 389 F.3d 1219, 1229-30 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)).

*Success on the Merits*

In the context of a bid protest, the court reviews agency action under the standards of the Administrative Procedure Act ("APA"), 28 U.S.C. § 706(2)(A) (2000). *See* 28 U.S.C. § 1491(b)(4) (2000). Deference is generally given to the agency upon a showing of a "reasoned explanation for its decision which is in accord with material facts contained in the administrative record." *Nutech Laundry & Textile, Inc. v. United States*, 56 Fed. Cl. 588, 593 (2003). If the record before the court does not provide an "adequate basis for review," *id.*, the court should "remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *accord Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (stating that a remand is proper under the APA when, *inter alia*, the agency's action is not

---

[12]This test comes from the Administrative Procedure Act, 28 U.S.C. § 706(2)(A), which this court applies under the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, now codified at 28 U.S.C. § 1491(b)(4). The more particularized test that has evolved with respect to bid protests is that the award may be set aside if either the procurement official's decision lacked a rational basis, or the procurement involved a prejudicial violation of law. *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004).

adequately explained in the record). The lack of an adequate explanation for how the agency found Sea Box compliant with the TAA is what prompted the remand here.

In light of Sea Box's offer during remand to move its manufacturing operation entirely to the United States, a question arises: must the court consider Sea Box's proposal as it existed in October 2007 or as it existed after the remand. During oral argument, plaintiff and government expressed the view that the question before the court is the reasonableness *vel non* of the CO's original award decision.[13] We agree. The purpose of the remand was to obtain clarification of the proposals as they existed, not to turn clarification into an opportunity for modification. The remand order called for the agency to obtain a description of the "entire process of manufacturing, assembly and testing." The agency thus could supplement its understanding of what the parties had offered at the time of award. Sea Box did not, however, limit itself to explaining its existing proposals. Instead it offered, in the April 1, 2008 letter from Sea Box's counsel to the CO, the possibility that Sea Box could completely alter its method of manufacture by shipping the refrigeration unit and the container to the United States. *See* (AR at 1424.) We do not view this as properly part of Sea Box's FPR. We note also that the offer was reluctant and conditional, and, in any event, not accepted by the agency.

For the agency to compare proposals fairly and equally, and to give competitive offerors a fair basis for comparison, they cannot continue to be in flux. If Sea Box is allowed, after award, to change its place of manufacture, it has benefitted from costing a proposal on the assumption it was made in China. Altering the location of manufacture is not a "clarification" of a proposal, it is a material change. We are not dealing here with a clerical error or omission. Even an inadvertent misrepresentation would be prejudicial to other bidders who priced their proposals on the assumption that the agency would enforce the TAA. It is fundamentally unfair for Sea Box to receive the award, and only if challenged, be forced to comply.

---

[13]In fairness, the government also argues that there were insufficient indicators of non-compliance to turn this into a protestable issue. It argues that the matter was one of contract performance. We agree with the government that certifications issues are typically matters of performance. As we explain below, however, an exception arises when the deficiency is patent.

The TAA gives effect to the World Trade Organization Government Procurement Agreement. Pursuant to the TAA, the United States Trade Representative waives the Buy American Act ("BAA")[14] and other statutory provisions for products and services provided by vendors of signatory nations. When an acquisition meets the TAA threshold, the article to be acquired must be either "wholly the growth, product, or manufacture of [a signatory or designated] country" or, in cases where the article "consists in whole or in part of materials from another country . . . , it has been substantially transformed into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed." 19 U.S.C. § 2518(4)(B) (2000). The relevant inquiry here is where the article last underwent a substantial transformation. The test contained in the statute itself is drawn from the Supreme Court's definition of the term "manufacture" under the Tariff Act of 1890: "Manufacture implies a change, but every change is not a manufacture and yet every change in an article is the result of treatment, labor and manipulation. . . . There must be transformation; a new and different article must emerge, 'having a distinctive name, character, or use.'" *Anheuser-Busch Brewing Ass'n. v. United States*, 207 U.S. 556, 562 (1908) (quoting *Jos. Schlitz Brewing Co. v. United States*, 181 U.S. 584 (1901)). The proper inquiry is thus at what point the article acquires its distinct name, character, or use. In this instance, we think that it was plainly China.

The government argues that compliance with the TAA is a matter strictly between the agency and the contractor to be dealt with after performance begins. Typically, that would be the case. When a solicitation contains a TAA certification requirement, the agency is entitled to rely upon an offeror's certification. The certification in turn will give rise to a contractual obligation on the part of the successful offeror to provide a TAA compliant product. *Wyse Technology, Inc.*, B-297454, 2006 CPD ¶23, at *13 (Comp. Gen. 2006). When, however, prior to the award, the agency has "reason to believe that a firm will not provide compliant products, the agency should go beyond a firm's representation of compliance." *Leisure-Lift, Inc.*, 2003 B-291878.3, B-292448.2, 2003 U.S. Comp. Gen. LEXIS 178, at *19 (Comp. Gen. 2003); *see also Harris Corporation Broadcast Division*, B-255302, 94-1 CPD ¶107, at *12 (Comp. Gen. 1994) ("An agency may reasonably rely upon an offeror's certification of compliance . . . in the absence

---

[14] 41 U.S.C. §§ 10a-10d (2000).

of information indicating that the certification is inaccurate."). This means that if an offeror's submission contains information that calls into question its TAA compliance, the agency has a duty to make reasonable inquiry and satisfy itself that the product offered meets the terms of the act. Failure to do so in the face of clear indications of non-compliance would be arbitrary and capricious and not in accordance with law. Consequently, we agree with plaintiff, that in such a circumstance, a bid protest can be lodged predicated on the argument that either the successful offeror was not in fact TAA complaint or that the agency could not have reasonably determined that it was compliant.

In this case, beginning with Sea Box's original proposal, the agency had cause to inquire further into Sea Box's TAA compliance. Sea Box's initial certification that its LFRS was an end-product of Singapore was fundamentally inconsistent with the rest of its proposal. Sea Box offered a RU manufactured in Singapore, which was then shipped to its subcontractor in China where it was, at the very least, physically combined with the container. The container is never physically present in Singapore and thus it is impossible for the constituent parts to have been substantially transformed in Singapore. On the face of Sea Box's initial proposal, therefore, the agency could not have relied on the TAA certification without further inquiry. In addition, Sea Box's schedule of work listed China as the place of "Final Assembly." (AR at 105.) Despite this patent inconsistency, the agency did not make further inquiry until after Klinge's first protest at the GAO.

After the filing of the first protest at the GAO, the agency did set about on a course of corrective action. It specifically asked both Klinge and Sea Box to explain how their proposals were TAA compliant. Sea Box once again provided information that was inconsistent with TAA compliance: "Following its manufacture in Singapore, the refrigeration system is then shipped to [China] where it will ultimately be mechanically and electrically integrated within the basic ISO container structure." (AR at 888 (Sea Box Discussion Question Resps. Sept. 12, 2007).) The statement that the ultimate mechanical and electrical integration takes place in China supports the representation that China would be the place of "Final Assembly." This statement makes sense given the additional representation that the LFRS would be operationally tested in China. These factors strongly suggest that Sea Box's LFRSs come into existence in name, character and use while they are in China.

Sea Box also provided a cost breakdown for activities performed in each country, concluding that "[ ] . . . represents

manufacturing efforts performed in a designated country (Singapore) and the U.S. Sea Box thus represents that it complies with the [TAA] . . . and it has so certified." *Id.* As we explain below, the agency should have realized that this purported test was not drawn from the TAA. The listing of respective percentages of costs attributable to each country is unresponsive to the relevant TAA inquiry of "substantial transformation."

Despite the continued inconsistencies in Sea Box's written submissions, agency counsel advised the CO that given Sea Box's representation that "they understood their obligations under the TAA and that the mere shipment of the Singapore refrigeration unit to China for placement in the container there did not serve to make them TAA noncompliant." (AR at 1379 (Decl. of David P. Ingold).) There are three problems with this statement. First, it was up to the agency to decide whether there was a TAA problem, not Sea Box. Second, the summary statement that the refrigeration unit is merely "placed" in the container is contradicted by the representation that "Final Assembly" and electrical and mechanical integration occur in China and are sufficient to permit operational testing. Third, it should have been apparent from Sea Box's reference to a legal test drawn from the BAA[15], rather than the TAA, that it was applying the wrong inquiry, hence its reference to the percentage of cost attributable to Singapore and the United States.

In its briefing in response to plaintiff's motion for judgment on the AR, Sea Box again disavows its earlier representations. The statement in the September 12, 2007 discussion responses that the unit is mechanically and electrically integrated in China is, according to Sea Box, a statement that should be ignored as coming from counsel. If we ignored counsel's representations, however, we would have no reason to credit counsel's statement in the same submission that "all additional and necessary manufacturing processes (e.g., electrical . . . ) and parts integration as well as quality assurance testing and preparation for inspection and final shipment to the government." (AR at 888.) At some point, Sea Box must be held to its written representations.

---

[15] Under the BAA, offerors are generally required to offer domestically manufactured products. *See* 41 U.S.C. §§ 10a-10d (2006). "For manufactured end products . . . The cost of domestic components must exceed 50 percent of the cost of all the components." 48 C.F.R. § 25.101(a) (2007).

It is apparent that the LFRS is substantially transformed in China. In its initial proposal, Sea Box included a schedule for production of its LFRS. It reflected that the containers are "finally assembled" in China and that the "system" is tested there. (AR at 105.) The total amount of work time in China was to be [ ]. Work time for the refrigerated unit in Singapore is listed as [ ]. Only [ ] were to be spent working on the combined unit after it arrives in the United States. In its FPR, Sea Box lists the following activities to take place over the course of [ ] in China: "Prepare sub-assemblies" [ ], "Receive Reefer Units" [ ], "Final Assembly" [ ], "ISO Tested" [ ], "CSC Certified" [ ], "Test System" [ ], and "Contractor Test" [ ].[16] (AR at 991.) In its March 28 and April 1, 2008 letters to the CO, Sea Box states that "*[t]he LFRS* is tested and certified for ISO purposes. This testing was performed in China on the container structure with the refrigeration unit installed."[17] (AR at 1423, 1579 (emphasis supplied).) ISO Standard 1496-2 testing has a number of elements, but any reasonable construction of them makes it clear that the "unit" being tested is an operational LFRS.[18] In fact, the RFP specifically required that "the LFRS system shall comply with the requirements of ISO 1496-2." (AR at 50.) At the point at which a unit is ISO certified, it must be capable of functioning as a LFRS.

As we also explained at the conclusion of oral argument, a number of considerations offered by Sea Box and apparently accepted by the CO, we find

---

[16] An additional [ ] are listed for packing and shipping to Sea Box in New Jersey.

[17] The March 28 letter was apparently a draft that was inadvertently sent to the agency. Sea Box sent an additional and nearly identical letter shortly thereafter on April 1. The March 28 letter was the subject of plaintiff's second motion to supplement the AR.

[18] For example, Test No. 12–Weatherproofness–requires: "On completion of the test, no water shall have leaked into the thermal container, and the refrigeration or heating unit shall function properly." Test No. 13–Airtightness–requires that the refrigeration unit be in place. Test No. 15a)–Test of performance of a thermal container under refrigeration by a mechanical refrigeration unit–is particularly telling as it requires the running of the "unit" for a period of eight hours with "the temperature cycling about a constant level."

irrelevant. First, the fact that ISO testing is only of the three prototypes does not alter the result. We take account of the ISO testing, not as an item of work, but, as we explained above, because it demonstrates conclusively that the LFRS was sufficiently functional in China to be tested for its ultimate purpose. Indeed, the intervenor itself refers to it as a LFRS at that point. *See* (AR at 1423, 1579.)

Second, the fact that "[ ]%) . . . represents manufacturing efforts performed in a designated country (Singapore) and the United States" (AR at 1422) is also not controlling. Because of the assembly of the unit in China, the inquiry under the TAA has to be where the substantial transformation takes place. The origin of parts or the expenditure of labor prior to arrival in the transforming-country becomes immaterial.

Third, the fact that the container can be broken apart into its two primary constituent components, which then revert to their pre-assembly character, is also irrelevant. The question is what the name, character and use of the unit is after assembly.

Fourth, the intervenor's motivations for how it organizes the process of manufacture is not material for purposes of testing TAA compliance. As we explain above, the fact that it is convenient for Sea Box to stabilize the container prior to shipment by uniting it to the refrigeration unit in China is irrelevant to the question of substantial transformation.[19]

At no point has the CO given a satisfactory justification for his reliance upon the characterization of what occurs in China as the "mere bolting of the Singapore refrigeration unit into the Chinese container for shipment to the U.S." It should have been readily apparent to the CO that Sea Box's informal oral characterizations of its proposal were inaccurate. Nor has the government offered an explanation during the protest for how the character, use or name of the unit is any different on its way from China, than it is after the finishing work in New Jersey. Although the most recent submission by Sea Box provides much greater detail about the work in New Jersey, we view none of this as transformative of the name, character or use of the LFRS. Painting,

---

[19] We note, in any event, that Klinge ships the same container from China to the United States prior to assembly.

installation of an interior light and accompanying transformer, and bolting on of skids, for example, are simply finishing work. By the time it arrives in New Jersey, the unit has been "mechanically and electrically integrated" and "finally assembled" and functionally tested. The fact that the unit did not meet all the contract requirements is not controlling. The government did not make the case that the additional elements performed in New Jersey meet the "substantial transformation" test.

In sum, there can be no question that, up until April 1, 2008, when Sea Box offered to make the LFRS in New Jersey, the CO could not have treated the proposal as clearly TAA compliant with respect to CLIN 0001. At a minimum, there were so many statements suggesting that the critical functions of turning the product into an LFRS occurred in China, that the CO should have insisted on more information. We view Sea Box's counsel's disavowals of these contraindications as not a substantial basis for eliminating concern. Sea Box's submissions to the agency, to the GAO, and to this court have been materially inconsistent and confusing, and they have been predicated on an incorrect understanding of the relevant test. It was arbitrary and capricious to ignore this fact. We conclude that it was arbitrary and capricious of the agency to accept Sea Box's proposal as satisfying the TAA certification requirement. In light of our conclusions with respect to CLIN 0001, it is unnecessary to address CLIN 0003 or any of the other arguments in Counts II-V of the amended compliant.

*Klinge Will Suffer Irreparable Injury Without Injunctive Relief*

It is well established in this court when considering the issue of irreparable injury that the question is whether the "plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993); *see also Serco Inc. v. United States*, Nos. 07-691C, et al., 2008 U.S. Claims LEXIS 69, at *132-33 (Fed. Cl. Mar. 5, 2008); *Weeks Marine, Inc. v. United States*, 79 Fed. Cl. 22, 36 (2007). The only other relief available in a bid protest is bid preparation costs. Bid preparation costs have been held inadequate for two reasons: loss of opportunity to earn profits on the contract, *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 369-70 (2004), and/ or failure to have a bid "fairly and lawfully considered." *Id.* at 370 (citing *e.g.*, *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 n.25 (2000); *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 398 (1999)).

Here, plaintiff alleges that without an injunction it will not have its bid "fairly and lawfully considered." Defendant baldy asserts to the contrary but provides no reasoning as to why. We agree with plaintiff. When, as here, the agency has failed to properly consider one of the offeror's compliance with a statutory requirement of the procurement, the protestor loses the opportunity to have had its bid "fairly and lawfully considered." That injury is irreparable outside of injunctive relief.

*The Harm to Klinge Outweighs the Harm to the Agency*

As cited above, the harm to the plaintiff must outweigh the harm to the government and intervenor. Although the defendant asserts that the harm to the agency would be outweighed by any harm to the protestor, it provides no basis for such a conclusion. The agency will undoubtedly still be able to procure LFRSs in a timely manner under the same solicitation if it so chooses. As plaintiff points out, during the initial March 7, 2008 status conference, government counsel stated that, "[i]f the agency finds that the systems are noncompliant, then the intent is to terminate for convenience, and award to the next offeror, who in this case is plaintiff . . . ." (Status Conf. Tr. 45, Mar. 7, 2008). Delay is also apparently not a concern given that, as late as April 2, 2008, the CO planned to terminate the contract and do new market research in anticipation of an entirely new solicitation. Additionally, any harm suffered by the defendant or intervenor is entirely of their own making. *See Serco Inc.*, 2008 U.S. Claims LEXIS at *135-36. The failure to "fairly and lawfully consider" plaintiff's proposal outweighs any potential harm to the agency or the intervenor.

*Protecting the Integrity of the Procurement Process Serves the Public Interest*

The public interest must weigh in favor of injunctive relief. The public interest is served by ensuring that the government conduct fair and legal procurement procedures, giving honest and fair consideration to all bids. *Aeroplate Corp. v. United States*, 67 Fed. Cl. 4, 13 (2005). Preserving the integrity of the public procurement system is in the public interest. *MVM, Inc. v. United States*, 46 Fed. Cl. 137, 143 (2000); *Day & Zimmerman Servs. v. United States*, 38 Fed. Cl. 591, 610 (1997). The integrity of the procurement process necessarily includes the requirement that government officials follow applicable procurement law and regulation. *Rotech Healthcare, Inc. v. United States*, 71 Fed. Cl. 393, 431 (2006). Here, the interest weighs in favor of preventing the government from awarding a contract in contravention of the

TAA and in preventing the government from failing to make proper inquiry into TAA compliance when it had a duty to do so.

## CONCLUSION

For the reasons expressed above and as stated on the record on May 29, 2008, plaintiff's motion for judgment on the administrative record is granted. The award to Sea Box was arbitrary, capricious, and not in accordance with law. The Marine Corps is enjoined from accepting further performance of the contract with Sea Box and is directed to terminate the contract to Sea Box. Costs to plaintiff.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge

DLA PIPER

ATTACHMENT 3:
U.S. Court of Federal Claims Termination Order
(May 29, 2008)

# In the United States Court of Federal Claims

No. 08-134C
(Filed: May 29, 2008)

* * * * * * * * * * * * * * * * * * * * * * * * *

KLINGE CORPORATION,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant,*

and

SEA BOX, INC.

*Intervenor.*

* * * * * * * * * * * * * * * * * * * * * * * * *

## ORDER

Pending are the parties' cross-motions for judgment on the administrative record. Oral argument was held on May 29, 2008. Also pending are plaintiff's two unopposed motions to supplement the administrative record and intervenor's unopposed motion to correct the transcript of the status conference held on April 17, 2008.

For the reasons stated on the record at the conclusion of oral argument, the following is ordered:

1. Plaintiff's two motions to supplement the administrative record and intervenor's motion to amend the transcript are granted.

2. Plaintiff's Motion for Judgment on the Administrative Record is granted.

3. Defendant's and Intervenor's cross-motions for judgment on the administrative record are denied.

4. The agency is ordered to terminate the contract awarded to Sea Box under Request for Proposals No. M67854-07-R-5060.

An opinion more fully detailing the reasons for granting plaintiff's motion will be filed shortly.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge

DLA PIPER

# ATTACHMENT 4:
# U.S. Court of Federal Claims Judgment
# (June 5, 2008)

# In the United States Court of Federal Claims

**No. 08-134 C**

**KLINGE CORPORATION,**
**Plaintiff,**

**JUDGMENT**

**v.**

**THE UNITED STATES,**
**Defendant,**
**and**

**SEA BOX, INC.,**
**Intervenor.**

Pursuant to the court's Opinion and Order, filed June 5, 2008, granting plaintiff's motion for judgment on the administrative record,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the award to Sea Box was arbitrary, capricious, and not in accordance with law. The Marine Corps is enjoined from accepting further performance of the contract with Sea Box and is directed to terminate the contract to Sea Box. Costs to plaintiff.

John S. Buckley
Acting Clerk of Court

**June 5, 2008** By: s/Lisa L. Reyes

Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $455.00.